**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---

*In re*

IRISH BANK RESOLUTION CORPORATION
LIMITED (IN SPECIAL LIQUIDATION),

        Debtor in a foreign proceeding.

Chapter 15

Case No. 13-12159 (___)

---

## DECLARATION OF KIERAN WALLACE IN SUPPORT OF VERIFIED PETITION UNDER CHAPTER 15 FOR RECOGNITION OF A FOREIGN PROCEEDING

I, Kieran Wallace, pursuant to 28 U.S.C. § 1746, hereby declare under the penalty of perjury as follows:

1. I am a partner in KPMG's restructuring practice in Dublin, Ireland. On 7 February 2013, the Irish Minister for Finance (the "**Finance Minister**") issued the Special Liquidation Order (the "**Special Liquidation Order**") appointing my colleague Eamonn Richardson and me as joint special liquidators (the "**Special Liquidators**") for Irish Bank Resolution Corporation Limited (in special liquidation) ("**IBRC**" or the "**Debtor**") pursuant to section 4 of the Irish Bank Resolution Corporation Act 2013 (the "**Bank Resolution Act**") for the purposes of winding up and liquidating IBRC in an orderly manner (the "**Irish Proceeding**").

2. I submit this declaration in support of the Verified Petition Under Chapter 15 for Recognition of a Foreign Proceeding (the "**Petition for Recognition**"), together with the form chapter 15 petition for the Debtor (the "**Chapter 15 Petition**"), filed contemporaneously herewith, which seeks recognition of the Irish Proceeding taking place in Ireland in respect of IBRC as a foreign main proceeding.

3. I am authorized to act as the foreign representative of IBRC, to commence this case under chapter 15 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the

"**Bankruptcy Code**") and to submit this declaration pursuant to the Special Liquidation Order and the Bank Resolution Act. I am also authorized to exercise all and any powers provided for under the Bank Resolution Act either jointly with my colleague Eamonn Richardson or individually on behalf of IBRC.

4. Except as otherwise noted, the facts and matters stated herein are gained from information within my own knowledge and belief or acquired by me or supplied to me in the performance of my duties in relation to IBRC. To the extent that the contents are not derived from my own knowledge and belief, I have indicated the source of such statement as may be appropriate.

## BACKGROUND

5. IBRC, a state-owned banking entity, was created on 1 July 2011 under the Credit Institutions (Stabilisation) Act 2010 (the "**Credit Stabilisation Act**") as the successor to Anglo Irish Bank Corporation Limited ("**Anglo**") and Irish Nationwide Building Society ("**INBS**"), which were merged into Anglo on the same day.

6. Anglo was established in Dublin in 1964 and was at one time the third largest financial institution in Ireland. Anglo provided business banking, treasury and wealth management services to retail, corporate and institutional customers. It had more than 1,000 employees and operated in various jurisdictions, including Ireland, the Czech Republic, Luxembourg, Jersey, Germany, the United States, the United Kingdom, the Isle of Man and Belgium.

7. INBS was headquartered in Dublin, Ireland and was founded in 1873. It was originally a mutual building society that focused historically on residential real estate lending. However, in the early 2000s, INBS became more involved in commercial real estate lending. Its business operations mainly targeted customers in Ireland and the United Kingdom.

2

8.    As a part of the Irish government's attempt to address the financial difficulties experienced by the Irish banking sector beginning in the late 2000s, the Irish legislature enacted the Credit Stabilisation Act as a mechanism under which the businesses of Anglo and INBS could be merged into IBRC and wound down in an organised fashion.    Under the Credit Stabilisation Act, IBRC was no longer permitted to make loans to new customers.    However, where appropriate, IBRC could extend credit to existing borrowers in order to maximize recoveries.

9.    At the time of its formation, IBRC's primary objectives as a wind down and asset recovery organisation were, among other things, to maximize the recovery of the commercial loan book, work out the residential mortgage book which it acquired from INBS and sell the portfolio of properties that comprised the former INBS branch network, in an effort to maximize returns for the Irish taxpayer and minimize capital losses suffered by the Irish government as its sole shareholder.    In accordance with commitments made by IBRC and the Irish government to the European Commission, IBRC is prohibited from participating in the new lending or deposit markets.

**IBRC's Corporate Structure**

10.    IBRC is the parent company to more than 100 directly and indirectly wholly-owned subsidiaries organized under the laws of various jurisdictions, including the United States. A simplified corporate organisation chart is attached hereto as **Exhibit A**.

11.    IBRC owns directly and indirectly more than 30 subsidiaries organized under the laws of various jurisdictions in the United States.    Pagnol Limited, one of IBRC's wholly-owned subsidiaries, owns IBRC Boston Corporation, IBRC New York Corporation and IBRC Chicago Corporation.    Each of those entities operated a representative office of Anglo in Boston, New York and Chicago, respectively.    Other than certain intercompany loans and transactions, no

loans were made by any of these three entities. IBRC at all times issued loans, while IBRC Boston Corporation, IBRC New York Corporation and IBRC Chicago Corporation provided marketing, loan administration and other support services in relation to the making of loans by IBRC in the United States.

12.    As of the date hereof, IBRC Chicago Corporation, IBRC New York Corporation and IBRC Boston Corporation do not hold any assets. The Chicago office was closed in December 2009, the New York office was closed in January 2012 and the Boston office was closed in September 2012 in conjunction with the sale of substantially all of IBRC's U.S. loan portfolio. However, certain of the loans in the U.S. loan portfolio (the "**Remaining U.S. Loans**") were not sold because the applicable loan documents required the consent of the borrower for loan assignment. IBRC was unable to obtain such consent at that time. The Remaining U.S. Loans were transferred to IBRC's Dublin and London offices for management when the Boston office closed in 2012.

**IBRC's Assets and Liabilities**

13.    IBRC's principal asset consists of its loan book, which was valued at approximately €25 billion as of June 2012. Approximately 70% of IBRC's loans were made to Irish borrowers, governed by Irish law and managed and held in Ireland.

14.    IBRC's loan book, the vast majority of which are loans governed by Irish law, comprised commercial development loans, residential development loans, business banking loans and residential mortgages. In contrast, less than 5% by value of the loan book is governed by U.S. law. In the United States, commercial lending to investment and development properties constituted approximately two-thirds of the U.S. loan book. The other one-third of the U.S. loan book consisted of loans made to residential developers. There were no significant loans made in the business banking or residential mortgage sectors of IBRC's U.S. loan book.

4

15.     As of 30 June 2012, IBRC had total liabilities of approximately €50 billion, over 90% of which was owed to the Central Bank of Ireland (the "**CBI Debt**"). In March 2013, the Central Bank of Ireland ("**Central Bank**") sold and assigned its interest in the CBI Debt to National Asset Resolution Limited, which is a subsidiary of the National Asset Management Agency ("**NAMA**"). Most of IBRC's other creditors, parties-in-interest and those who would be most affected by the Irish Proceeding are located in Ireland. Currently, as the Irish Proceeding progresses, professionals assisting in the wind up of IBRC have become one of the largest categories of creditors.

16.     In addition, IBRC issued the following outstanding debt:

**Outstanding Senior Bonds**

| Debt Instrument | Principal | Maturity Date | Currency |
|---|---|---|---|
| 6th Supplemental Trust Deed dated May 24, 2007 | 25,000,000 | 11/29/2013 | Bulgarian Lev |
| 6th Supplemental Trust Deed dated May 24, 2007 | 100,000,000 | 6/13/2017 | Hong Kong Dollar |
| 6th Supplemental Trust Deed dated May 24, 2007 | 2,000,000 | 4/23/2018 | Euros |
| 7th Supplemental Trust Deed dated May 23, 2008 | 25,000,000 | 7/22/2013 | Euros |
| 2nd Supplemental Trust Deed dated July 15, 2005 | 20,000,000 | 11/10/2015 | Euros |
| 7th Supplemental Trust Deed dated May 23, 2008 | 50,000,000 | 7/4/2013 | Euros |
| 6th Supplemental Trust Deed dated May 24, 2007 | 4,000,000 | 2/15/2016 | Euros |

RLF1 9276970v.1

**Outstanding Subordinated Notes**

| Debt Instrument | Principal | Maturity Date | Currency |
|---|---|---|---|
| 1st Supplemental Trust Deed dated August 15, 2002 | 18,010,000 | 6/25/2014 | Euros |
| Private Placement Agreements and the Note Purchase Agreement dated September 28, 2005[1] | 165,000,000 | 9/29/2015 | U.S. Dollars |
| Private Placement Agreements and the Note Purchase Agreement dated September 28, 2005 | 35,000,000 | 9/29/2017 | U.S. Dollars |
| 3rd Supplemental Trust Deed dated May 26, 2006 | 40,552,000 | 6/21/2016 | Euros |
| 6th Supplemental Trust deed dated May 24, 2007 | 59,780,000 | 6/19/2017 | Euros |

## EVENTS PRECIPITATING THE COMMENCEMENT OF IBRC'S SPECIAL LIQUIDATION

**A.      The Businesses of Anglo and INBS Were Heavily Exposed to a Decline in Property Prices and to Illiquidity in Global Wholesale Funding Markets**

17.      The businesses of Anglo and INBS throughout the 1990s and 2000s were heavily exposed to the property market, primarily in Ireland. Anglo's market share increased from 3% to 18% in 10 years representing an annual average growth rate of 36%. Anglo's loan book grew from €23.7 billion to €72.2 billion in the four years from September 2004 to September 2008. A

---

[1] The Note Purchase Agreement dated 28 September 2005 (the "**Note Purchase Agreement**") is governed by New York law pursuant to which Anglo issued $165 million of Series A Subordinated Notes due 29 September 2015, and $35 million of Series B Subordinated Notes due 29 September 2017 (collectively, the "**Notes**"). The Notes are unsecured and subordinated in right of payment to ordinary creditors, including depositors of IBRC. Interest payments on the Notes were due on 29 March 2013, and 29 June 2013, subject to a seven-day grace period for payment not made on those dates. As of the date hereof, the interest payments for the last two quarters have not been made to the holders of the Notes. I am advised that no holder of the Notes has commenced litigation against IBRC for failure to make such interest payments or taken other steps to recover unpaid amounts.

significant portion of this growth derived from loans to customers in the property development sector.

18.     INBS similarly increased its exposure in the real estate market, particularly in the commercial property market, during the 2000s. By 2008, 85% of the value of INBS's loan book consisted of loans made on commercial property. Typically, INBS's business model involved providing 100% financing to purchase sites that required planning permission to enhance and develop. The security taken typically comprised property assets only. This lending model was more akin to investment practices by venture capital firms than those of traditional banks.

19.     Property prices in Ireland began to fall at the time of the collapse of Lehman Brothers in September 2008. As a result of the steep decline in property prices combined with the liquidity crisis suffered in the Irish and global financial markets in 2008 and 2009, both the financial positions of Anglo and INBS deteriorated significantly.

**B.     The Impact of the Global Financial Crisis and the Nationalisation of Anglo and INBS**

20.     Although the main Irish banks were not heavily exposed to U.S. mortgage-backed securities, they were highly dependent on wholesale funding and were therefore highly exposed to the disruption in the international market for short-term bank funding from early August 2007 onwards. The Irish government was preoccupied with addressing the liquidity issues facing the main Irish banks and stated in September 2008 that no Irish bank would be allowed to fail. During the first week of September 2008, Fitch had issued a very adverse report regarding INBS. Similarly, Anglo's share price was collapsing dramatically, and, by the end of September 2008, it was thought that Anglo could not survive another day. There was a fear that Anglo's failure would lead to a general run on the Irish banks, and so decisive action was needed.

21.     On the evening of September 29, 2008, the Irish government decided to issue a blanket guarantee of the liabilities of Anglo, INBS and four other major Irish retail banks through 29 September 2010 (the "**Irish Government Guarantee**").  Following a negative market reaction to Anglo's year-end results, in December 2008 the Irish government announced a recapitalisation program for the guaranteed banks.  Despite these measures, however, market confidence in the banks continued to decline and the banks continued to experience haemorrhaging of funds and rating downgrades.

22.     By January 2009, it had become clear that recapitalization would not be sufficient to save Anglo, particularly in light of the bank's weak funding position.  As a result, the Irish government decided that it was necessary to nationalise Anglo.   The Anglo Irish Bank Corporation Act 2009 was signed into law on 21 January 2009, under which all of the shares in Anglo were transferred to the Finance Minister.

23.     INBS also faced financial difficulties as a result of the crisis in the Irish commercial and residential property market.  On 19 April 2010, INBS reported a loss of €2.5 billion for 2009 after writing off nearly €2.8 billion in commercial real estate loans to property developers and land speculators, which comprised almost a quarter of its €10.5 billion loan book.  Later that month, INBS's chief executive officer resigned from the bank.  In 2010, the Irish government injected €2.7 billion in INBS in exchange for a 100% ownership interest in INBS.

**C.      The Establishment of the National Asset Management Agency Act**

24.     At the same time, the Irish government searched for other solutions to its banking crisis.  The Irish Legislature enacted the National Asset Management Agency Act of 2009 creating the National Asset Management Agency ("**NAMA**").  NAMA was intended to act as a form of "bad bank," an entity through which the government exchanged liquid, government-guaranteed securities for certain qualifying distressed loans on any national bank's books.

8

During 2010, Anglo sold approximately €34 billion in loans to NAMA in exchange for approximately €13 billion in NAMA bonds.

**D.    The Government-Directed Merger of Anglo and INBS and the Issuance of the Promissory Notes**

25.     Meanwhile, the Irish government was struggling to meet its mounting obligations under the Irish Government Guarantee.  As a result, in consultation with the European Central Bank, the Irish government issued promissory notes to, among others, Anglo and INBS.  The promissory notes were essentially a promise to pay Anglo and INBS the cash necessary to run their operations at a future date.  Anglo in turn used the promissory note (the "**Promissory Note**") issued to it by the Irish government as collateral to the Central Bank in relation to several transactions, including the Emergency Liquidity Assistance (the "**ELA**") that the Central Bank had given to IBRC at various times.  The Central Bank had also obtained a deed of floating charge (the "**Floating Charge**") over IBRC's assets to secure the funding it had given to IBRC.

26.     In December 2010, the Credit Stabilisation Act was enacted to provide a legal basis for the restructuring and stabilisation of the Irish banking system as agreed in the joint European Union/International Monetary Fund Programme of Financial Support for Ireland.  This legislation granted the Finance Minister an extensive range of restructuring powers with respect to each of the national banks that received financial support from the Irish government.

27.     In February 2011, the Finance Minister used his powers under the Bank Stabilisation Act to begin the process of merging Anglo and INBS into a new entity, the Irish Bank Resolution Corporation.  Anglo and INBS were merged into IBRC on 1 July 2011, and all assets and liabilities were transferred to IBRC.

9

**E.     The Commencement of the Irish Proceeding and Appointment of the Special Liquidators**

28.     The Irish legislature passed the Bank Resolution Act[2] in the early hours of 7 February 2013, and it was signed into law by the Irish President shortly afterward.  The purposes of the Bank Resolution Act include winding up IBRC in an orderly and efficient manner to benefit the public interest and seeking to end the exposure of Ireland and the Central Bank to IBRC.  Later that day, the Finance Minister placed IBRC into special liquidation by issuing the Special Liquidation Order in accordance with section 4 of the Bank Resolution Act.  My colleague Eamonn Richardson and I were appointed joint special liquidators.

29.     The Special Liquidation Order placed an immediate stay on all proceedings against IBRC.  Currently, no further actions or proceedings can be issued against IBRC without the consent of the High Court of Ireland, but the terms and conditions of mortgages, loans and other products provided to IBRC customers remain intact and unaffected by the Special Liquidation Order.

30.     As a result of the commencement of the Irish Proceeding, the various transactions between IBRC and the Central Bank were terminated, and a payment was due from the Irish government to IBRC to settle the Promissory Note.  However, the settlement payment of the Promissory Note was less than the total amount of debt owing by IBRC to the Central Bank. The Central Bank subsequently sold and transferred this debt along with its rights in the Floating Charge to National Asset Resolution Limited, a subsidiary of NAMA, in March 2013.

---

[2] The Bank Resolution Act is attached hereto as **Exhibit B**.

**F.**    **The Irish Proceeding Has Made Significant Progress Since Its Commencement**

31.    Following the commencement of the Irish Proceeding, IBRC is no longer a licensed bank.  Instead, IBRC has been granted permission by the Central Bank to carry out certain banking operations that are appropriate to an orderly wind up of a credit institution.

32.    Following their appointment, the Special Liquidators are tasked with conducting an orderly wind up of IBRC in accordance with the Bank Resolution Act, the Ministerial Instructions issued on 7 February 2013, 10 May 2013 and 20 July 2013, by the Finance Minister pursuant to section 9 of the Bank Resolution Act (the "**Ministerial Instructions**") and applicable Irish law.  Shortly after the commencement of the Irish Proceeding, the Special Liquidators sent a letter to all of IBRC's known creditors notifying them of the issuance of the Special Liquidation Order and prescribing the manner by which they should file claims against IBRC. The Special Liquidators are obliged to continue to keep all creditors informed of the progress of the Irish Proceeding as required under the European Communities (Reorganisation and Winding Up of Credit Institutions) Regulations, 2011.

33.    As with all liquidations carried out under Irish law, the Special Liquidators are obligated to maximize the pool of assets available for distribution to IBRC's creditors.   In administering IBRC's assets in the Irish Proceeding, the Special Liquidators must act in accordance with the Bank Resolution Act and the Ministerial Instructions.

34.    Since their appointment, the Special Liquidators have taken significant steps towards preparing for the sale of IBRC's assets, including its loan book.  In this regard, the Special Liquidators have engaged the services of independent professional appraisers for the purpose of valuing IBRC's loan book and other assets.  The Special Liquidators have also engaged, among others, legal and property advisors to conduct due diligence of IBRC's loan

book and collateral securing the loans.  The Special Liquidators are currently in the process of developing a framework strategy for the marketing and sale of IBRC's assets.

35.    On the subsidiary level, the Special Liquidators and their team have also been conducting due diligence in respect of IBRC's subsidiaries to determine their function, value and indebtedness.  Additionally, the Special Liquidators have replaced departing directors (whose employments have been terminated or who have resigned following the commencement of the Irish Proceeding) with new directors in order to stabilise the management of certain of IBRC's subsidiaries.

36.    Moreover, the Special Liquidators have provided assistance to the Central Bank and the National Treasury Management Agency in determining IBRC depositors' eligibility for compensation under the two deposit protection schemes operating in Ireland, the Deposit Guarantee Scheme and the Eligible Liabilities Guarantee Scheme, as well as the appropriate amount of any such compensation payments.

37.    Finally, the Special Liquidators have managed pending litigation involving IBRC in Ireland and various other jurisdictions.  To this end, the Special Liquidators have instructed their legal teams across multiple jurisdictions to continue proceedings brought by, or on behalf of, IBRC seeking to recover valuable assets in those jurisdictions and to defend any claims against those assets.

**G.    The Special Liquidators Are Charged with Liquidating IBRC's Assets and Obtaining the Best Possible Recovery for Creditors**

38.    In the Special Liquidation Order, the Finance Minister appointed Eamonn Richardson and me as Special Liquidators of IBRC, charged with carrying out the Irish Proceedings with respect to IBRC.  We are entrusted with all the powers and functions of the Board of Directors of IBRC, including the realisation of the assets of IBRC for the best price

reasonably attainable for those assets and applying the proceeds of such disposals towards satisfaction of the liabilities of IBRC in accordance with the priorities set down in the Irish Companies Acts 1963–2012.

39.    Pursuant to section 12 of the Bank Resolution Act, the Special Liquidators can validly sell or transfer assets of IBRC notwithstanding pre-existing statutory, equitable or contractual restrictions on such transfers.

40.    As part of the Irish Proceeding, the Special Liquidators are responsible for overseeing the sales and valuation process in respect of IBRC's loan book. Specifically, we have been directed to appoint independent appraisers to complete a valuation of IBRC's assets and liabilities. Subsequently, all assets will be offered for sale to the highest bidder whose bid equals or exceeds the value as determined by the independent appraisers (the "**Valued Price**"). If bids received do not at least match the Valued Price, the assets will be sold to NAMA at the Valued Price.

41.    By commencing this case under chapter 15, I am seeking, in my capacity as foreign representative of IBRC, the assistance of this Court in having the Irish Proceeding recognized in the United States as a foreign main proceeding to obtain the benefit of the automatic stay and other protections afforded to debtors under chapter 15.

## CRITERIA FOR CHAPTER 15 RECOGNITION

**A.    The Irish Proceeding Is a "Foreign Proceeding" Within the Meaning of the Bankruptcy Code**

42.    The Irish Proceeding is a collective judicial proceeding in Ireland under the Bank Resolution Act and the Companies Acts 1963–2012, relating to insolvency or the adjustment of debt in which the assets and affairs of IBRC are subject to the control and supervision of an authority competent to control or supervise the foreign proceeding, for the purpose of

liquidation. Accordingly, I have been advised and believe that the Irish Proceeding is a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code.

**B.      As IBRC's Centre of Main Interests Is in Dublin, the Irish Proceeding Is a "Foreign Main Proceeding" Within the Meaning of the Bankruptcy Code**

43.     I have been advised and believe that the Irish Proceeding is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code because IBRC was incorporated under the Credit Stabilisation Act.  I have been informed that the Bankruptcy Code provides a presumption in section 1516(c) that, in the absence of evidence to the contrary, the debtor's registered office is presumed to be the centre of the debtor's main interests.  IBRC benefits from this presumption because, since the enactment of the Credit Stabilisation Act in July 2011, 19 months prior to the commencement of the Irish Proceeding, IBRC has had its registered office and centre of main interest in Ireland where the Irish Proceeding is underway. Specifically:

a)     The location of IBRC's registered head office is 1 Stokes Place, St. Stephen's Green in Dublin, Ireland, which is also the registered office of KPMG.  This is typical in liquidations in Ireland.  IBRC's registered office before the commencement of the Irish Proceeding was 18-21 Stephen Court, Stephen's Green, Dublin 2;

b)     IBRC's mailing address and principal place of business is and at all times has been at the address of its former registered head office at 18-21 Stephen Court, Stephen's Green, Dublin;

c)     All decision-making and control in respect of IBRC's liquidation takes place within Ireland by the Special Liquidators;

d)     All administrative and winding down functions, including accounting, financial reporting, budgeting and cash management, are conducted in Ireland, and a vast majority of the persons who perform such functions are situated in Ireland;

e)     IBRC is being liquidated under the Special Liquidation Order issued pursuant to the Bank Resolution Act, which was enacted by the Irish Parliament; and

f)      Most of the correspondence that the Special Liquidators have had with IBRC's creditors since the commencement of the Irish Proceeding has emanated from Ireland.

44.      In light of these circumstances, I believe (a) that IBRC's centre of main interest, as that term has been explained to me by the Special Liquidators' U.S. counsel, Linklaters LLP, is for the purposes of the Chapter 15 Petition located in Ireland, and (b) that the Irish Proceeding constitutes a foreign main proceeding as that term has been explained to me by Linklaters LLP. It is also my understanding that all creditors of IBRC would be aware that IBRC's centre of main interest was always in Ireland.

## C.      I Am a "Foreign Representative" Within the Meaning of the Bankruptcy Code

45.      Given the foregoing, to the best of my information and belief, I am a foreign representative within the meaning of sections 101(24) and 1517(a)(2) of the Bankruptcy Code, as I am a person who, pursuant to the Special Liquidation Order and the Bank Resolution Act, has been authorized to liquidate IBRC. Under section 23(2)(i) of the Irish Companies Act 1963, I have the authority to do all things that may be necessary for winding up the affairs of IBRC and distributing its assets. I consider the relief requested in the Petition for Recognition to be necessary for an orderly winding up of IBRC, to bind IBRC's creditors in the U.S. to the Irish Proceeding and to protect IBRC's assets located in the U.S. from any enforcement action by individual creditors.

## D.      The Requirements for Recognition Under Section 1515 Have Been Satisfied

46.      As set out in paragraphs 51 through 54 of this Declaration, I believe that the requirements for recognition under section 1515 have been satisfied.

## RELIEF REQUESTED

47.      The Special Liquidators' goal is to wind up IBRC in adherence with the Bank Resolution Act, liquidate IBRC's assets in an orderly manner under the supervision of and in

compliance with the directions of the Finance Minister and satisfy the claims of creditors to the fullest extent possible in accordance with the priorities provided for under Irish law, with the ancillary assistance of this Court. To that end, assistance of this Court is necessary to bind IBRC's creditors in the U.S. to the Irish Proceeding and to protect IBRC's U.S. assets from any claims, enforcement actions, attachment or other action.

48. Recognition of the Irish Proceeding will enable the Special Liquidators to effectively liquidate IBRC's assets through the above-described liquidation sales without disruptive action being taken on an individual basis by opportunistic creditors, thereby undermining the collective interest in an efficient and orderly winding up of IBRC. It is my belief that the relief requested herein is necessary to give effect to the Irish Proceeding in the United States, protect IBRC's assets located in the United States and prevent creditors in the United States from taking actions that would frustrate the Irish Proceeding. Moreover, the relief sought in the Petition for Recognition will ensure that claims of all creditors will be processed in an orderly and equitable manner.

49. I submit that the relief sought herein is within the scope of chapter 15 of the Bankruptcy Code and the criteria for recognition are clearly satisfied under the facts of this case.

50. Absent the relief requested herein, IBRC may be subject to various lawsuits and other actions by individual creditors seeking to assert their rights and protect their interests, thereby jeopardizing the orderly and uniform administration of IBRC's assets and claims against IBRC in one central forum.

## SECTION 1515 OF THE BANKRUPTCY CODE

51. The Chapter 15 Petition and this Declaration are accompanied by a certified copy of the Special Liquidation Order attached hereto as **Exhibit C**.

52.     I understand that section 1515(c) of the Bankruptcy Code provides that "[a] petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative."

53.     In compliance with section 1515(c) of the Bankruptcy Code, I hereby declare that the only foreign proceeding (as such term is defined in section 101(23) of the Bankruptcy Code) pending with respect to IBRC that is known to me is the Irish Proceeding.

54.     Accordingly, I believe that IBRC's Chapter 15 Petition satisfies the requirements of section 1515 of the Bankruptcy Code.

## INFORMATION PURSUANT TO BANKRUPTCY RULE 1007(A)(4)

55.     I understand that Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") provides as follows:

> In addition to the documents required under section 1515 of the Bankruptcy Code, a foreign representative filing a petition for recognition under chapter 15 shall file with the petition: (A) a corporate ownership statement containing the information described in Rule 7007.1; and (B) unless the court orders otherwise, a list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code.

56.     In compliance with Bankruptcy Rule 1007(a)(4), I hereby provide the following information:

- **Corporate Ownership Statement**

57.     According to IBRC's share register, it is an entity wholly owned by the Finance Minister in his official capacity on behalf of the Irish government.

- **Administrators in the Irish Proceeding**

58.     My office address is 1 Stokes Place, St. Stephen's Green, Dublin, Ireland.  Aside from the Irish Proceeding, there is no other foreign liquidation proceeding for IBRC.  Aside from

17

the Special Liquidators appointed pursuant to the Special Liquidation Order, there is no other person or body that is authorized to administer a foreign proceeding for IBRC.

- **Parties to Litigation in the United States**

59.    IBRC is party to a litigation entitled John Flynn Snr. et al. v. Irish Bank Resolution (F/K/A Anglo Irish Bank Corporation) et al., Civil Action No. 13-CB-3882 (S.D.N.Y.), which was filed on 6 June 2013.   In their complaint, the plaintiffs, as borrowers under 84 separate loan agreements, allege, among other things, that Anglo overcharged them for interest, resulting in alleged damages of more than $11 million.  Subsequent to the filing of this action, the plaintiffs' counsel filed an application and sought permission from the Irish High Court under section 6(2)(b) of the Bank Resolution Act to pursue this action against IBRC.

60.    The plaintiffs' application was heard before the Irish High Court on 24 June 2013, at which time the Irish High Court denied the plaintiffs' application to pursue this action against IBRC before the United States District Court for the Southern District of New York.  On that basis, my solicitors in Ireland have corresponded with the plaintiffs' counsel seeking confirmation that the action against IBRC will be dismissed without prejudice to any arguments that IBRC may raise before the United States District Court for the Southern District of New York that the court has no jurisdiction to hear this case. The plaintiffs have now filed an appeal against the order issued by the Irish High Court denying its application.  There is no date set for the hearing of this appeal. The parties to the litigation are:

| Party | Address |
|---|---|
| **Plaintiffs** | |
| John Flynn , Sr. | **Leonard Zack** |
| | Leonard Zack & Associates |
| Leona Flynn | 405 Park Avenue |
| | Suite 1001 |
| M.D. Joseph Sheehan | New York, NY 10022 |

RLF1 9276970v.1

John Flynn, Jr.

Elaine Flynn

Fox Rock LLC

Anna Livia LLC

The Bloomsday Trust *C/O Lewis F. Crippen (Trustee)*

BlackRock Medical Corporation

Haytonvale Properties Limited

Haytonvale Developments Limited

Mountville Developments Limited

Lakebridge Limited

Nesco Limited

Pamerette Limited

Industrial Yarns Limited

Benray Limited

Trefon Limited

Coolbrook Developments Limited

Aruba Properties Limited

Kilberry Limited

Tibany Properties Limited

Bluecrown Limited

Komady & Michael O'Reily Trading *(As Belgard Retail Park Limited)*

Stonewood Developments

212-754-4050
Fax: 212-759-8890
Email: leonardzack@lzack.com

RLF1 9276970v.1

Mallia Properties Limited

Island Associates Limited

Pizzaro Developments Limited

Fusano Properties Limited

Bellpark Developments Limited

v.

**Defendant**
Irish Bank Resolution Corporation
*formerly known as*
Anglo Irish Bank Corporation PLC

**Defendant**
National Asset Management Agency

**Defendant**
Successors To Anglo Irish Bank Corporation Limited

**Defendant**
Tiarnan O'Mahoney

**Defendant**
Arthur Michael Royal Aynsley

**Defendant**                                          **Austin Ridgely Evers**
KPMG, LLP                                             Williams & Connelly LLP
                                                      725 12th Street N.W.
                                                      Washington, DC 20005
                                                      (202) 434-5697
                                                      Fax: (202) 434-5029
                                                      Email: aevers@wc.com

**Defendant**
Brendan McDonagh

        61.    IBRC is party to a litigation entitled <u>Amethyst Worldwide Ltd. v. Scottish Mutual</u>

<u>Int'l, PLC</u>, Civil Action No. 11-01535 (C.D. Cal. 2011).    Amethyst Worldwide Limited

("**Amethyst Worldwide**") and Dr. Berenice Kaplan, in her capacity as an officer and

shareholder of Amethyst Worldwide, filed an action alleging Scottish Mutual International, PLC

and others, including Anglo (now IBRC), of committing acts of fraud and misrepresentation in the sale of certain investment funds. Amethyst Worldwide has settled with all other parties to the action other than Anglo, which contends that there was no fraud or misrepresentation committed by employees of Anglo. Moreover, Anglo argues that Amethyst Worldwide does not have standing to sue, that the action is barred by the statute of limitations and that the summary judgment entered against Dr. Kaplan in a state court decision regarding the same transactions at issue has preclusive effect. The parties have agreed to a pre-trial schedule with a trial date set for March 2014. The parties to the litigation are:

| Party | Address |
|---|---|
| **Plaintiff**<br>Amethyst Worldwide Limited | Alan M Mansfield<br>The Consumer Law Group<br>10200 Willow Creek Road Suite 160<br>San Diego, CA 92131<br>619-308-5034<br>Fax: 888-341-5048<br>Email: alan@clgca.com |
| | James Robert Hail<br>Doyle Lowther LLP<br>10200 Willow Creek Road Suite 150<br>San Diego, CA 92131<br>858-935-9960<br>Fax: 858-939-1939<br>Email: jim@doylelowther.com |
| | John A Lowther, IV<br>Doyle Lowther LLP<br>10200 Willow Creek Road Suite 150<br>San Diego, CA 92131<br>858-935-9960<br>Fax: 858-939-1939<br>Email: john@doylelowther.com |
| | William James Doyle, II<br>Doyle Lowther LLP |

10200 Willow Creek Road Suite 150
San Diego, CA 92131
858-935-9960
Fax: 858-939-1939
Email: bill@doylelowther.com

**Plaintiff**
Dr. Berenice Kaplan
in her capacity as an officer and
shareholder of Amethyst Worldwide
Limited

Alan M. Mansfield
(See above for address)

James Robert Hail
(See above for address)

John A. Lowther, IV
(See above for address)

William James Doyle, II
(See above for address)

v.

**Defendant**
Scottish Mutual International, PLC
TERMINATED: 04/18/2012

Bethany C Woodard
Munger Tolles and Olson
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
213-683-9292
Email: bethany.woodard@mto.com
TERMINATED: 05/11/2012

Robert L Dell Angelo
Munger Tolles and Olson LLP
355 S Grand Avenue 35th Floor
Los Angeles, CA 90071-1560
213-683-9100
Fax: 213-687-3702
Email: robert.dellangelo@mto.com
TERMINATED: 05/11/2012

**Defendant**
Anglo Irish Bank Corporation, PLC

James F McCabe
Morrison and Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
415-268-7000
Fax: 415-268-7522

Email: jmccabe@mofo.com
ATTORNEY TO BE NOTICED

**Defendant**
Andrew Peat
TERMINATED: 07/18/2012

Julie Rose Gerchik
Latham and Watkins
355 South Grand Avenue
Los Angeles, CA 90071-1560
213-485-1234
Email: julie.gerchik@lw.com
TERMINATED: 05/11/2012

**Defendant**
Andrew Peat Group Holdings, B.V.
TERMINATED: 07/18/2012

**Defendant**
Clerical Medical Investment Group
Limited
TERMINATED: 05/11/2012

Robert W Perrin
Latham & Watkins
355 South Grand Avenue
Los Angeles, CA 90071-1560
213-485-1234
Fax: 213-891-8763
Email: robert.perrin@lw.com
TERMINATED: 05/11/2012

Victor Leung
Latham & Watkins
355 South Grand Avenue
Los Angeles, CA 90071-1560
213-485-1234
Fax: 213-891-8763
Email: victor.leung@lw.com
TERMINATED: 05/11/2012

62.    IBRC is party to a litigation entitled Tampa Port Authority v. Channelside Bay Mall, LLC, a Florida Limited Liability Company, and Anglo Irish Bank Corporation Limited, a banking corporation named under the laws of the Republic of Ireland f/k/a Anglo Irish Bank Corporation, PLC, Case No.: 10-CA-002832, in the Thirteenth Judicial Circuit in and for Hillsborough County, Florida.   Co-defendant Channelside Bay Mall, LLC ("**CBM**") is the tenant, and plaintiff Tampa Port Authority ("**TPA**") is the landlord of a retail centre pursuant to certain ground lease (the "**Ground Lease**").   Anglo extended a mortgage loan to CBM in 2006 that was secured by CBM's leasehold interest in the Ground Lease.   When CBM, as the leasehold mortgagee, defaulted on the mortgage loan, IBRC, as Anglo's successor in interest,

foreclosed on Anglo's security interest in the mortgage loan and appointed a receiver who is currently managing the retail centre. In this litigation, the TPA filed a complaint against CBM and Anglo for termination of the Ground Lease based on monetary and non-monetary breaches of the Ground Lease and other related agreements between the TPA and CBM. TPA, CBM and IBRC have entered into a stipulation to stay this litigation through the end of October 2013, while IBRC seeks a prospective note purchaser/ground tenant subject to TPA's approval. IBRC is currently in the process of attempting to finalise the sale of the note to a purchaser. The parties to the litigation are:

| Party | Address |
|---|---|
| **Plaintiff** | |
| Tampa Port Authority, a body politic and corporate existing under the laws of the State of Florida | David S. Hendrix<br>Gray Robinson P.A.<br>401 East Jackson Street<br>Suite 2700<br>P.O. Box 3324<br>Tampa, FL 33602<br>813-273-5000<br>Fax: 813-273-5145<br>Email: david.hendrix@gray-robinson.com |
| v. | |
| **Defendant** | |
| Channelside Bay Mall, LLC, a Florida Limited Liability Company | Jaime Austrich<br>Shumaker, Loop & Kendrick, LLP<br>Bank of America Plaza<br>101 E. Kennedy Boulevard<br>Suite 2800<br>Tampa, FL 33602<br>813-227-2273<br>Fax: 813-229-1660<br>Email: jaustrich@slk-law.com |
| **Defendant** | |
| Anglo Irish Bank Corporation Limited, a banking corporation named under the laws of the Republic of Ireland f/k/a Anglo Irish Bank Corporation, PLC | Stephen R. Leslie<br>Stichter, Riedel, Blain & Prosser, P.A.<br>110 East Madison Street |

Suite 200
Tampa, Florida 33602
813-229-0144
Fax: 813-229-1811
Email: srl@srbp.com

John R. Goldman
Herrick Feinstein LLP
2 Park Avenue
New York, NY 10016
212-592-1460
Fax: 212-545-3440
Email: jgoldman@herrick.com

Catherine Belfi
Herrick Feinstein LLP
2 Park Avenue
New York, NY 10016
212-592-1460
Fax: 212-545-3440
Email: cbelfi@herrick.com

- **Entities Against Whom Provisional Relief Is Sought under Section 1519**

63.    IBRC is not currently seeking any provisional relief but reserves its right to do so should the need arise.

64.    For the foregoing reasons, I respectfully request that this Court grant the relief requested in the Chapter 15 Petition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Executed on this __26__ day of August, 2013
in Dublin, Ireland

_Kieran Wallace_
Kieran Wallace

Foreign Representative of the
Irish Bank Resolution Corporation Limited