IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:                                             :    Chapter 15
:
IRISH BANK RESOLUTION CORPORATION      :    Case No. 13-12159 (CSS)
LIMITED (IN SPECIAL LIQUIDATION),          :
:
Debtor in a foreign proceeding.  :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF SUCCESSFUL BIDDER

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

      1.   Pursuant to the Order (I) Establishing Bidding Procedures Relating To The Sale Of Certain Assets Relating To The Mandarin Oriental Boston, (II) Applying Section 365 Of The Bankruptcy Code For Purposes Of This Motion, (III) Approving Form And Manner Of Notice Of All Procedures, Protections, Schedules, And Agreements, (IV) Establishing Procedures Relating To The Assumption And Assignment Of Certain Executory Contracts, And (V) Scheduling A Hearing To Consider The Proposed Sale (Docket No. 501) (the "Bidding Procedures Order")[1] entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on May 12, 2015, CWB Hotel Limited Partnership ("CWB Hotel"), an affiliate of the above-captioned debtor, has accepted the bid of Hilton Worldwide, Inc. ("Hilton") for the purchase of certain of CWB Hotel's assets (the "Hotel Assets").  The terms of the bid are set forth in the acquisition agreement (the "Purchase Agreement"), dated as of December 4, 2015 between the Foreign Representatives and Hilton, substantially in the form attached hereto as Exhibit A.  The bid remains subject to the terms of the Management Agreements, including provision of a ROFO Notice under the terms of such Management Agreements.

      2.   The Sale Hearing will be held at **10:00 a.m. (prevailing Eastern Time) on January 15, 2016** before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge for the District of Delaware, in the United States Bankruptcy Court for the District of Delaware, 5th Floor, Courtroom 6, 824 North Market Street, Wilmington, Delaware 19801.  At the Sale Hearing the Foreign Representatives will seek entry of an order (the "Sale Order"), approving the sale of the Hotel Assets, substantially in the form attached hereto as Exhibit B.

      3.   Objections, if any, to the sale, must: (i) be in writing; (ii) comply with the Bankruptcy Rules and Local Bankruptcy Rules; and (iii) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 North Market Street,

---

[1]    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order.

Wilmington, Delaware 19801, on or before **4:00 p.m. (prevailing Eastern Time) on January 8, 2016**; and be served upon (a) the undersigned attorneys for the Foreign Representatives of Irish Bank Resolution Corporation Limited, and (b) Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, DE 19801, Attn: David R. Hurst, Esq..  UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER HEARING AND NOTICE.

Dated:  Wilmington, Delaware
       December 7, 2015

                            SKADDEN, ARPS, SLATE, MEAGHER
                            & FLOM LLP

                            */s/ Van C. Durrer, II*
                            Van C. Durrer, II (I.D. No. 3827)
                            Annie Z. Li
                            300 South Grand Avenue
                            Los Angeles, California 90071
                            Telephone: (213) 687-5000
                            Facsimile: (213) 687-5600

                            *Attorneys for the Foreign Representatives of Irish Bank Resolution Corporation Limited*

## Exhibit A

**Purchase Agreement**

# AGREEMENT OF PURCHASE AND SALE

between

## CWB HOTEL LIMITED PARTNERSHIP,

the Seller

and

## HILTON WORLDWIDE, INC.,

the Purchaser

Premises:
Hotel Unit
in
The 776-778 Boylston Primary Condominium
City of Boston
County of Suffolk
Commonwealth of Massachusetts

As of December 4, 2015

84245-0028/128864721.2

Table of Contents

Page

1.    Agreement to Sell and Purchase ................................................................. 2
2.    Exceptions to Title; Title Matters ............................................................... 3
3.    Deposit ........................................................................................................ 4
4.    Purchase Price and Payment; Closing ........................................................ 4
5.    As Is ............................................................................................................ 6
6.    Apportionments ........................................................................................... 8
7.    Representations and Warranties of the Parties; Certain Covenants............ 13
8.    Closing Deliveries ....................................................................................... 17
9.    Conditions to the Closing Obligations......................................................... 20
10.    Default ......................................................................................................... 22
11.    Termination.................................................................................................. 22
12.    Fire or Other Casualty; Condemnation ....................................................... 22
13.    Brokerage..................................................................................................... 24
14.    Closing Costs; Fees and Disbursements of Counsel, etc. ........................... 24
15.    Release by the Purchaser ............................................................................. 25
16.    [Intentionally Omitted] ............................................................................... 25
17.    Notices ........................................................................................................ 25
18.    Survival; Governing Law ............................................................................ 26
19.    Counterparts; Captions and Headings ......................................................... 26
20.    Entire Agreement; No Third Party Beneficiaries ....................................... 27
21.    Waivers; Extensions .................................................................................... 27
22.    No Recording............................................................................................... 27
23.    Assignment .................................................................................................. 27
24.    Pronouns; Joint and Several Liability.......................................................... 28
25.    Successors and Assigns ............................................................................... 28
26.    Continued Operations .................................................................................. 28
27.    Confidentiality............................................................................................. 29
28.    Further Assurances ...................................................................................... 30
29.    Exhibits ....................................................................................................... 30
30.    Publicity, Litigation .................................................................................... 30
31.    Severability.................................................................................................. 31
32.    Claims, Matters, and Issues Relating to this Agreement ............................ 32
33.    Limitation of Liability ................................................................................. 33
34.    Limitation of Remedies. .............................................................................. 33
35.    Time of the Essence..................................................................................... 34
36.    Purchaser Acknowledgement ...................................................................... 34
37.    No Offer....................................................................................................... 35
38.    No Setoff...................................................................................................... 35
39.    Conspicuousness.......................................................................................... 35
40.    Neutral Construction.................................................................................... 35

EXHIBITS:

| | |
|---|---|
| A | Legal Description of Land |
| B | Additional Permitted Encumbrances |
| C | Form of Deed |
| D | Form of Bill of Sale |
| E | Title Affidavit |
| F | Form of Assignment Agreement |
| G | Form of Interim Beverage Agreement |

SCHEDULES:

| | |
|---|---|
| 1.1.8 | Leases |
| 1.1.9 | Hotel Contracts |

84245-0028/128864721.2

## AGREEMENT OF PURCHASE AND SALE

THIS AGREEMENT OF PURCHASE AND SALE (this "Agreement"), is made as of the _4th_ day of _December_, 201_5_ (the "Effective Date"), by and between CWB HOTEL LIMITED PARTNERSHIP, a Delaware limited partnership, having an address at 800 Boylston Street, Suite 1600, Boston, Massachusetts 02199 (the "Seller"), and HILTON WORLDWIDE, INC., a Delaware corporation, having an address at 7930 Jones Branch Drive, McLean, VA 22102 (the "Purchaser" and, collectively with the Seller, the "Parties" and, each, a "Party").

## RECITALS

WHEREAS, the Seller, is the fee owner of certain real property located at 776 Boylston Street, City of Boston, County of Suffolk, Massachusetts, as more particularly described on Exhibit A attached hereto (the "Land") and the improvements located thereon (the "Improvements" or "Hotel") being the Hotel Unit in the Condominium (as defined in Exhibit A);

WHEREAS, the Seller is a borrower under that certain Construction and Term Loan Agreement, dated as of August 15, 2008, by and among the Seller and certain of its affiliates as borrowers, and Anglo Irish Bank Corporation Limited, predecessor to Irish Bank Resolution Corporation Limited (In Special Liquidation) ("IBRC");

WHEREAS IBRC is also the indirect owner of the Seller;

WHEREAS on February 7, 2013, the Irish Minister for Finance issued the Irish Bank Resolution Corporation Act 2013 (Special Liquidation) Order appointing Kieran Wallace and Eamonn Richardson as joint special liquidators (the "Special Liquidators") for IBRC pursuant to section 4 of the Irish Bank Resolution Corporation Act 2013 for the purposes of winding up and liquidating IBRC in an orderly manner (such wind-up and liquidation, the "Irish Proceeding");

WHEREAS in connection with the Irish Proceeding, the Special Liquidators commenced a proceeding (the "Chapter 15 Case") in August 2013 under chapter 15 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS the Bankruptcy Court entered an order on December 18, 2013 recognizing the Irish Proceeding as a foreign main proceeding under the Bankruptcy Code and granting certain related relief;

WHEREAS on May 12, 2014 the Bankruptcy Court entered an order approving certain procedures (as amended, the "Sale Procedures") setting forth the sale and auction process for the Property (as defined below), among other things;

WHEREAS, consistent with the Sale Procedures, the Special Liquidators will request that the Bankruptcy Court enter an order authorizing and directing the Special Liquidators to cause the Seller to sell the Property to the Purchaser under the terms of this Agreement (the "Sale Order");

WHEREAS, subject to the terms and conditions of this Agreement and the Sale Procedures, and the entry of the Sale Order, (1) the Seller wishes to sell, transfer, assign, and convey without representation, warranty, recourse, or guaranty of any kind, expressed or implied, other than as expressly set forth in this Agreement, and the Purchaser wishes to purchase and assume from the Seller, all of the Seller's right, title, and interest in, to, and under the Property; and (2) the Parties agree that the Seller shall not have any liability from and after the Closing Date (as defined below) under or in connection with the Property.

NOW, THEREFORE, based on the above recitals (which are incorporated into and made part of this Agreement by this reference), subject to the terms of the Sale Order, the Sale Procedures, and this Agreement, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1.    <u>Agreement to Sell and Purchase</u>.  Subject to Bankruptcy Court approval, the entry of the Sale Order, and the terms and conditions of this Agreement, the Seller, at the Closing (as defined below), shall sell, transfer, assign, and convey to the Purchaser, without representation, warranty, recourse, or guaranty of any kind, expressed or implied (except as otherwise expressly provided in this Agreement), the Property, and the Purchaser, at the Closing, shall assume all of the Seller's duties and obligations relating to the Property.

1.1    As used herein, "<u>Property</u>" shall mean, collectively, the Seller's right, title, and interest  in and to the following (subject to the exclusions listed in the last paragraph of this Article 1):

1.1.1    the Land;

1.1.2    the Improvements, including the improvements comprising the Hotel Unit and all improvements in Hotel Limited Common Elements or Hotel/Apartments Limited Common Elements owned by the owner of the Hotel Unit (the "<u>Hotel</u>");

1.1.3    all fixtures, furniture, furnishings, fittings, equipment, machinery, apparatus, appliances, and other articles of personal property located on the Land, that are being used exclusively in connection with any part of the Hotel, subject to such depletions, substitutions and replacements as shall occur and be made in the ordinary course of business prior to the Closing Date (the "<u>Personal Property</u>");

1.1.4    all opened and unopened food and beverages (non-alcoholic and, to the extent legally transferable, alcoholic), cleaning supplies, bath products, and other consumable inventory located on the Land, if any, and used exclusively in connection with the Hotel (the "<u>Consumables</u>");

1.1.5    all china, glassware, linens, silverware, kitchen and bar small goods, paper goods, guest supplies, cleaning supplies, operating supplies, printing supplies and printed brochures, stationery, and uniforms, whether in use or held in reserve storage for future use exclusively in connection with the operation of the Hotel (the "<u>Inventory</u>")

1.1.6  all existing contracts or reservations for the use or occupancy of guest rooms and/or the banquet facilities of the Hotel and any additional such contracts or reservations made in the ordinary course of business between the Effective Date and the Closing Date that are disclosed to Purchaser (the "Bookings");

1.1.7  all licenses, permits, certificates of occupancy, authorizations and approvals used in or relating to the ownership, occupancy or operation of any part of the Hotel (collectively, the "Permits");

1.1.8  all space leases, license agreements, occupancy agreements, concession agreements, and other agreements described on Schedule 1.1.8 attached hereto (the "Leases"); and

1.1.9  all service contracts, purchase orders, equipment leases, and other contracts or agreements relating to the maintenance, operation, provisioning or equipping of the Hotel (a) that are listed on Schedule 1.1.9 attached hereto or (b) that require payments by the Hotel of no more than $10,000 per month and are terminable by the Hotel without penalty on ninety (90) days' notice or less (collectively, the "Hotel Contracts").

Notwithstanding the foregoing, "Property" shall exclude (i) all items of Personal Property, Inventory or Consumables in the Hotel that are owned by the Mandarin Entities (ii) the Existing Management Agreements (as defined in Section 9.1.5) or any rights or obligations thereunder, (iii) any Hotel Contracts between the Seller or Hotel and any of the Mandarin Entities or their affiliates, (iv) the Hotel Contracts with Guest-TEK, Harvard Pilgrim, Excel, NEC, Avendra, IDeaS, Infor Global Solutions and Post Integrations (v) any other Hotel Contracts entered under a corporate contracting program of the Mandarin Entities, (vi) any rights in intellectual property owned by the Mandarin Entities or items of Personal Property, Consumables or Inventory bearing the marks or other intellectual property of the Mandarin Entities, (vii) Hotel Contracts, Leases or Permits that, by their terms, are not assignable or that require consent to assignment that Seller is unable to obtain, (viii) any employee benefit agreements or contracts, and (ix) property owned by any guest, occupant, tenant, licensee concessionaire or invitee of the Property.

2.    Exceptions to Title; Title Matters.

2.1    The Property shall be sold, conveyed and/or assigned to the Purchaser subject only to the exceptions shown below and on Exhibit B attached hereto (collectively, "Permitted Encumbrances"):

2.1.1  Any state of facts that an accurate survey of the Land and Improvements would show (collectively, "Facts");

2.1.2  All present and future zoning, building, environmental, and other laws, ordinances, codes, restrictions, and regulations of all governmental authorities having jurisdiction with respect to the Property, including, without limitation, landmark designations and all zoning variances and special exceptions, if any (collectively, "Laws and Regulations");

2.1.3    Any rights of tenants pursuant to the Leases, and others claiming by, through, or under such tenants;

2.1.4    Any violations of building, fire, sanitary, environmental, housing, and similar Laws and Regulations as of the Effective Date, whether or not disclosed, and any such violations between the Effective Date and the Closing Date (provided that, with respect to any such violations occurring after the Effective Date, the aggregate cost to cure same as of the Closing Date is not reasonably expected to exceed One Million Dollars ($1,000,000)) (collectively, "Violations");

2.1.5    Any liens and exceptions for taxes and other governmental charges and assessments (including special assessments, water rates, water meter charges, sewer taxes, rents and charges, if any) that are not yet due and payable;

2.1.6    Variations between tax lot lines and lines of record title;

2.1.7    Any liens, encumbrances or exceptions caused by the Purchaser, its agents, representatives or employees;

2.1.8    Any easements and other matters shown in the public records, but excluding any (a) matters relating to the Existing Management Agreements, (b) mortgage liens, security interests, and other liens securing indebtedness of the Seller or its affiliates, and (c) mechanics liens or similar liens relating to work performed at the Property by or on behalf of Seller; and

2.1.9    Any matters that arise subsequent to the Effective Date that are approved (or deemed approved) by the Purchaser.

2.2    The Seller shall not be required to take or bring any action or proceeding or any other steps to remove any defect in or objection to title or to fulfill any condition precedent to the Purchaser's obligations under this Agreement or to expend any moneys therefor, nor shall the Purchaser have any right of action against the Seller therefor, at law or in equity.

3.    Deposit. The Purchaser shall pay a deposit to the Seller in accordance with the Sale Procedures (together with any interest earnings thereon, the "Deposit").

4.    Purchase Price and Payment; Closing.

4.1    Purchase and Sale. Subject to Bankruptcy Court approval, entry of the Sale Order, and the terms and conditions of this Agreement, the Seller, at the Closing, shall sell, transfer, assign, and convey to the Purchaser without representation, warranty, recourse, or guaranty of any kind, expressed or implied (except as expressly provided in this Agreement), the Property, and the Purchaser, at the Closing, shall assume all of the Seller's duties and obligations relating to the Property. The Purchase Price (as defined below) shall be payable as follows:

4.1.1    Purchase Price. In consideration of the sale, transfer, assignment, and conveyance of the Property, the Purchaser shall pay to the Seller ONE HUNDRED FORTY MILLION AND NO/100 DOLLARS ($140,000,000) (the "Purchase Price") (a) less the amount

of the Deposit and (b) subject to such apportionments, adjustments, and credits as are provided in Sections 6 and 12 of this Agreement.

4.1.2    No Financing Contingency.  The Purchaser expressly agrees and acknowledges that the Purchaser's obligations under this Agreement are not in any way conditioned upon or qualified by the Purchaser's ability to obtain financing of any type or nature whatsoever, including, without limitation, through debt financing, equity investment, or otherwise.

### 4.1.3    Allocated Purchase Price.

(a)    No more than thirty (30) calendar days prior to the Closing Date, Seller shall provide to the Purchaser an allocation of the Purchase Price for federal, state and local tax purposes, further allocated, as applicable (in accordance with the rules of Section 1060 of the Code and the Treasury Regulations promulgated thereunder and any similar provision of state or local law) among the real property and other tangible property comprising the Property (the "**Proposed Allocation**").  The Proposed Allocation shall become final and binding fifteen (15) calendar days after it is provided by the Seller, unless the Purchaser objects in good faith in writing.  In that case, the Parties shall negotiate in good faith to agree upon any disputed items.  If the Parties cannot agree on an allocation of the Purchase Price within fifteen (15) calendar days after the Purchaser provides written notice of the Purchaser's objection to Seller, each such Party may use its own allocation of the Purchase Price, as each shall deem appropriate.

(b)    If the Proposed Allocation is agreed or becomes final, or if the Parties reach agreement on all disputed items and agree to a final allocation (such agreed and final allocation, the "**Final Allocation**"), the Parties agree to (a) cooperate in the filing of any forms (including Form 8594 under Section 1060 of the Code) with respect to the Final Allocation, including any amendments to such forms required pursuant to this Agreement with respect to any adjustments to the Purchase Price and (b) file all federal, state and local Tax returns and related tax documents consistent with such Final Allocation, as the same may be adjusted pursuant to the terms of Article X or any other provision of this Agreement, and not take any position (whether in audits, Tax returns or otherwise) inconsistent with such allocations unless otherwise required by Applicable Law.

4.2    Closing; Closing Date.  The closing of this transaction (the "Closing") shall occur two (2) business days after satisfaction of the conditions set forth in Section 9 (such date, as may be extended by the Seller pursuant to Section 4.3 of this Agreement, the "Closing Date").  The Closing will occur at the office of First American Title Insurance Company (the "Title Company") located closest to the Property, or at such other place upon which the Parties shall mutually agree.

4.3    Extension of Closing Date.  The Purchaser agrees that, upon written notice from the Seller to the Purchaser no later than ten (10) business days prior to the then-scheduled Closing Date, the Seller shall have the right, in its sole discretion, to extend the Closing Date for any period of days up to and including forty-five (45) days.

4.4    1031 Exchange. The Purchase will, at the Purchaser's election as provided below, take place as part of a so-called like-kind exchange (the "**Exchange**") pursuant to Section 1031 of the Internal Revenue Code and any Treasury Regulations promulgated thereunder and shall be effected through an assignment of this Agreement, or the Purchaser's rights under this Agreement, in whole or in part, to a qualified intermediary or exchange accommodation titleholder designated by the Purchaser. The Seller shall not be required to acquire or hold title to any other real property or sell the Property to any other third party, as the case may be, for purposes of consummating the Exchange. The Purchaser shall pay or reimburse the Seller for any additional costs that the Seller would not have incurred if the Closing were not consummated as part of the Exchange. In the event that the Purchaser elects to assign this Agreement or its rights under this Agreement pursuant to this Section 4.4, the Purchaser shall inform the Seller in writing of such decision and identify the qualified intermediary or exchange accommodation titleholder at least five (5) business days prior to Closing. The Seller shall, if required, (x) consent to such assignment (in the form reasonably requested by the qualified intermediary or exchange accommodation titleholder and reasonably acceptable to the Seller), (y) comply with written instructions providing that the payment of all or a part of the Purchase Price may come from a qualified escrow or qualified trust account at Closing, and (z) otherwise cooperate with the Purchaser in all reasonable respects in effecting the Exchange, including by the execution of additional escrow instructions, documents, agreements or instruments as may reasonably be requested by the Purchaser, the Title Company, the qualified intermediary, or exchange accommodation titleholder to effect the Exchange so long as same does not subject the Seller to any additional liabilities or obligation not paid by the Purchaser. In the event of an assignment of this Agreement by the Purchaser pursuant to this Section 4.4, its assignee shall be deemed to be the Purchaser hereunder for all purposes hereof, and shall have all rights of the Purchaser hereunder, provided the assignor shall not be released from any liability hereunder. The provisions of this Section 4.4 shall in no way affect or diminish in any manner any of the Seller's rights under this Agreement, except as expressly provided in this Section 4.4. The Seller shall not be responsible for compliance with, or be deemed to have warranted to the Purchaser that the Exchange in fact complies with, Section 1031 of the Code and any Treasury Regulations promulgated thereunder; nor shall the terms or provisions of this Agreement be modified, amended or extended thereby except as expressly provided in this Section 4.4.

5.    As Is.

5.1    EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT TO THE CONTRARY, THE PURCHASER IS EXPRESSLY PURCHASING THE PROPERTY "AS IS, WHERE IS, AND WITH ALL FAULTS" WITH RESPECT TO ALL FACTS, CIRCUMSTANCES, CONDITIONS, AND DEFECTS, INCLUDING, WITHOUT LIMITATION, ANY RELATING TO THE TRANSACTIONS CONTEMPLATED BY OR REFERENCED IN THIS AGREEMENT AND, EXCEPT AS IS EXPRESSLY SET FORTH IN THIS AGREEMENT TO THE CONTRARY, THE SELLER HAS NO OBLIGATION TO DETERMINE OR CORRECT ANY SUCH FACTS, CIRCUMSTANCES, CONDITIONS, OR DEFECTS OR TO COMPENSATE THE PURCHASER FOR SAME. THE SELLER HAS SPECIFICALLY BARGAINED FOR THE ASSUMPTION BY THE PURCHASER OF ALL RESPONSIBILITY TO INVESTIGATE THE PROPERTY, LAWS AND REGULATIONS, FACTS, AND VIOLATIONS AND OF ALL RISK OF ADVERSE CONDITIONS, AND HAS STRUCTURED THE PURCHASE PRICE AND OTHER TERMS OF THIS AGREEMENT IN

LIGHT OF AND WITH DUE CONSIDERATION OF THE FOREGOING.  THE PURCHASER HAS UNDERTAKEN ALL SUCH INVESTIGATIONS OF THE PROPERTY, LAWS AND REGULATIONS, FACTS, AND VIOLATIONS AS THE PURCHASER DEEMS NECESSARY OR APPROPRIATE UNDER THE CIRCUMSTANCES AS TO THE STATUS OF THE PROPERTY AND, BASED UPON THE SAME, EXCEPT AS IS EXPRESSLY SET FORTH IN THIS AGREEMENT TO THE CONTRARY, THE PURCHASER IS AND WILL BE RELYING STRICTLY AND SOLELY UPON SUCH INVESTIGATIONS, INSPECTIONS AND EXAMINATIONS AND THE ADVICE AND COUNSEL OF ITS OWN CONSULTANTS, AGENTS, LEGAL COUNSEL AND OFFICERS AND THE PURCHASER IS AND WILL BE FULLY SATISFIED THAT THE PURCHASE PRICE IS FAIR AND ADEQUATE CONSIDERATION FOR THE PROPERTY AND, BY REASON OF ALL THE FOREGOING, THE PURCHASER ASSUMES THE FULL RISK OF ANY LOSS OR DAMAGE (SUBJECT TO SECTION 12 BELOW) OCCASIONED BY ANY FACT, CIRCUMSTANCE, CONDITION OR DEFECT PERTAINING TO THE PROPERTY.

5.2    EXCEPT AS IS EXPRESSLY SET FORTH IN THIS AGREEMENT TO THE CONTRARY, THE SELLER HEREBY DISCLAIMS ALL WARRANTIES OF ANY KIND OR NATURE WHATSOEVER (INCLUDING, WITHOUT LIMITATION, WARRANTIES OF HABITABILITY AND FITNESS FOR PARTICULAR PURPOSES), WHETHER EXPRESSED, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, WARRANTIES WITH RESPECT TO THE PROPERTY.  EXCEPT AS IS EXPRESSLY SET FORTH IN THIS AGREEMENT TO THE CONTRARY, THE PURCHASER ACKNOWLEDGES THAT IT IS NOT RELYING UPON ANY REPRESENTATION OF ANY KIND OR NATURE MADE BY THE SELLER, OR ANY OF THE SELLER'S DIRECTORS, OFFICERS, EMPLOYEES, MANAGERS, MEMBERS, PARTNERS, PRINCIPALS, EQUITY HOLDERS, OTHER DIRECT OR INDIRECT BENEFICIAL OWNERS, AFFILIATES, AGENTS, REPRESENTATIVES, ATTORNEYS, CONSULTANTS, OR ADVISORS, INCLUDING BUT NOT LIMITED TO IBRC AND THE SPECIAL LIQUIDATORS (COLLECTIVELY, THE "SELLER RELATED PARTIES") WITH RESPECT TO THE PROPERTY AND THAT, IN FACT, NO SUCH REPRESENTATIONS WERE MADE EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT.

5.3    The Seller makes no representation with regard to Hazardous Materials (as defined below) at the Property including, without limitation, any representation or warranty with respect to the presence of Hazardous Materials on, above, or beneath the Land (or any parcel in proximity thereto) or in any water on or under the Land (or in proximity thereto). The Purchaser's closing hereunder shall be deemed to constitute an express waiver of any right that the Purchaser may hereafter have to cause the Seller to be joined in any action brought under any Environmental Laws (as defined below). The term "Hazardous Materials" shall mean (a) those substances included within the definitions of any one or more of the terms "hazardous materials," "hazardous wastes," "hazardous substances," "industrial wastes," and "toxic pollutants," as such terms are defined under any or all of the Environmental Laws, (b) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof, (c) natural gas, synthetic gas, and any mixtures thereof, (d) asbestos and/or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophylite, and/or actinolite, whether friable or non-friable, (e) polychlorinated biphenyl ("PCBs") or PCB-containing materials or fluids, (f) radon, (g) mold,

(h) any other hazardous or radioactive substance, material, pollutant, contaminant, or waste, and (i) any other substance with respect to which any Environmental Law or governmental authority requires environmental investigation, monitoring, or remediation.  The term "Environmental Laws" shall mean all federal, state, and local laws, statutes, ordinances, regulations, and requirements, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees, and binding judgments relating to the regulation and protection of human health, safety, the environment, and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface, or subsurface strata, wildlife, aquatic species, and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S. §§ 6901 et seq.), the Toxic Substances Control Act, as amended (15 U.S.C. §§ 2601 et seq.), the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f et seq.), any state or local counterpart or equivalent of any of the foregoing, and any federal, state, or local transfer of ownership notification or approval statutes.

5.4     The Purchaser shall rely solely upon the Purchaser's own knowledge of the Property based on its investigation of the Property and its own inspection of the Property in determining the Property's physical condition.  Except as expressly set forth in this Agreement to the contrary, the Purchaser releases the Seller, the Seller Related Parties, and their respective affiliates, successors, and assigns from and against any and all claims which the Purchaser or any party related to or affiliated with the Purchaser (each, a "Purchaser Related Party") has or may have in any way relating to or arising or resulting from any matter or thing in any way related to the Property, except as expressly set forth in this Agreement to the contrary, including, without limitation, the documents and information referred to herein, any construction defects, errors, or omissions in the design or construction, and any environmental conditions, and, except as expressly set forth in this Agreement to the contrary, neither the Purchaser nor any Purchaser Related Party shall look to the Seller, the Seller Related Parties, or their respective affiliates, successors, and assigns in connection with any of the foregoing for any redress or relief.  This release shall be given full force and effect according to each of its express terms and provisions, including those relating to unknown and unsuspected claims, damages, and causes of action.

5.5     The provisions of this Section 5 shall survive the Closing or earlier termination of this Agreement and shall not be deemed to have merged into any of the documents executed or delivered at the Closing.

6.     Apportionments.  At the Closing, the following items shall be apportioned and prorated between the Parties as of 11:59 p.m. on the day immediately preceding the Closing Date ("Cut-Off Time"), unless otherwise expressly set forth below.  Any errors in the apportionments pursuant to this Section 6 shall be corrected by appropriate re-adjustment between the Seller and the Purchaser post-closing, provided that notice of any such error, with supporting calculations, shall be given by the Purchaser to the Seller or by the Seller to the Purchaser, as the case may be,

no later than ninety (90) days after the Closing, if ascertainable within such period, it being understood and agreed that if any such items or errors are not ascertainable at the Closing or within ninety (90) days thereafter, the apportionment shall be made subsequent to the Closing when the charge or error is determined but no later than one (1) year after the Closing. Any apportionments and prorations which are not expressly provided for in this Agreement shall be made in accordance with the customary practices in the Commonwealth of Massachusetts and City of Boston. The items to be apportioned are as follows:

6.1     Income and Expenses.  Except as otherwise expressly provided in this Agreement, all income and expenses of the Property with respect to the period prior to the Cut-Off Time shall be for the account of the Seller, and all income and expenses of the Property with respect to the period from and after the Cut-Off Time shall be for the account of the Purchaser.

6.2     Taxes.

6.2.1     All taxes assessments, unmetered water and sewer charges, and vault charges, if any, and any and all other municipal or governmental assessments of any and every nature levied or imposed upon the Property (including, but not limited to, real property, personal property, ad valorem, tangible, intangible, sales, use, net income, alternative, unitary, alternative minimum, minimum franchise, value added, income, receipts, capital, excise, leasing, fuel, excess profits, turnover, occupation and transient accommodation, employment, transfer, recording and stamp taxes, and non-ad-valorem assessments, but calculated as if paid on time, without late fees, as provided under Massachusetts law) (collectively, "Taxes"), in respect of the current fiscal year or other period of the applicable taxing authority in which the Closing Date occurs (the "Current Tax Period"), on a per diem basis based upon the number of days in the Current Tax Period prior to the Closing Date (which shall be allocated to the Seller) and the number of days in the Current Tax Period on and after the Closing Date (which shall be allocated to the Purchaser).  Any refunds or abatements of Taxes with respect to periods prior to the Closing Date will belong to the Seller.  If the Closing shall occur before the tax rate for the Current Tax Period is fixed, the apportionment of real estate taxes shall be upon the basis of the tax rate for the preceding fiscal period applied to the latest assessed valuation. Upon the Closing Date and subject to the adjustment provided above, the Purchaser shall be responsible for Taxes levied or imposed upon the Property payable in respect of the Current Tax Period and all periods after the Current Tax Period.  In no event shall the Seller be charged with or be responsible for any increase in the Taxes levied or imposed upon the Property resulting from the transfer of the Property herein contemplated or for any other reason.  If any Taxes levied or imposed upon the Property are payable in installments, the installment for the Current Tax Period shall be prorated in the manner set forth above and the Purchaser hereby assumes the obligation to pay any such installments due on and after the Closing Date.

6.2.2     The Parties acknowledge that certain Taxes accrue and are payable to the various local governments by any business entity operating a hotel and its related facilities in Boston, Massachusetts.  Included in those Taxes may be business and occupation Taxes, retail sales and use Taxes, gross receipts Taxes, and other special lodging or hotel Taxes. For purposes of this Agreement, the income or revenue on which such Taxes are based and/or calculated shall be allocated between the Seller and the Purchaser such that the income or revenue attributable to the period prior to the Closing shall be allocable to the Seller and the income or revenue

attributable to the period from and after the Closing shall be allocable to the Purchaser, and the Seller shall be solely responsible for the payment of such Taxes with respect to the income and revenue for the period prior to the Closing and the Purchaser shall be solely responsible for payment of such Taxes with respect to income and revenue for the period from and after the Closing.

6.3     Room Rentals. One hundred percent (100%) of the room rentals attributable to the night prior to the Closing and any other nights prior to the Closing shall be the property of the Seller and one hundred percent (100%) of the room rentals on and after the Closing shall be the property of the Purchaser.

6.4     Reservation Deposits. Prepaid and unearned reservation deposits (including any Bookings deposits) and other items prepaid by guests of the Hotel shall be disclosed in writing and transferred to the Purchaser at the Closing or credited against the Purchase Price.

6.5     Operating Expenses and Trade Accounts. The Seller shall be responsible for the payment of (i) all operating expenses and trade accounts of the Property (including, without limitation, charges and fees payable under the Hotel Contracts and all amounts due under the documents described on Exhibits A and B to this Agreement) up to and including the Cut-Off Time and (ii) all fees and other charges that are or may become due under the Existing Management Agreements; provided, however, that to the extent any expenses, charges, or fees are imposed by counterparties under any of the Hotel Contracts listed on Schedule 1.1.9 hereof or the documents described on Exhibits A and B and such expenses, charges, or fees arise out of or are imposed in connection with the transactions contemplated by or referenced in this Agreement (collectively, the "Counterparty Expenses"), the Purchaser shall be solely responsible for such expenses, charges, or fees. To the extent the amounts of such items are then known, the Seller shall pay such items at Closing and shall pay the balance of such amounts in the ordinary course of business but in no event later than forty-five (45) days after the Closing. The Purchaser shall assume responsibility for purchase orders made by the Seller in the ordinary course of business and which have not been delivered to the Hotel as of the Closing.

6.6     Food, Beverage and Other Income. Revenue from food, beverage and banquet services, room service, meeting room revenues, health club revenues, and other services rendered to guests and invitees of the Hotel shall be prorated as of the Cut-Off Time if, as and when collected.

6.7     Employees. The Seller shall pay all wages and fringe benefits (including, but not limited to, accrued vacation pay, sick pay (if required by applicable law) and payroll taxes), through the Cut-Off Time. As of and immediately after the Closing Date, the Purchaser shall offer employment or shall direct its management company to offer employment to all employees of the Hotel, other than the general manager and others holding senior executive level positions, at base compensation (base salary or basic hourly wage rate) at the same, or at Purchaser's election, greater rates than the employees received on November 24, 2015, subject to any base compensation increases in the ordinary course. The Seller shall not have any obligation to comply with the Workers Adjustment and Retraining (WARN) Act or any similar state law, and the Purchaser shall indemnify, protect, defend and hold the Seller harmless from and against

any liability, cost, loss, damages and fees (including, without limitation, attorneys' fees) resulting from the Purchaser's or its manager's or agent's employment of the employees of the Hotel, including, without limitation, the Purchaser's or its manager's or agent's failure to hire the employees of the Hotel in a manner that will not result in any liability on the part of the Seller under Workers Adjustment and Retraining (WARN) Act or any similar state law. Wage and fringe benefits (including, but not limited to, accrued vacation pay) of employees of the Hotel shall be prorated between the Seller and the Purchaser as of the Cut-Off Time.

6.8    Cash.  All cash on hand in the Hotel's safe or house bank on the morning of the Closing shall become the property of the Purchaser and the amount thereof shall be credited to the Seller.

6.9    Consumables. The Seller shall receive a credit, and the Purchaser shall be charged for, the inventory of unopened bottles of liquor and wine at the Property paid for by the Seller and transferred to the Purchaser, including minibar inventories, and the Purchaser shall purchase all other unopened boxes of food and beverage supplies at the Property.  The credit or purchase price, as applicable, of such food, liquor and wine shall be equal to the actual cost of such items paid therefor by the Seller.

6.10    Ledger and Other Receivables.  All accounts receivable attributable to guests in the Hotel on the night preceding the Closing (the "Ledger") shall be prorated as provided in this Agreement, the Seller's share shall be credited to the Seller, and the Ledger shall become the property of the Purchaser.  All other accounts receivable that are the property of the Seller under this Agreement shall be set forth in a schedule on the Closing and shall remain the property of the Seller. The Purchaser shall cooperate with the Seller, at the Seller's sole cost and expense, to collect such accounts receivable in the ordinary course of business; provided, however, that the Purchaser shall not be required to commence any litigation to collect any such amounts If any receivables which are the property of the Seller under this Agreement shall be collected by the Purchaser, the Purchaser shall remit the same to the Seller on a monthly basis, provided that the Purchaser may offset against such collections any amounts unpaid by the Seller to the Purchaser under this Section 6.10.

6.11    Licenses and Permits.  Any charges or fees for transferable Permits shall be paid by the Seller.

6.12    Guest Property in Seller's Possession on Closing.  Property of guests of the Hotel in the Seller's care, possession or control (excluding that in guest rooms) on the Closing Date shall be handled in the following manner:

6.12.1 Safe Deposit Boxes.  On the Closing Date, the Seller shall cause notice to be sent to all guests of the Hotel who have safe deposit boxes, advising them of the pending sale of the Property and requesting the removal and verification of the contents of such safe deposit boxes within three (3) days after the Closing Date.  The Seller may have a representative present at the Hotel during such three (3) day period for the purpose of viewing such removal and verification.  Boxes of guests not responding to the written notice shall be listed at the end of such three (3) day period.  Such boxes shall be opened on the following day in the presence of representatives of the Seller and the Purchaser to be agreed upon between the

Seller and the Purchaser and the contents thereof shall be recorded. Any property contained in the safe deposit boxes and so recorded and thereafter remaining in the hands of the Purchaser shall be the responsibility of the Purchaser.

6.12.2 <u>Baggage Inventory; Other Property</u>. All guest baggage checked and other guest property left in the possession, care and control of the Seller shall be listed in an inventory to be prepared in duplicate and signed by the Seller's and the Purchaser's representatives on the Closing Date. The Purchaser shall be responsible from and after the Closing Date for all baggage listed in the signed inventory (and the contents thereof) and other guest property listed in the signed inventory.

6.12.3 <u>Other Property</u>. All other guest property left in the possession, care or control of the Seller prior to the Closing Date shall, if not inventoried pursuant to <u>Section 6.12.2</u> above, be returned by the Seller to guests prior to the Closing Date and if not so returned prior to the Closing Date and not listed in the inventory contemplated under <u>Section 6.12.2</u> above shall be the sole responsibility of the Seller subsequent to the Closing Date.

6.13    <u>Utility Charges</u>. If there are water, sewer, gas, electricity, telephone or other utility meters on the Property, the Seller shall furnish readings at the Closing, and such charges shall be apportioned on the basis of such last readings. If the Seller fails or is unable to obtain such readings with respect to any such charge that, if unpaid, could not constitute a lien against the Property, the Closing shall nevertheless proceed and the parties shall apportion the meter charges and sewer rents on the basis of the last readings and bills received by the Seller and the same shall be appropriately readjusted after the Closing on the basis of the next subsequent bills. The Purchaser shall utilize commercially reasonable efforts to transfer all utility accounts to the Purchaser as of the Closing Date, if applicable, and the Seller shall cooperate (at no cost to the Seller) in connection with any such transfer. In the event that the Purchaser is unable to effectuate the transfer of such utility accounts on the Closing Date, the Purchaser shall bear the cost of such utilities from and after the Closing. The Purchaser shall be entitled to retain any utility deposits made by or on behalf of the Seller, or any other party, if the deposit funds are available.

6.14    <u>Insurance</u>. The Seller shall not be required or entitled to assign any policies of insurance in respect of the Property to the Purchaser, and the Purchaser shall be responsible for obtaining its own insurance as of the Closing Date, and no adjustment shall be made for any insurance premiums.

6.15    <u>Rents and Security Deposits</u>. All rental revenue under the Leases (including fixed rents and charges in respect of electricity, operating expenses and taxes) shall be prorated as of the Cut-Off Time if, as and when collected. If there are any arrearages under the Leases as of the Closing, any rents collected by the Purchaser after the Closing with respect to such Leases shall be applied first to rents due and payable with respect to periods from and after the Closing and then to arrearages with respect to periods prior to the Closing. The Purchaser shall have no obligation to collect arrearages on behalf of the Seller. Payments from tenants for electricity, operating expenses and taxes which are billed to tenants in arrears or on an estimated basis shall be prorated on such basis and readjusted if, as and when such amounts are finally

determined and collected.  Any security deposits under the Leases shall be transferred to the Purchaser at the Closing or credited against the Purchase Price.

6.16    Survival.  The provisions of this Section 6 shall survive the Closing; provided, however, that any re-prorations or re-apportionments shall be made as and when required under the first paragraph of Section 6 above.

7.    Representations and Warranties of the Parties; Certain Covenants.

7.1    The Seller warrants, represents, and covenants to and with the Purchaser that the following are true and correct on the Effective Date:

7.1.1    Subject to Bankruptcy Court approval and entry of the Sale Order, the Seller has the requisite power and authority to enter into and to perform the terms of this Agreement.  Subject to Bankruptcy Court approval and entry of the Sale Order, the Seller is not subject to any law, order, decree, restriction or agreement (including, without limitation,  as of the Closing Date, the Existing Management Agreements) which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby.  Subject to Bankruptcy Court approval and entry of the Sale Order, the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of the Seller.  This Agreement constitutes, and each document and instrument contemplated hereby to be executed and delivered by the Seller, when executed and delivered, shall constitute the legal, valid and binding obligation of the Seller enforceable against the Seller in accordance with its respective terms, subject to Bankruptcy Court approval and entry of the Sale Order.

7.1.2    The Seller is not, and will not become, a person or entity with whom United States persons or entities are restricted or prohibited from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's specially designated and blocked persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not engaged and will not engage in any dealings or transactions or be otherwise associated with such persons or entities; provided, however, the Seller makes no representations or warranties in this Section 7.1.2 with respect to any general partner, manager, managing member, or other person or entity holding a comparable position with respect to the Seller that is a governmental authority.

7.1.3    To the actual knowledge of the Seller, all documents provided by the Seller, Special Liquidator, or their representatives to the Purchaser are true, complete, and correct copies of the originals, and include all amendments, addenda, terminations, and other modifications thereto, if any.

7.1.4    Seller has good title to the Personal Property, Consumables and Inventory (and good leasehold title to any leased equipment pursuant to any equipment leases that are described on Schedule 1.1.9 attached hereto) to be conveyed to the Purchaser pursuant to

this Agreement, subject to no rights of third parties (except for Permitted Encumbrances and the rights of lessors under any such equipment leases).

7.1.5   None of the property in the Hotel that is owned by any of the Mandarin Entities is material to the operation of the Hotel.

7.1.6   There are no oral or written leases, licenses, or other agreements allowing any third party (or the equipment or property of any third party) the right to possess or use all or any portion of the Property, except for (a) the Leases described on Schedule 1.1.8 attached hereto and (b) Bookings.

7.1.7   To the actual knowledge of the Seller, Schedule 1.1.9 attached hereto contains a complete list of all service contracts, purchase orders, equipment leases and other contracts or agreements relating to the maintenance, operation, provisioning or equipping of the Hotel that (a) require payments by the Hotel of more than $10,000 per month, (b) are not terminable by the Hotel without penalty on ninety (90) days' notice or less, and that will or may become binding on Purchaser at Closing, or (c) that would require the payment of Counterparty Expenses by the Purchaser.

7.1.8   To the actual knowledge of the Seller, there are no pending or proposed special assessments under any of the Permitted Encumbrances that have not been previously disclosed in writing by the Seller to the Purchaser. Neither Seller nor the Special Liquidators has received any written notice of default under any of the Permitted Encumbrances which has not been cured and, and to the actual knowledge of the Seller, none of the counterparties to the Permitted Encumbrances are in default in any material respect.

7.1.9   Neither Seller nor, to the Seller's actual knowledge, the Mandarin Entities or the Special Liquidators, has received notice of any material Violations or of any failed inspections that would indicate material Violations.

7.1.10   There are no contracts between the Seller or its Affiliates, on the one hand, and any of the Mandarin Entities, on the other hand, relating to the Hotel or the Condominium (or Units therein) other than the Offshore Management Agreement, the Onshore Management Agreement, the License Agreement, the Condo Agreement, the Apartment Agreement and the Residences Agreement (as those terms are defined in Section 9.1.5) (i) that would be binding on Purchaser upon Closing or (ii) the termination of which could result in liability to the Purchaser.

7.1.11   The Seller has the contractual right to terminate the Hotel Management Agreements on terms described therein and will exercise such rights in accordance with such terms as a condition to Closing.

The Seller shall promptly advise the Purchaser in writing of any changes to the Seller's representations or warranties. Unless written notice to the contrary has been delivered to the Purchaser prior to the Closing (matters set forth in such advice or notice, the "Seller Updates"), the representations and warranties made by the Seller in this Section 7.1 shall be deemed restated and shall be true and accurate in all material respects on the Closing Date; provided, however, that none of the foregoing representations or warranties shall survive the

Closing. The Purchaser acknowledges that the Special Liquidators have not undertaken any independent investigation to determine the substance or accuracy of such facts and no inference as to the Seller's knowledge concerning such facts should be drawn, although the Special Liquidators have no knowledge that any of such facts are untrue.

7.2    The Purchaser warrants, represents, and covenants to and with the Seller that the following are true and correct on the Effective Date:

7.2.1    The Purchaser is a corporation duly formed and in good standing under the laws of the State of Delaware and has the requisite power and authority to enter into and to perform the terms of this Agreement. The Purchaser is not subject to any law, order, decree, restriction, or agreement that prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of the Purchaser. Subject to Bankruptcy Court approval and the entry of the Sale Order, this Agreement constitutes, and each document and instrument contemplated hereby to be executed and delivered by the Purchaser, when executed and delivered, shall constitute the legal, valid, and binding obligation of the Purchaser enforceable against the Purchaser in accordance with its respective terms (subject to bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally);

7.2.2    Except as otherwise provided in this Agreement, neither the execution, delivery, and performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by, or requires the Purchaser to obtain any consent, authorization, approval, or registration under, any law, statute, rule, regulation, judgment, order, writ, injunction, or decree that is binding upon the Purchaser;

7.2.3    There are no judgments, orders, or decrees of any kind against the Purchaser unpaid or unsatisfied of record, nor any actions, suits, or other legal or administrative proceedings pending or, to the Purchaser's actual knowledge, threatened against the Purchaser, which would have any material adverse effect on the business or assets or the condition, financial or otherwise, of the Purchaser or the ability of the Purchaser to consummate the transactions contemplated by this Agreement; and

7.2.4    The Purchaser is not, and will not become, a person or entity with whom United States persons or entities are restricted or prohibited from doing business under regulations of OFAC (including those named on OFAC's specially designated and blocked persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and will not engage in any dealings or transactions or be otherwise associated with such persons or entities; provided, however, that the Purchaser makes no representations or warranties in this Section 7.2.4 with respect to any holder of shares in Purchaser's parent company, Hilton Worldwide Holdings Inc.

7.2.5    The Purchaser is adequately capitalized to perform its obligations under this Agreement and in connection with the Property.

The Purchaser shall promptly advise the Seller in writing of any changes to the representations or warranties. Unless written notice to the contrary has been delivered to the Seller prior to the Closing (matters set forth in such advice or notice, the "Purchaser Updates"), the representations and warranties made by the Purchaser in this Section 7.2 shall be deemed restated and shall be true and accurate in all material respects on the Closing Date; provided, however, that none of the foregoing representations or warranties shall survive the Closing. The Seller acknowledges that the Purchaser has not undertaken any independent investigation to determine the substance or accuracy of such facts, and no inference as to the Purchaser's knowledge concerning such facts should be drawn, although the Purchaser has no knowledge that any of such facts are untrue.

       7.3     The Purchaser agrees and acknowledges that, except as specifically set forth in this Agreement, neither the Seller nor any of the Seller Related Parties, nor any agent or any representative or purported agent or representative of the Seller or any of the Seller Related Parties has made, and neither the Seller nor any of the Seller Related Parties is liable for or bound in any manner by, any express or implied warranties, guaranties, promises, statements, inducements, representations, or information pertaining to all or any part of the Property. Without limiting the generality of the foregoing, the Purchaser has not relied on any representations or warranties, and the Seller and the Seller Related Parties have not made any representations or warranties other than as expressly set forth in Section 7.1 hereof, in either case express or implied, as to (a) the current or future real estate tax liabilities, assessments, or valuations of the Property, (b) the potential qualification of the Property for any and all benefits conferred by federal, state, or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated, (c) the compliance of the Property, in its current or any future state, with applicable zoning ordinances and the ability to obtain a change in the zoning or a variance with respect to the Property's non-compliance, if any, with said zoning ordinances, (d) the availability of any financing for the alteration, rehabilitation, or operation of the Property from any source, including, without limitation, any state, city, or federal government or any institutional lender, (e) the current or future use of the Property, including, without limitation, with respect to the Property's use for residential (including hotel, cooperative or condominium use) or commercial purposes, (f) the present and future condition and operating state of any and all machinery or equipment on the Property and the present or future structural and physical condition of any building or its suitability for rehabilitation or renovation, (g) the presence or absence of any Laws and Regulations or any Violations, or (h) the layout, leases, rents, income, expenses, operation, agreements, licenses, easements, instruments, or documents of or in any way affecting the Property. The provisions of this Section 7.3 shall survive the Closing or the earlier termination of this Agreement.

       7.4     The Purchaser shall honor all existing Bookings and all other Bookings made in accordance with this Agreement for any period beginning on or after the Closing.

       7.5     The Purchaser shall assume as of the Closing all of the Hotel Contracts, to the extent assignable or transferable (other than those excluded from the definition of "Property" at the end of Section 1 hereof), and all of the Seller's rights, obligations and liabilities thereunder arising from and after the Closing, provided that Seller will not on or after the Effective Date

exercise any extension options provided in the Hotel Contracts without the Purchaser's consent, not to be unreasonably withheld.

7.6     As soon as reasonably practicable following the Effective Date, the Purchaser (or its affiliate) shall make an application to the appropriate governmental authorities to have the existing liquor license at the Property assigned to the Purchaser (or its affiliate or manager) or, if the liquor license is not assignable, to purchase and apply for a transfer and change of location to, or apply for the issuance of a new all alcoholic beverages on-premises license covering the Property in the name of the Purchaser (or its affiliate or manager), in any case in compliance with applicable law and at the Purchaser's sole cost and expense, and the Purchaser shall use diligent, good faith efforts to expeditiously effect the approval of such transfer or issuance. The Seller shall reasonably cooperate with the Purchaser in this regard (at no cost or expense to Seller), including, but not limited to, providing a Certificate of Good Standing from the Department of Revenue ("DOR COGS") and providing any other documentation reasonably required of the Seller by the City of Boston Licensing Board ("BLB") and/or Massachusetts Alcoholic Beverages Control Commission ("ABCC"). Seller's cooperation shall also include ensuring that no monies are due to any liquor distributors or wholesalers in respect of the existing liquor license. In no event shall the approval of such liquor license transfer or issuance of such a new liquor license be a condition to Closing. In the event that, despite the Purchaser's (or its affiliate's) timely, good faith diligent efforts, the approval of such liquor license transfer or issuance of such a new liquor license has not been obtained as of the Closing then, at the Purchaser's request, and except as may be prohibited by applicable law", the Purchaser and the Seller shall enter into an interim management agreement substantially in the form attached hereto as Exhibit G, pursuant to which the Purchaser (a) shall retain the Seller to manage and control the purchase, sale and service of alcoholic beverages at the Property until such approval or issuance has been obtained, but in no event to exceed one hundred and eighty (180) days after the Closing Date, and (b) shall indemnify, protect, defend and hold harmless the Seller and its affiliates from and against any and all damages, claims, losses, expenses, costs and other liabilities arising during the term of such interim agreement with respect to such agreement or the purchase, sale or service of alcoholic beverages at the Property.

7.7     For a period of one (1) year after the Closing, Seller shall (A) remain in existence as a limited partnership in good standing in Delaware, and (B) maintain sufficient liquid assets in order to satisfy any potential liabilities under this Agreement.

8.     Closing Deliveries.

8.1     The Seller shall deliver to the Purchaser at the Closing the following (the "Seller's Closing Documents"):

8.1.1     A Quitclaim Deed substantially in the form attached hereto as Exhibit C (the "Deed"), duly executed by the Seller;

8.1.2     A bill of sale, in the form attached hereto as Exhibit D (the "Bill of Sale"), duly executed by the Seller conveying and transferring to the Purchaser all right, title and interest of the Seller, if any, in and to the Personal Property, Consumables and Inventory, free and clear of all encumbrances, other than Permitted Encumbrances;

8.1.3    A counterpart original of an assignment and assumption document, in the form attached hereto as <u>Exhibit F</u> (the "<u>Assignment Agreement</u>"), duly executed by the Seller, conveying and transferring to the Purchaser all of the Bookings, Leases, Permits, and Hotel Contracts, as provided therein;

8.1.4    A counterpart original of the Closing Statement (as defined below), executed by the Seller;

8.1.5    Keys to any portion of the Property, to the extent in the Seller's possession or control;

8.1.6    To the extent they are in the Seller's possession and not posted at the Property, certificates, licenses, permits, authorizations, and approvals issued for or with respect to the Property by governmental and quasi-governmental authorities having jurisdiction;

8.1.7    A blanket assignment, without recourse or representation, of all the Seller's right, title, and interest, if any, to all contractors', suppliers', materialmen's, and builders' guarantees and warranties of workmanship and/or materials in force and effect with respect to the Property on the Closing Date and a true and complete copy of each thereof to the extent they are in the Seller's possession;

8.1.8    All applicable real property transfer tax forms, if any, duly completed and acknowledged; and

8.1.9    An affidavit of title to the Title Company in substantially the form attached hereto as <u>Exhibit E.</u>

8.1.10    A written letter or certificate from the Primary Trust of the Condominium (the "<u>Primary Trust</u>") pursuant to Chapter 183A, Section 6(d) of the Massachusetts General Laws  confirming that there are no unsatisfied assessments or other obligations of the Seller under the Primary Trust or Master Deed of the Condominium.

8.1.11    The written resignations in form appropriate for registration with the Registry (as that term is defined in The 776-778 Boylston Primary Trust) of the current Primary Trustees of the Primary Trust that are appointed by Seller.

8.1.12    Written documentation, as contemplated by Section 9.2.5, confirming to Purchaser's reasonable satisfaction that the Hotel Management Agreements (and, to the extent Seller has been able to obtain terminations, the other Existing Management Agreements, which Seller hereby agrees to use commercially reasonable efforts to also terminate or cause to be terminated) have been terminated in accordance with their terms and all amounts owing thereunder, including, but not limited to, any applicable termination fees, have been paid in full.

8.1.13    All documents required to be executed by Seller in connection with the Exchange, as more fully-described in Section 4.4 hereof.

8.1.14 To the extent reasonably required by the Title Company, all required corporate and other documents authorizing the Seller to consummate the transactions contemplated by this Agreement, including, without limitation, the documents required to be executed and delivered by the Seller under this Agreement.

8.1.15 Such other instruments, agreements, or other documents as may be necessary or convenient to effectuate the provisions of this Agreement.

8.2    On the Closing Date, the Purchaser shall execute (as applicable) and deliver to the Seller the following (collectively, the "Purchaser's Closing Deliveries"):

8.2.1 Documentation authorizing the Title Company to release the Deposit to Seller, and payment of the balance of the Purchase Price (a) less the amount of the Deposit and (b) subject to such apportionments, adjustments, and credits as are provided in Sections 6 and 12 of this Agreement, by federal funds wire transfer of immediately available funds to an insured escrow account designated by the Seller or the Seller's counsel;

8.2.2 A counterpart original of the Assignment Agreement, duly executed by the Purchaser;

8.2.3 A counterpart original of the Closing Statement, executed by the Purchaser;

8.2.4 To the extent reasonably required by the Title Company, all required corporate and other documents authorizing the Purchaser to consummate the transactions contemplated by this Agreement, including, without limitation, the documents required to be executed and delivered by the Purchaser under this Agreement;

8.2.5 A good standing certificate of the Purchaser dated no earlier than thirty (30) days prior to the Closing Date;

8.2.6 Acknowledgment of the receipt of the Seller's Closing Documents;

8.2.7 All applicable real property transfer tax forms, if any, duly completed and acknowledged, together with a certified check to the order of the appropriate tax collecting agency for the applicable transfer or documentary stamp taxes;

8.2.8 Any and all information reasonably requested by the Seller in order to comply with any applicable laws, rules, or regulatory or other requirements arising in connection with this Agreement, including without limitation, the Purchaser's source of funds;

8.2.9 Documentation demonstrating that the Purchaser is adequately capitalized to perform its obligations under this Agreement and in connection with the Property;

8.2.10 Any and all documents that the Sale Procedures require the Purchaser to deliver to the Seller; and

8.2.11 Such other instruments, agreements, or other documents as may be necessary or convenient to effectuate the provisions of this Agreement.

8.3 The Seller shall use commercially reasonable efforts to prepare, no later than three (3) business days' prior to the Closing, a closing statement in accordance with the terms and conditions of this Agreement (the "Closing Statement"). The amounts set forth on the Closing Statement shall be subject to the review and reasonable approval of the Purchaser and shall be the basis upon which the prorations and apportionments provided for in this Agreement shall be made at the Closing.

8.4 The parties agree to instruct the Title Company to record the original Deed, in the public records of Suffolk County, Massachusetts.

9.    Conditions to the Closing Obligations.

9.1 Notwithstanding anything in this Agreement that might be asserted to the contrary, the obligation of the Seller to close in accordance with this Agreement is expressly conditioned upon each of the conditions listed below, provided that the Seller, at its election, evidenced by notice delivered to the Purchaser at or prior to the Closing, may waive any of such additional conditions.

9.1.1 The Purchaser shall have delivered to the Seller all of the Purchaser's Closing Deliveries, shall have paid all sums of money (including the Purchase Price) required to be paid by the Purchaser hereunder, and shall have taken or caused to be taken all of the other action required of the Purchaser in this Agreement;

9.1.2 All representations and warranties made by the Purchaser in Section 7.2 of this Agreement, not taking into account the Purchaser Updates, shall be true and correct in all material respects as of the Closing Date;

9.1.3 The Sale Order shall have been entered, in form and substance reasonably acceptable to each of the Parties, and not been stayed; and

9.1.4 The Purchaser shall be adequately capitalized to perform its obligations under this Agreement and in connection with the Property.

9.1.5 Neither Mandarin Oriental Overseas Management Limited ("Mandarin Overseas") nor Mandarin Oriental Management (USA) Inc. ("Mandarin USA", and, collectively with Mandarin Overseas and each of their respective affiliates, the "Mandarin Entities") shall have provided notice to the Seller or the Seller's affiliates that such Mandarin Entity intends to exercise the "Right of First Offer/First Refusal" provision (the "ROFO") contained in Section 16.5 of that certain Offshore Management Agreement, dated March 5, 2003 (the "Offshore Management Agreement"), between the Seller and Mandarin Overseas, or Section 14.6 of that certain Onshore Management Agreement, dated March 5, 2003 (the "Onshore Management Agreement"), between the Seller and Mandarin USA, as applicable. The Offshore Management Agreement, the Onshore Management Agreement, the License Agreement by and between Mandarin Oriental Hotel Company, Inc. and CWB Hotel LLC, dated March 5, 2003 (the "License Agreement") (collectively, the "Hotel Management Agreements"), the Primary

Condominium Management Agreement by and between Residences at Mandarin Oriental Management (Boston) LLC (the " Condo Agreement") and The 776-778 Boylston Primary Condominium Trust, dated August 15, 2008, the Apartments Identification and Management Agreement by and between Residences at Mandarin Oriental Management (Boston) LLC and CWB Apartments Limited Partnership, dated August 15, 2008 (the "Apartment Agreement"), the Residences Identification and Management Agreement dated August 15, 2008 (the "Residences Agreement"), and all other existing management agreements entered into by any of the Mandarin Entities with respect to the Property are hereby, including the Hotel Management Agreements, collectively referred to as the "Existing Management Agreements".

    9.2  Notwithstanding anything in this Agreement that might be asserted to the contrary, the obligation of the Purchaser to close in accordance with this Agreement is expressly conditioned upon each of the conditions listed below, provided that the Purchaser, at its election, evidenced by written notice delivered to the Seller at or prior to the Closing, may waive any of such additional conditions. Accordingly, in the event that the conditions to the Closing Obligations referenced in this Section 9.2 are not met, the Purchaser may terminate this Agreement, and the Deposit shall be returned to Purchaser and otherwise treated in accordance with the terms of this Agreement and the terms of the Sale Procedures.

    9.2.1 The Seller shall have executed and delivered to the Purchaser all of the Seller's Closing Documents, and shall have taken or caused to be taken all of the other action required of the Seller in this Agreement at the Closing;

    9.2.2 All representations and warranties made by the Seller in Section 7.1 of this Agreement, not taking into account the Seller Updates, shall be true and correct in all material respects as of the Closing Date; and

    9.2.3 The Sale Order shall have been entered, in form and substance reasonably acceptable to each of the Parties, and not been stayed.

    9.2.4 None of the Mandarin Entities have provided notice of their intent to exercise the ROFO.

    9.2.5 Seller shall have delivered to Purchaser a certification or other documentation reasonably acceptable to Purchaser confirming that each of the Hotel Management Agreements has been duly terminated as of or immediately prior to the Closing Date in accordance with its terms (including evidence reasonably satisfactory to the Purchaser that all requisite notices have been given and applicable notice periods have been satisfied or waived in writing by the applicable Mandarin Entities) and that all amounts due and payable thereunder, including, but not limited to, any applicable termination fees, have been paid in full.

    9.2.6 The Primary Trust has either waived the transfer fee that may be assessed under Section 6.1.15 of the Declaration of Trust (the "Transfer Fee"), or the Seller has paid such Transfer Fee on or prior to Closing.

10.    <u>Default</u>.

10.1    If the Purchaser defaults in the performance of the Purchaser's obligations under this Agreement and the Closing does not occur as a result thereof (a "<u>Purchaser Default</u>"), the Seller shall be entitled to any and all remedies available under the Bankruptcy Code, any other applicable law, and this Agreement, including, but not limited to, specific performance as set forth in <u>Section 34</u> hereof.

10.2    If the Seller defaults in the performance of the Seller's obligations under this Agreement and the Closing does not occur as a result thereof (a "<u>Seller Default</u>"), the Purchaser's sole and exclusive remedy shall be, and the Purchaser shall be entitled, to terminate this Agreement and receive the Deposit, subject to the terms of the Sale Procedures and this Agreement, and the parties hereto shall be released from any further liability to each other hereunder, except for those obligations and liabilities that are expressly stated to survive termination of this Agreement. Notwithstanding anything in this Agreement that might be asserted to the contrary, in no event whatsoever shall the Seller be liable to the Purchaser for any other damages of any kind or nature whatsoever. The provisions of this <u>Section 10.2</u> shall survive the termination of this Agreement.

11.    <u>Termination</u>.

In the event that either or both of the Mandarin Entities delivers timely notice to the Seller that such Mandarin Entity intends to exercise the ROFO contained in either the Offshore Management Agreement or the Onshore Management Agreement, as applicable, the Seller shall have the right to terminate this Agreement upon notice to the Purchaser consistent with <u>Sections 17.1</u> and <u>34</u> hereof.

12.    <u>Fire or Other Casualty; Condemnation</u>.

12.1    The Seller agrees (a) to maintain (i) its present property insurance policy including fire and extended coverage or (ii) similar insurance coverage and (b) to give the Purchaser reasonably prompt notice of any fire or other casualty occurring at the Property of which the Seller or the Special Liquidators receive actual knowledge, between the Effective Date and the Closing Date, or of any actual or threatened condemnation of all or any part of the Property of which the Seller or the Special Liquidators receive actual knowledge.

12.2    <u>Casualty/Condemnation</u>.

12.2.1 If prior to the Closing there shall occur (a) any damage to the Property caused by fire or other casualty, or (b) a taking by condemnation of all or any portion of the Property, and the reasonably estimated cost of restoring the Property as nearly as possible to its condition immediately prior to such casualty or condemnation (the "<u>Cost to Restore</u>") does not exceed Five Million Dollars ($5,000,000), then, (i) the Purchaser shall have no right to terminate this Agreement, (ii) the Closing shall take place as herein provided, without abatement of the Purchase Price, (iii) the Seller shall assign to the Purchaser at the Closing, by written instrument in form reasonably satisfactory to the Purchaser, all of the Seller's interest in and to any insurance proceeds or condemnation awards which may be payable to the Seller on account of any such fire, casualty or condemnation and shall deliver to the Purchaser any such proceeds

or awards actually theretofore paid, less any unreimbursed amounts (the "Reimbursable Amounts") (A) actually and reasonably expended or incurred by the Seller in adjusting any insurance claim or negotiating and/or obtaining any condemnation award (including, without limitation, reasonable attorneys' fees and expenses) and/or (B) theretofore actually and reasonably incurred or expended by or for the account of the Seller for the cost of any compliance with laws, protective restoration, or emergency repairs made by or on behalf of the Seller (to the extent the Seller has not theretofore been reimbursed by its insurance carriers for such expenditures), and (iv) the Seller shall pay to the Purchaser the amount of the deductible and uninsured portion of the loss, if any, under the Seller's property insurance policy(ies), less all Reimbursable Amounts not received by the Seller from any insurance proceeds or condemnation awards paid to the Seller prior to the Closing.  The proceeds of rent interruption insurance, if any, shall on the Closing Date be appropriately apportioned between the Purchaser and the Seller.

        12.2.2  If prior to the Closing there shall occur any damage to the Property caused by fire or other casualty, and the reasonably estimated Cost to Restore exceeds Five Million Dollars ($5,000,000) (the "Material Casualty"), then the Seller shall, within ten (10) business days following the Material Casualty, notify the Purchaser whether the Seller elects to repair and/or restore the Property to as nearly as reasonably possible to the condition that it was in immediately prior to the occurrence of the Material Casualty (the "Final Repairs"). If the Seller timely makes such election to repair and/or restore, then the Closing shall be postponed until the date that is five (5) business days after the Final Repairs have been completed and written notice thereof has been  delivered by the Seller to the Purchaser. In the event that the Seller notifies the Purchaser that it does not elect to so repair and/or restore the Property, or otherwise fails to make a timely election, then the Purchaser shall have the option, to be exercised within five (5) business days after receipt of the Seller's election not to repair and/or restore, or the expiration of the aforesaid ten (10) business day period, if no election is made, as applicable to either (A) terminate this Agreement, in which event the Deposit be returned to the Purchaser and otherwise treated in accordance with the terms of the Sale Procedures and the Agreement; or (B) elect to have the Closing take place as herein provided, without abatement of the Purchase Price,  in which case (i) the Seller shall assign to the Purchaser at the Closing, by written instrument in form reasonably satisfactory to the Purchaser, all of the Seller's interest in and to any applicable insurance proceeds, less the Reimbursable Amounts (1) actually and reasonably expended or incurred by the Seller in adjusting any insurance claim (including, without limitation, reasonable attorneys' fees and expenses) and/or (2) theretofore actually and reasonably incurred or expended by or for the account of the Seller for the cost of any compliance with laws, protective restoration, or emergency repairs made by or on behalf of the Seller (to the extent the Seller has not theretofore been reimbursed by its insurance carriers for such expenditures), and (ii) the Seller shall pay to the Purchaser the amount of the deductible and uninsured portion of the loss, if any, under the Seller's property insurance policy(ies), less all Reimbursable Amounts not received by the Seller from any insurance proceeds or condemnation awards paid to the Seller prior to the Closing.  In the event the Purchaser fails to timely elect to proceed pursuant to clause (A) or (B) above, then the Purchaser shall be deemed to have elected to proceed under clause (B). Notwithstanding the foregoing, in the event that the Seller has elected to repair and/or restore the Property, but the Seller has not completed the Final Repairs by the date that is one year from the date of the Material Casualty, then the Purchaser shall have the right to elect to proceed pursuant to clauses (A) or (B) above.

12.3    Nothing contained in this <u>Section 12</u> shall be construed to impose upon the Seller any obligation to repair any damage or destruction to the Property caused by fire or other casualty or condemnation, except as provided herein.

12.4    In connection with the provisions of this <u>Section 12</u>, the Seller shall be entitled to negotiate, compromise, or contest the obtaining of any insurance proceeds and/or any condemnation awards upon consultation with the Purchaser and shall not enter into any settlement or compromise without the consent of the Purchaser which consent shall not be unreasonably withheld or delayed.

13.    <u>Brokerage</u>.

The Seller represents and warrants to the Purchaser that it has not dealt with any broker, consultant, finder, or like agent who might be entitled to a commission or compensation on account of introducing the parties hereto, the negotiation or execution of this Agreement, or the closing of the transactions contemplated hereby except for Jones Lang LaSalle (the "<u>Seller's Broker</u>"). The Seller shall pay the commission due to the Seller's Broker pursuant to a separate agreement. The Purchaser represents and warrants to the Seller that it has not engaged any broker, consultant, finder, or like agent who might be entitled to a commission or compensation with respect to any of the transactions described in this Agreement or otherwise relating to the purchase of the Property; nor, except for the Seller's Broker, has any broker, consultant, finder, or like agent brought about such transactions, brought the Property to the attention of the Purchaser, or otherwise communicated with the Purchaser with respect to any such transactions or the Property. Each party agrees to indemnify, protect, defend, and hold harmless the other party from and against all claims, losses, liabilities, and expenses (including, without limitation, reasonable attorneys' fees and disbursements) caused by or arising out of (a) a breach of any of the aforesaid representations and warranties of the indemnifying party; and (b) any claims for any brokerage or sales commissions, consultant's fees, finder's fees, or any other similar fees or compensation of any person or entity (other than the Seller's Broker) claiming to have dealt with, on behalf of, through, or under such indemnifying party. The provisions of this <u>Section 13</u> shall survive the Closing or the earlier termination of this Agreement.

14.    <u>Closing Costs; Fees and Disbursements of Counsel, etc.</u>

At the Closing, the Purchaser shall pay all Massachusetts excise tax/deed stamps incident to the transfer of title to the Property and any other Massachusetts and/or local realty transfer taxes (including sales and use tax) upon or payable in connection with the transfer of title to the Property or the execution of this Agreement. All such realty or transfer or stamp tax payments shall be made payable directly to the order of the appropriate governmental officer or the Title Company. The Purchaser shall pay (a) all charges for recording and/or filing the Deed and (b) all applicable fees, title charges (including any escrow or settlement fees charged by the Title Company), including the premium on the Purchaser's Title Policy. Each of the parties hereto shall bear and pay the fees and disbursements of its own counsel, accountants, surveyors, and other advisors in connection with the negotiation and preparation of this Agreement and the Closing. The provisions of this <u>Section 14</u> shall survive the Closing or the earlier termination of this Agreement.

15.    <u>Release by the Purchaser</u>.    In connection with the purchase and sale of the Property contemplated by this Agreement, the Purchaser waives any and all claims, actions, suits, costs, obligations, liabilities, and demands of any nature or kind that the Purchaser may have against the Seller, the Seller Related Parties, and/or their respective affiliates, successors, and assigns, including, without limitation, the Special Liquidators, in connection with the Property and/or all related documents and obligations of the Seller relating to the Property and/or the transactions contemplated by or referenced in this Agreement (including without limitation, any claim of contribution or reimbursement), other than claims, actions, suits, costs, obligations, liabilities, and demands arising out of the Seller's fraud, intentional misrepresentation, or express obligations under this Agreement. The provisions of this Section 15 shall survive the Closing or the earlier termination of this Agreement.

16.    [Intentionally Omitted]

17.    <u>Notices</u>.

17.1    Except as otherwise expressly provided in this Agreement, all notices, demands, requests, consents, approvals, or other communications (collectively, "Notices") required or permitted to be given under this Agreement or which are given with respect to this Agreement, in order to constitute effective notice to the other Party, shall be in writing and shall be deemed to have been given when (a) personally delivered with signed delivery receipt obtained, (b) upon receipt, when sent by prepaid reputable overnight courier, or (c) three (3) days after the date so mailed if sent postage prepaid by registered or certified mail, return receipt requested, in each case addressed as follows and in each case, in addition to and without limiting the foregoing requirements, with a copy of the applicable Notice also sent by e-mail:

If to the Seller, to

CWB Hotel Limited Partnership
c/o Cortona Capital Management LLC
800 Boylston Street, Suite 1600
Boston, Massachusetts 02199
Attention: George Guzzi
E-mail: gguzzi@cortonacapital.com

with a copy to the Seller's Counsel

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, California 90071-3144
Attention: Van C. Durrer II and Meryl K. Chae
E-mail: van.durrer@skadden.com and meryl.chae@skadden.com

If to the Purchaser, to

> Hilton Worldwide, Inc.
> 7930 Jones Branch Drive
> McLean, VA 22012
> Attention: Matt Sparks
> E-mail: matt.sparks@hilton.com

with a copy to

> Hilton Worldwide, Inc.
> 7930 Jones Branch Drive
> McLean, VA 22102
> Attention: General Counsel
> E-mail: nevin.kelly@hilton.com

with a copy to the Purchaser's Counsel

> Perkins Coie LLP
> 131 South Dearborn, Suite 1700
> Chicago, Illinois 60603
> Attention: David Neff
> E-mail: dneff@perkinscoie.com

Personal delivery to a Party or to any partner, member, manager, agent, officer, or employee of such Party at the foregoing addresses shall constitute receipt. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt. Notices may be sent by the attorneys for the respective parties and each such notice so served shall have the same force and effect as if sent by such party. Notices shall be valid only if served in the manner provided in this Section 17.

18. Survival; Governing Law.

Except as otherwise expressly set forth in this Agreement, the provisions of this Agreement shall not survive the Closing. This Agreement shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the Commonwealth of Massachusetts. Subject to the terms of this Agreement, venue for enforcement of this Agreement shall be in the Bankruptcy Court or the courts of Suffolk County, Massachusetts.

19. Counterparts; Captions and Headings.

This Agreement may be executed by the Parties in multiple counterparts, each of which will be considered an original and all of which, together, will be considered one document. Transmission of a signed copy of this Agreement by one Party (or its counsel) to the other Party (or its counsel) by facsimile, e-mail, or similar electronic means will have the same force and effect as delivery of the original, manually signed counterpart so transmitted. The captions and headings contained in this Agreement are for convenience of reference only, and will not be deemed to modify, expand, or limit the provisions of this Agreement.

20.    Entire Agreement; No Third Party Beneficiaries.

This Agreement (including all exhibits and schedules attached hereto) constitutes the final expression of the entire agreement of the Parties with respect to the subject matter of this Agreement, and the provisions of this Agreement may only be modified by the written agreement of the Seller and the Purchaser. This Agreement supersedes any and all prior agreements, oral or written, by the Parties with respect to the subject matter of this Agreement. Neither Party is relying on any oral, written, or implied representation or warranty not expressly set forth in this Agreement. The Parties do not intend to confer any benefit under this Agreement on or to any person or entity other than the Parties. Notwithstanding the foregoing, the members of the Special Liquidator Group shall be entitled to rely on Section 27 (Confidentiality) and Section 33 (Limitation of Liability) of this Agreement as if they were parties to it. The provisions of this Section 20 shall survive the Closing or the earlier termination of this Agreement.

21.    Waivers; Extensions.

No waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provision herein contained. No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts.

22.    No Recording.

Except as otherwise allowed by this Agreement or the Sale Order, the Parties agree that neither this Agreement nor any memorandum or notice of this Agreement shall be recorded. Any such unpermitted recordation or attempted unpermitted recordation by the Purchaser shall constitute a default by the Purchaser under this Agreement. Any such unpermitted recordation or attempted unpermitted recordation by the Seller shall constitute a default by the Seller under this Agreement. For the avoidance of doubt, nothing in this provision or this Agreement shall preclude the Seller from filing this Agreement and any related documents with the Bankruptcy Court.

23.    Assignment.

Prior to the Closing, except as contemplated by Section 4.4, the Purchaser may not transfer or assign its rights under this Agreement without the Seller's prior written consent and Bankruptcy Court approval. Notwithstanding the foregoing, at the Closing, the Purchaser may assign all of its rights and delegate all of its obligations hereunder to any Affiliate (as defined below) of the Purchaser that is under the control of the Purchaser. In such event, the Purchaser shall remain liable for all of its obligations under this Agreement, including all provisions that survive the Closing or earlier termination of this Agreement. In connection with any assignment permitted or consented to under this Agreement, the assignee shall assume in writing all of the assignor's obligations under this Agreement in form and substance mutually satisfactory to the Seller and the Purchaser, provided that the Purchaser originally named in this Agreement and the Seller shall not be relieved from their respective obligations under this Agreement. Any other purported or attempted assignment or delegation without obtaining the Seller's prior written

consent and Bankruptcy Court approval, or not otherwise permitted under this Agreement, shall be void and of no effect.  For purposes of this Section 23, the term (a) "Affiliate" means any entity in which Purchaser or any partner, shareholder, director, officer, member, or manager of Purchaser directly or indirectly owns or controls more than 75% of the beneficial interest therein and (b) "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the entity in question, whether through the ownership of voting stock, by contract, or otherwise.

24.     Pronouns; Joint and Several Liability.

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the identity of the parties may require.  If the Purchaser consists of two or more parties, the liability of such parties shall be joint and several.

25.     Successors and Assigns.

This Agreement is binding upon, and inures to the benefit of, the Parties and their respective agents, heirs, administrators, representatives, executors, successors, and assigns.

26.     Continued Operations.

26.1     Until the Closing or earlier termination of this Agreement, the Seller shall (a) use commercially reasonable efforts to operate and maintain the Property in a manner consistent with the manner in which the Property has been operated and maintained prior to the Effective Date, and (b) not remove from the Property any Personal Property unless such item is replaced with a similar item of comparable utility and value.

26.2     Until the Closing or earlier termination of this Agreement, the Seller shall not (a) further mortgage, convey, or encumber the Property; (b) enter into any recorded or unrecorded contracts or leases with respect to the Property which are (i) not by their terms terminable prior to the Closing or (ii) otherwise inconsistent with this Agreement; or (c) seek any zoning changes with respect to the Property.

26.3     The Seller shall give the Purchaser prompt written notice of any of the following that occurs after November 24, 2015 and before the Closing, and of which the Seller or the Special Liquidators receive actual knowledge: (a) any suit, proceeding, written dispute, or written claim against or affecting the Seller or the Property; (b) any rezoning of the Property; (c) any actual or threatened taking or condemnation of all or any portion of the Property; (d) any actual or threatened (in writing) enforcement action by any governmental agency or authority relating to the use, condition or environmental quality of the Property; or (e) the commencement of any action by any party seeking relief and which would result in the imposition of a lien on the Property, including, without limitation, an action to foreclose any mortgage on the Property.

26.4     In the event the Seller fails to comply with the provisions of this Section 26, such failure shall be considered a Seller Default and subject to the terms of Section 10.2 hereof unless, with respect to the matters described in Section 26.2(a) or 26.2(b), the Seller shall, at or prior to the Closing, (a) cause any such mortgage or encumbrance to be removed of record, at the Seller's sole cost and expense and (b) cause any such recorded or unrecorded contracts and

leases to be removed of record and terminated, at the Seller's sole cost and expense prior to Closing.

27. Confidentiality.

The Seller and the Purchaser covenant and agree not to communicate or otherwise disclose to any person or entity, without the express written consent of the other party, but subject to the exclusions noted below, (a) the material terms of this Agreement or (b) the content of any and all information in respect of the Property that is supplied by the Seller to the Purchaser (collectively, the "Confidential Information"); provided, however, that either Party may, without consent, disclose the Confidential Information (y) to its respective advisors, consultants, attorneys, accountants, partners, investors, and lenders (the "Transaction Parties") without the express written consent of the other Party, so long as any such Transaction Parties to whom disclosure is made shall also agree to keep all such information confidential in accordance with the terms of this Agreement, or (z) if disclosure is required by law or by regulatory or judicial process or pursuant to any regulations promulgated by the New York Stock Exchange or other public exchange for the sale and purchase of securities, provided that in such event the Seller or the Purchaser, as applicable, shall notify the other Party in writing of such required disclosure, shall exercise all commercially reasonable efforts to preserve the confidentiality of the Confidential Information, including, without limitation, reasonably cooperating with the other Party at the other Party's cost to obtain an appropriate order or other reliable assurance that confidential treatment will be accorded such Confidential Information by such tribunal, and shall disclose only that portion of the Confidential Information that it is legally required to disclose. If this Agreement is terminated, such confidentiality shall be maintained by the Purchaser, and the Purchaser and its Transaction Parties shall destroy or deliver to the Seller, upon request, all Confidential Information, and all copies thereof, with any such destruction to be confirmed in writing by the Purchaser and its Transaction Parties; except where the Purchaser or its representatives is required to retain any Confidential Information by any Applicable Law or to meet the requirements of an internal policy or where such documents are summaries, file notes, analyses, compilations or memoranda which contain the Confidential Information. To the extent that any Confidential Information is not so destroyed, the Confidential Information will be held in confidence, subject to the terms of this Agreement. The foregoing confidentiality obligations shall not apply to (i) any information that has been or is disclosed in the exercise of the statutory duties of the Special Liquidators or to the extent required by current insolvency practice or to enable the Special Liquidators properly to carry out the duties of their office, (ii) any information that has been or is disclosed in the Bankruptcy Case by the Seller, the Special Liquidators, or others, including, without limitation, in connection with the pursuit of the Sale Order, or (iii) any information that has been or is a matter of public record or has been or is provided in other sources readily available to the real estate industry other than as a result of disclosure by the Purchaser or its respective Transaction Parties. The Purchaser and the Seller acknowledge and agree that, notwithstanding the foregoing restrictions in this Section 27, (a) each of the Purchaser and the Seller may disclose Confidential Information, on a strictly confidential basis, to its equity holders, other direct or indirect beneficial owners, advisors, and other parties in accordance with whose instructions the Purchaser or the Seller is required to act (and their officers, employees, affiliates, agents, legal, and other professional advisers) and (b) the Purchaser and the Seller shall not be responsible, or in breach under this Agreement, in the event that any press release, publicity, advertising, promotion, or other announcement is issued or made by any person not

controlled by the Purchaser or the Seller, including, without limitation, any general partner, manager, managing member, or other person or entity holding a comparable position with respect to the Purchaser or any general partner, manager, managing member, or other person or entity holding a comparable position with respect to the Seller.    The Purchaser hereby indemnifies the Seller against, and holds the Seller harmless from, any and all claims, losses, damages, liabilities, and expenses (including, without limitation, reasonable attorneys' fees and disbursements) arising in connection with or in any way relating to the Purchaser's disclosure of any Confidential Information in violation of this Section 27.  In the event that either or both of the Parties becomes legally compelled to disclose all or any part of the Confidential Information under a subpoena or inquiry issued by a court of competent jurisdiction or by a judicial or administrative agency, such Party shall immediately provide the other Party with prompt written notice so that such non-disclosing Party may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement and shall consult with the non-disclosing Party on the advisability of taking legally available steps to resist or narrow such request and cooperate with the non-disclosing Party on any steps it considers advisable.  In the event that such protective order or other remedy is not obtained, or that either Party waives compliance with the provisions of this Agreement, in such instance, the other Party shall furnish only that portion of the Confidential Information that is legally required and shall exercise its reasonable best efforts to obtain an order, stipulation, or other reliable assurance that confidential treatment will be accorded such portion of the Confidential Information to be disclosed.

The provisions of this Section 27 shall survive the Closing or the earlier termination of this Agreement.

28.    Further Assurances.

The Purchaser agrees to take such actions as the Seller may reasonably request, at the Purchaser's sole cost and expense, in order to effectuate the purposes of this Agreement.  The Seller agrees to take such actions, and to execute and deliver such instruments and documents as the Purchaser may reasonably request, at the Purchaser's sole cost and expense, in order to effectuate transfer of the Property to the Purchaser consistent with the terms of this Agreement, provided that the terms of such instruments and documents shall exclude any personal liability of the Special Liquidators, be subject to the Special Liquidators' prior approval, and be in form and substance reasonably satisfactory to the Seller.  The provisions of this Section 28 shall survive the Closing or the earlier termination of this Agreement.

29.    Exhibits.  All exhibits attached to this Agreement are hereby incorporated into this Agreement with the same force and effect as if the terms and provisions of such exhibits were set forth in the body of this Agreement.  Notwithstanding anything in this Agreement that might be asserted to the contrary, the final forms of the documents attached as exhibits hereto must be in form and substance reasonably satisfactory to the Seller.

30.    Publicity, Litigation.  Except as otherwise expressly provided herein, in no event shall either party (a) issue any press release, publicity, advertising, promotion, or otherwise announce or disclose or cause or permit to be announced or disclosed in any manner whatsoever this Agreement or the transactions contemplated by or referenced in this Agreement or otherwise disclose the terms and conditions of this Agreement prior to the Closing; provided, that neither

the Seller nor the Purchaser shall be responsible, and neither the Seller nor the Purchaser shall be in breach hereunder, in the event that any press release, publicity, advertising, promotion, or other announcement is issued or made by any Person not controlled by the Seller or the Purchaser including, without limitation, any general partner, manager, managing member, or other person or entity holding a comparable position with respect to the Seller or the Purchaser, (b) institute or continue any legal action in the name of the other party or its respective members, managers, equity holders, principals, partners, affiliates, directors, officers, or other person or entity holding a comparable position with respect to the Seller or the Purchaser other than litigation or other similar matter expressly assigned to such instituting party with respect to the Property; provided, however, that the Seller shall be permitted to defend itself in any litigation commenced by any party, (c) intentionally or unintentionally, through misrepresentation or nondisclosure, conceal or mislead any Person as to the other party's identity, or (d) use or refer to the other party's name or the names of any members, managers, equity holders, principals, partners, affiliates, directors, officers, or other person or entity holding a comparable position with respect to the other party to promote the sale or transfer of the Property or the collection or management thereof (provided that in descriptions of the Property, either party may refer to the Seller as having previously held interests in the Property and to the Purchaser as the Seller's successor-in-interest with respect to such interests in the Property), in each case without the prior written consent of the other party.  For purposes hereof, the term (i) "control," as such term is used with respect to any Person (as defined below), including the correlative meanings of the terms "controlled by" and "under common control with," shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and (ii) "Person" shall mean any individual, corporation, partnership, joint venture, limited liability company, entity, estate, trust, unincorporated association, any federal, state, county or municipal government, or any bureau, department, or agency thereof, and any fiduciary acting in such capacity on behalf of any of the foregoing.  Notwithstanding the foregoing or anything in this Agreement that might be asserted to the contrary, the Seller and the Special Liquidators may disclose this Agreement (and any information and materials relating to the Property) as permitted by the Sale Procedures or otherwise in the exercise of the statutory duties of the Special Liquidators or to the extent required by current insolvency practice or to enable the Special Liquidators properly to carry out the duties of their office.

31.    Severability.  Each part of this Agreement is intended to be severable.  If any term, covenant, condition, or provision of this Agreement is unlawful, invalid, or unenforceable for any reason whatsoever, and such illegality, invalidity, or unenforceability does not affect the remaining parts of this Agreement, then all such remaining parts of this Agreement shall be valid and enforceable and have full force and effect, as if the invalid or unenforceable part had not been included.  Any term or provision of this Agreement that is unlawful, invalid, or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such, unlawfulness, invalidity, or unenforceability without rendering unlawful, invalid, or unenforceable the remaining terms and provisions of this Agreement or affecting the lawfulness, validity, or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, the provision will be interpreted to be only so broad as is enforceable.

32.    Claims, Matters, and Issues Relating to this Agreement.

(a)    During the pendency of the Chapter 15 Case, each of the Parties irrevocably, unconditionally, and expressly (i) agrees that the Bankruptcy Court shall resolve any and all claims, matters, and issues arising directly or indirectly out of or in connection with this Agreement and/or the transactions contemplated by or referenced in this Agreement (any such claim, matter, or issue, a "Bankruptcy Matter"), regardless of whether such Bankruptcy Matters are, or might be deemed to be, core or non-core, (ii) consents, under 28 U.S.C. § 157(c)(2) and any other law, rule, or principle that might be applicable, to the entry by the Bankruptcy Court of final orders or judgments on all Bankruptcy Matters, (iii) waives any rights to have any Bankruptcy Matter adjudicated by a court established under Article III of the Constitution of the United States of America, and (iv) accepts the jurisdiction of the Bankruptcy Court.

(b)    After entry of a final decree closing the Bankruptcy Case, to the fullest extent permitted by applicable law, each of the Parties irrevocably, unconditionally, and expressly (i) agrees that any suit, action, or proceeding seeking any relief whatsoever arising directly or indirectly out of, or in connection with, this Agreement and/or the transactions contemplated by or referenced in this Agreement (any such suit, action, or proceeding, an "Agreement Action") shall be brought in a federal or state court of competent jurisdiction sitting in the Commonwealth of Massachusetts (including the appellate courts thereof) (each, a "Massachusetts Court"), and shall not be brought in any other court in the United States of America or any other country, and (ii) accepts the jurisdiction of the Massachusetts Courts.

(c)    Each Party expressly and irrevocably submits the person of such Party to the *in personam* jurisdiction of the Massachusetts Court in any Agreement Action. To the extent permitted under applicable law, this consent to personal jurisdiction shall be self-operative and no further instrument or action, other than service of process in one of the manners specified in this Agreement or as otherwise permitted by law, shall be necessary in order to confer jurisdiction upon the person of such Party in any such Massachusetts Court.

(d)    To the fullest extent permitted under applicable law, each of the Parties irrevocably, unconditionally, and expressly waives and agrees not to assert, by way of motion, as a defense, or otherwise, (i) any objection that it may now or hereafter have to the laying of the venue of any Agreement Action brought in a Massachusetts Court, (ii) any claim that any such Agreement Action has been brought in an inconvenient forum, and (iii) any claim that it is not personally subject to the jurisdiction of any such Massachusetts Court or that this Agreement or the subject matter of this Agreement may not be enforced in or by such Massachusetts Court.

(e)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM, MATTER, OR ISSUE IN THE BANKRUPTCY COURT AND/OR ANY AGREEMENT ACTION.    EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY CLAIM, MATTER, OR ISSUE IN THE BANKRUPTCY COURT AND/OR AN AGREEMENT ACTION, SEEK TO ENFORCE THE FOREGOING WAIVER OF ANY RIGHT IT MAY HAVE TO A JURY TRIAL AND (II)

ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 32.

(f)    The provisions of this Section 32 shall survive the Closing or the earlier termination of this Agreement.

33.    Limitation of Liability

33.1    Except as otherwise expressly provided in this Agreement, the Parties understand and agree that (a) none of the directors, officers, employees, managers, members, partners, principals, equity holders, other direct or indirect beneficial owners, affiliates, agents, representatives, attorneys, consultants, or advisors of the Seller, including but not limited to IBRC and the Special Liquidators, shall have any personal liability or obligation whatsoever for obligations entered into by or on behalf of the Seller under or in connection with this Agreement, and (b) none of the directors, officers, employees, managers, members, partners, principals, equity holders, other direct or indirect beneficial owners, affiliates, agents, representatives, attorneys, consultants, or advisors the Purchaser shall have any personal liability or obligation whatsoever for obligations entered into by or on behalf of the Purchaser under or in connection with this Agreement; provided, however, that the foregoing shall not in any way limit the Parties' obligations and liabilities under this Agreement.

33.2    The provisions of this Section 33 shall survive the Closing or the earlier termination of this Agreement.

34.    Limitation of Remedies.

The Purchaser's sole and exclusive remedy for any breach of the terms of this Agreement by the Seller shall be limited to termination of this Agreement and return of the Deposit, subject to the terms of the Sale Procedures, the Sale Order, and this Agreement. In the event that the Seller terminates this Agreement under Section 11 hereof, the Purchaser shall be entitled to a full refund of its Deposit, and such refund shall be Purchaser's sole and exclusive remedy in the event of any such termination. Under no circumstances shall the Seller, IBRC, or the Special Liquidators be liable for punitive damages or indirect, special, incidental, or consequential damages arising out of or in connection with this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof, including damages alleged as a result of tortious conduct. The provisions of this Section 34 shall survive the Closing or the earlier termination of this Agreement.

34.1    The Purchaser acknowledges and agrees that any breach of the terms of this Agreement by the Purchaser would give rise to irreparable harm for which money damages would not be an adequate remedy, and, accordingly agrees that, in addition to any other remedies, the Seller shall be entitled to enforce the terms of this Agreement by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting a bond.

34.2    The Purchaser agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of

{018245-033847 NKE0005.DOC; 1}33

this Agreement on the basis that (i) there is adequate remedy at law or (ii) an award of specific performance is not an appropriate remedy for any reason at law or equity. In the event the Seller seeks an injunction or injunctions to prevent breaches of this Agreement when expressly available pursuant to the terms of this Agreement and to enforce specifically the terms and provisions of this Agreement when expressly available pursuant to the terms of this Agreement, it shall not be required to provide any bond or other security in connection with any such order or injunction.

35.    Time of the Essence.  The parties hereto acknowledge and agree that, except as otherwise expressly provided in this Agreement, **TIME IS OF THE ESSENCE** for the performance of all actions (including, without limitation, the giving of notices, the delivery of documents, and the funding of money) required or permitted to be taken under this Agreement. Whenever action must be taken (including, without limitation, the giving of notice, the delivery of documents, or the funding of money) under this Agreement, prior to the expiration of, by no later than, or on a particular date, unless otherwise expressly provided in this Agreement, such action must be completed by 6:00 p.m. (Eastern Standard Time) on such date, provided that such action must be completed by 3:00 p.m. (Eastern Standard Time) with respect to the payment of the balance of the Purchase Price and other payments by the Purchaser on the Closing Date. However, Notwithstanding anything in this Agreement that might be asserted to the contrary, whenever action must be taken (including, without limitation, the giving of notice, the delivery of documents, or the funding of money) under this Agreement prior to the expiration of, by no later than, or on a particular date that is not a Business Day, then such date shall be extended until the immediately following Business Day.

36.    Purchaser Acknowledgement.  The Purchaser agrees that the terms and conditions, including, without limitation, the exclusions and limitations, contained in this Agreement and/or related documents are fair and reasonable, including, without limitation, with regard to, and/or in light of, the following:

36.1    that the limited representations and warranties given by or on behalf of the Seller or the Special Liquidators are reasonable;

36.2    that the sale, transfer, assignment, and conveyance of the Property under the terms of this Agreement is subject to the Sale Procedures, Bankruptcy Court approval and entry of the Sale Order;

36.3    that the Purchaser obtained all necessary or appropriate independent individual legal advice in relation to all aspects of this Agreement;

36.4    that the Purchaser has relied solely upon its own opinions, and those of its professional and other advisors, concerning this Agreement and the transactions contemplated by or referenced in this Agreement; and

36.5    that the Purchaser and its representatives and advisors have been given sufficient opportunity, in connection with the Purchaser's decision to enter into this Agreement, to examine and inspect all of the Property and all relevant and available documents relating to

the Property and to obtain information from the Seller, the Special Liquidators, and/or others relating to the Property.

The provisions of this <u>Section 36</u> shall survive the Closing or the earlier termination of this Agreement.

37.     <u>No Offer.</u>  This Agreement shall not be deemed an offer or binding upon the Seller until this Agreement is fully executed and delivered by the Seller and the Purchaser, subject to Bankruptcy Court approval and entry of the Sale Order.

38.     <u>No Setoff</u>.  All payments that the Purchaser is required to make to the Seller under or in relation to this Agreement (including, without limitation, the Purchase Price and the Deposit) shall be calculated and made without (and free and clear of deduction for) any setoff, netting, combination of accounts, withholding, or retention in respect of any liabilities that might be asserted to be owed to the Purchaser by the Seller or any of the Seller's affiliates, except with respect to any apportionments under Section 6 hereof.  The provisions of this Section 38 shall survive the Closing or the earlier termination of this Agreement.

39.     <u>Conspicuousness</u>.  To the extent required to be operative, the disclaimers, warranties, and other items contained in this Agreement are "conspicuous" and otherwise formatted appropriately for purposes of any applicable law, rule, regulation, order, or requirement.

40.     <u>Neutral Construction</u>.  Each Party has cooperated, including by and through its counsel, in the drafting and preparation of this Agreement.  Accordingly, this Agreement shall be construed neutrally, and shall not be applied more strictly against one Party than against another Party.

[THE SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have duly executed this Agreement to be effective as of the day and year first above written.

**THE SELLER:**

CWB HOTEL LIMITED PARTNERSHIP, a
Delaware limited partnership

By: _George Guzzi_

Its: _Manager_

**THE PURCHASER:**

HILTON WORLDWIDE, INC.,
a Delaware corporation

By: _____

Its: _Senior Vice President_

## EXHIBIT A

### Description of the Land

Legal Description of the Hotel Unit of The 776-778 Boylston Primary Condominium

Real property at 776-778 Boylston Street in the City of Boston, County of Suffolk, Commonwealth of Massachusetts, described as follows:

The Hotel Unit

Condominium Name:  The 776-778 Boylston Primary Condominium (the "Condominium")

A.    That unit of the Condominium referred to above, submitted to the provisions of Massachusetts General Laws, Chapter 183A, by virtue of Master Deed of The 776-778 Boylston Primary Condominium, dated July 14, 2008, and recorded with the Suffolk County Registry of Deeds on August 5, 2008, in Book 43887, Page 1, as affected by Special Amendment to Master Deed dated as of September 15, 2008, recorded in Book 44032, Page 184; and by Special Amendment to Master Deed dated as of October 2, 2008, recorded in Book 44104, Page 281, as further amended of record (the "Master Deed"), and the Declaration of Trust of The 776-778 Boylston Primary Condominium Trust dated July 14, 2008, and recorded with the Suffolk County Registry of Deeds on August 5, 2008, in Book 43887, Page 57, as amended of record (the "Condominium Trust").

B.    Together with the undivided percentage interest appurtenant to said unit in the common areas or facilities of said Condominium as set forth in said Master Deed.

C.    Easements appurtenant to said unit:

(1)  for the existence and maintenance of encroachments within the common areas or facilities;

(2)  for the use of utility and other common facilities; and

(3) for other purposes as set forth in said Master Deed.

D.    Rights appurtenant to said unit, subject to the provisions of the Master Deed:

(1) Together with the benefit of the Declaration of Cross-Easements and Operating, Parking and Common Area Agreement between BP Prucenter Acquisition LLC and CWB Boylston LLC, dated as of February 22, 2005, filed as Document No. 696671, and recorded in Book 36524, Page 1; as affected by First Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement dated as of July 20, 2007, filed as Document No. 740294, and recorded in Book 42181, Page 97; as further affected by Second Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement dated as of June 30, 2008, filed as Document No. 754133, and recorded in Book 43779, Page 59; as further affected by Waiver of Right of First Offer by BP Prucenter Acquisition LLC, dated as of August 15, 2008, and recorded in Book 43927,

Page 343, and filed as Document No. 755646, and by Estoppel Certificate and Agreement (BP), dated as of August 15, 2008, and recorded in Book 43928, Page 1, and filed as Document No. 755652 (the "CWB Declaration").

(2) Together with the benefit of a Declaration of Cross-Easements and Operating, Parking and Common Area Agreement by The Prudential Insurance Company of America, dated as of June 30, 1998, recorded July 2, 1998, in Book 22643, Page 1, and filed as Document No. 568836; as affected by First Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement by and between BP Prucenter Acquisition LLC and Avalon Bay BFG Limited Partnership, dated as of November 6, 2001, filed as Document No. 623541, and recorded in Book 27354, Page 114; as further affected by Second Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement by and between BP Prucenter Acquisition LLC and Avalon Bay BFG Limited Partnership, dated as of February 22, 2005, filed as Document No. 696665, and recorded in Book 36523, Page 167, and unrecorded Side Letter Agreement from BP Prucenter Acquisition LLC and CWB Boylston LLC to Avalon Bay BFG Limited Partnership, dated January 5, 2005; as further affected by Third Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement dated as of July 20, 2007, filed as Document No. 740296, and recorded in Book 42181, Page 113; as further affected by Fourth Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement dated as of July 19, 2011, recorded in Book 48162, Page 7, and filed as Document No. 798038; as further affected by Fifth Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement dated as of December 16, 2011, recorded in Book 48826, Page 189 (the "Avalon Cross-Easement").

(3) Together with the benefit of certain access rights set forth in Declaration of Cross-Easements and Operating, Parking and Common Area Agreement by and between BP Prucenter Acquisition LLC and BP Belvidere LLC dated as of November 6, 2000, filed as Document No. 606580, and recorded in Book 25546, Page 185; as affected by First Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement by and between BP Prucenter Acquisition LLC and InterCapital Belvedere Limited Partnership dated as of April 29, 2002, filed as Document No. 634160, and recorded in Book 28566, Page 225; as further affected by Acknowledgement and Release Agreement by and between BP Prucenter Acquisition LLC and The Trustees of the Belvedere Condominium Trust, dated as of June 5, 2006 and recorded in Book 39773, Page 92, and filed as Document No. 721368.

(4) Together with the benefit of certain access rights set forth in Declaration of Cross-Easements and Operating, Parking and Common Area Agreement between BP Prucenter Acquisition LLC and BP Supermarket LLC, dated as of November 6, 2001, filed as Document No. 623544, and recorded in Book 27354, Page 179; as affected by First Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement dated as of July 19, 2011, recorded in Book 48162, Page 64, and filed as

Document No. 792987.

(5) Air rights at 772-778 Boylston Street, Boston, Suffolk County, Massachusetts, as recited in
Release Deed from the City of Boston dated February 27, 2007, recorded in Book 41484,
Page 325. Said air rights are shown on the plan entitled "City of Boston Public Works
Department, Engineering Division, Vertical Discontinuance Plan, Boylston Street, Boston
Proper" dated December 2, 2005, and prepared by Vanasse Hangen Brustlin Inc., recorded
in Plan Book 2007, Page 36.

## EXHIBIT B

### Additional Permitted Encumbrances

1.      Covenants, conditions, restrictions, reservation, easements, liens for assessments, options, powers of attorney, and limitations of title, created by the laws of the Commonwealth of Massachusetts or set forth in the Master Deed of The 776-778 Boylston Primary Condominium dated July 14, 2008, recorded in Book 43887, Page 1, as affected by Special Amendment to Master Deed dated as of September 15, 2008, recorded in Book 44032, Page 184; and by Special Amendment to Master Deed dated as of October 2, 2008, recorded in Book 44104, Page 281, as further amended of record; in the Declaration of Trust of The 776-778 Boylston Primary Condominium dated July 14, 2008, recorded in Book 43887, Page 57, in the related By-Laws, Site Plans and Floor Plans as duly recorded in the Suffolk County Registry of Deeds, and as the same may have been lawfully amended.

2.      Amended and Restated Sewer Easement by and between the Boston Water and Sewer Commission and BP Prucenter Acquisition LLC, dated as of October 2, 2004, filed December 16, 2004, as Document No. 693278, which amends and restates the Sewer easement extending between Huntington Avenue at Garrison Street and Boylston Street near Fairfield Street by The Prudential Insurance Company of America to the City of Boston dated May 18, 1959 and filed as Document No. 238960, and shown on L.C. Plan No. 28611B.

3.      Cross-Easement, Operations, Parking and Common Area Agreement between The Prudential Insurance Company of America and State Street Bank and Trust Company, not in its individual capacity, but solely as Trustee of 1994 Sheraton Boston Hotel Trust, dated as of December 29, 1994 and filed as Document No. 522048 and recorded in Book 19527, Page 82.

4.      Declaration of Cross-Easements and Operating, Parking and Common Area Agreement by The Prudential Insurance Company of America, dated as of June 30, 1998, recorded July 2, 1998, in Book 22643, Page 1, and filed as Document No. 568836; as affected by First Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement by and between BP Prucenter Acquisition LLC and Avalon Bay BFG Limited Partnership, dated as of November 6, 2001, filed as Document No. 623541, and recorded in Book 27354, Page 114; as further affected by Second Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement by and between BP Prucenter Acquisition LLC and Avalon Bay BFG Limited Partnership, dated as of February 22, 2005, filed as Document No. 696665, and recorded in Book 36523, Page 167, and unrecorded Side Letter Agreement from BP Prucenter Acquisition LLC and CWB Boylston LLC to Avalon Bay BFG Limited Partnership, dated January 5, 2005; as further affected by Third Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement dated as of July 20, 2007, filed as Document No. 740296, and recorded in Book 42181, Page 113; as further affected by Fourth Amendment to Declaration of Cross-Easements

and Operating, Parking and Common Area Agreement dated as of July 19, 2011, recorded in Book 48162, Page 7, and filed as Document No. 798038; as further affected by Fifth Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement dated as of December 16, 2011, recorded in Book 48826, Page 189 (collectively, the "Avalon Cross-Easement").

5.    Restrictions, Covenants, Retained Rights, Trademark License Agreement and Branding Agreement between The Prudential Insurance Company of America, BP Prucenter Acquisitions LLC, Boston Properties Limited Partnership, Boston Properties, Inc., and BP Prucenter Development LLC, dated June 30, 1998, recorded July 2, 1998, in Book 22643, Page 146, and filed as Document No. 568857; as affected by First Amendment to Restrictions, Covenants, Retained Rights, Trademark License Agreement and Branding Agreement dated March 20, 2007, filed August 13, 2007, as Document No. 741307, and recorded in Book 42311, Page 60; as further affected by Second Amendment to Restrictions, Covenants, Retained Rights, Trademark License Agreement and Branding Agreement dated as of December 3, 2007, filed December 20, 2007, as Document No. 746536, and recorded in Book 42874, Page 50; as further affected by Third Amendment to Restrictions, Covenants, Retained Rights, Trademark License Agreement and Branding Agreement dated as of September 2, 2008, recorded August 28, 2009, in Book 45433, Page 209, and filed as Document No. 768899; as further affected by Fourth Amendment to Restrictions, Covenants, Retained Rights, Trademark License Agreement and Branding Agreement dated as of November 17, 2009, recorded October 5, 2011, in Book 48482, Page 54; as further affected by Fifth Amendment to Restrictions, Covenants, Retained Rights, Trademark License Agreement and Branding Agreement dated as of February 3, 2011, recorded October 5, 2011, in Book 48482, Page 61; as further affected by Sixth Amendment to Restrictions, Covenants, Retained Rights, Trademark License Agreement and Branding Agreement dated as of November 15, 2012, recorded in Book 50828, Page 73.

6.    Declaration of Cross-Easements and Operating, Parking and Common Area Agreement by and between BP Prucenter Acquisition LLC and BP Belvidere LLC dated as of November 6, 2000, filed as Document No. 606580, and recorded in Book 25546, Page 185; as affected by First Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement by and between BP Prucenter Acquisition LLC and InterCapital Belvedere Limited Partnership dated as of April 29, 2002, filed as Document No. 634160, and recorded in Book 28566, Page 225; as affected by Belvedere Condominium Parking Prepayment Certificate dated August 19, 2002, filed as Document No. 640455, and recorded in Book 29303, Page 265; as further affected by Belvedere Condominium Parking Prepayment Certificate dated October 21, 2002, filed as Document No. 643140, and recorded in Book 29625, Page 265; as further affected by Belvedere Condominium Parking Prepayment Certificate dated May 29, 2003, filed June 9, 2003, as Document No. 658300, and recorded May 29, 2003, in Book 31573, Page 202; as further affected by Acknowledgement and Release Agreement by and between BP Prucenter Acquisition LLC and The Trustees of the Belvedere Condominium Trust, dated as of June 5, 2006, filed as Document No. 721368, and recorded in Book 39773, Page 92.

7.      Declaration of Cross-Easements and Operating, Parking and Common Area Agreement between BP Prucenter Acquisition LLC and BP Supermarket LLC, dated as of November 6, 2001, filed as Document No. 623544, and recorded in Book 27354, Page 179; as affected by First Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement dated as of July 19, 2011, recorded in Book 48162, Page 64, and filed as Document No. 792987.

8.      Terms, easements, agreements, obligations, limitations, development rights, covenants, restrictions, conditions and provisions set forth and/or incorporated by reference in the Declaration of Cross-Easements and Operating, Parking and Common Area Agreement between BP Prucenter Acquisition LLC and CWB Boylston LLC, dated as of February 22, 2005, filed as Document No. 696671, and recorded in Book 36524, Page 1 (the "CWB Declaration"); as the CWB Declaration is affected by the Estoppel Certificate and Agreement (BP) (the "Estoppel Agreement") among BP Prucenter Acquisition LLC, CWB Boylston LLC and Fleet National Bank, as Agent; as affected by First Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement dated as of July 20, 2007, filed as Document No. 740294, and recorded in Book 42181, Page 97; as further affected by Second Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement dated as of June 30, 2008, filed as Document No. 754133, and recorded in Book 43779, Page 59 (the "CWB Cross-Easement"); as further affected by Waiver of Right of First Offer by BP Prucenter Acquisition LLC, dated as of August 15, 2008, recorded in Book 43927, Page 343, and by Estoppel Certificate and Agreement (BP), dated as of August 15, 2008, recorded in Book 43928, Page 1, and filed as Document No. 755652.

9.      Petition to the City of Boston Public Improvement Commission by CWB Boylston LLC for Approval of Sidewalk Improvement, dated January 5, 2006, recorded March 21, 2007, in Book 41484, Page 235, and filed May 10, 2007, as Document No. 737031.

10.     Terms and provisions of Release Deed from the City of Boston dated February 27, 2007, recorded in Book 41484, Page 325, for parcels shown on plans recorded in Plan Book 2007, Page 36.

11.     License Agreement by and between CWB Hotel Limited Partnership, as Licensor, and Alan W. Rottenberg and Martin A. Glazer, as Trustees of W-12A Boylston Street Nominee Trust, for storage space on Floor 11 of the West Tower, dated October 8, 2008, recorded in Book 44122, Page 238; as affected by Assignment to with Paul G. Roberts, as Trustee of Mandarin Orange Residence Trust, dated August 31, 2011, recorded in Book 48329, Page 340; as further affected by Amendment to License Agreement dated March 26, 2015, recorded in Book 54233, Page 343.

12.     Irrevocable License Agreement by and between CWB Hotel Limited Partnership, as Licensor, and Andrew P. Prague, as Trustee of the B776 W12B Nominee Realty Trust, for storage space on Floor 12 of the West Tower, dated October 8, 2008, recorded in Book 44123, Page 123; as affected by Assignment to Joseph M. Jourieh, dated June 1,

2011, recorded in Book 47986, Page 178; as further affected by Assignment to Chi-u Liang, Trustee of Underhill Holdings Nominee Trust, dated February 27, 2014, recorded in Book 52737, Page 313.

13.    License Agreement by and between CWB Hotel Limited Partnership, as Licensor, and Martin Trust and Diane Trust, as Trustees of The 1997 Diane Trust Master Trust, for storage space on Floor PH1 of the West Tower, dated October 8, 2008, recorded in Book 44234, Page 286; as assigned by Assignment and Assumption of License Agreement to Diane Trust and Martin Trust, as Trustees of the Diane Trust Family 2015 QPRT, dated March 12, 2015, recorded in Book 54322, Page 321.

14.    Terms and provisions of the License, Maintenance and Indemnification Agreement by and between the City of Boston and CWB Hotel Limited Partnership, dated as of January 1, 2015, recorded in Book 54616, Page 270.

## **EXHIBIT C**

**Form of Deed**

Locus:  Hotel Unit
772-778 Boylston Street
Boston, MA 02199

### *THE 776-778 BOYLSTON PRIMARY CONDOMINIUM*

### *PRIMARY CONDOMINIUM UNIT DEED*

---

Grantor:          CWB Hotel Limited Partnership,
                  a Delaware limited partnership

Grantor's
Address:          [_____]

Grantee:          [_____]

Grantee's         [_____]
Address:

Unit:             Hotel Unit of The 776-778 Boylston Primary Condominium (the
                  "Primary Condominium")

Percentage Interest in General Common Elements Appurtenant to Unit:  [40%]
Percentage Interest in Hotel Limited Common Elements Appurtenant to Unit:  100%
Percentage Interest in Hotel/Apartments Limited Common Elements Appurtenant to
Unit:  As provided in Section 7.2 of the Master Deed.

Appurtenant Easement Interests:   All rights and easements appurtenant to and benefiting
the Unit, as set forth in the Master Deed.

Master Deed:      Master Deed of The 776-778 Boylston Primary Condominium dated

as of July 14, 2008 and recorded with Suffolk County Registry of Deeds (the "Registry") in Book 43887, Page 1, as amended by Special Amendment to Master Deed dated as of September 15, 2008 and recorded with the Registry in Book 44032, Page 184, Special Amendment to Master Deed dated as of October 2, 2008 and recorded with the Registry in Book 44104, Page 281, Amendment to Master Deed dated as of October 20, 2015 and recorded with the Registry in Book 55263, Page 215, as the same may have been further amended

Declaration of Trust:   Declaration of Trust of The 776-778 Boylston Primary Condominium Trust dated as of July 14, 2008 and recorded with the Registry in Book 43887, Page 57, as amended by Amendment to Declaration of Trust dated as of March 31, 2009 and recorded with the Registry in Book 44936, Page 258, as the same may have been further amended

By-Laws:   By-Laws of The 776-778 Boylston Primary Condominium, included as Article 6 of the Declaration of Trust, as the same may have been amended

Rules and Regulations:   Rules and Regulations of the 776-778 Boylston Primary Condominium, attached as Exhibit "A" to Declaration of Trust, as the same may have been amended

---

Grantor for consideration of the sum of [_____] 00/100 Dollars ($_____) paid hereby grants to Grantee with QUITCLAIM COVENANTS the Unit in the Primary Condominium established by the Master Deed. The Unit is conveyed together with its undivided Percentage Interest in the General Common Elements, its undivided Percentage Interest in the Hotel Limited Common Elements and the Hotel/Apartments Limited Common Elements, and the Appurtenant Easement Interests.

The post office address of the Unit is:  Hotel Unit, The 776-778 Boylston Primary Condominium, 772-778 Boylston Street, Boston, Massachusetts 02199.

This Deed and the Primary Condominium are subject to the provisions of Massachusetts General Laws Chapter 183A, as amended.  Capitalized terms not defined herein shall have the meaning ascribed to them in the Master Deed.

The Unit is one of four (4) units comprising the Primary Condominium, and is shown on the Plans of the Primary Condominium ( the "Plans") recorded in the Registry with the Master Deed, bearing the verified statement of a registered architect in the form required by Massachusetts General Laws Chapter 183A, Section 8.

The Unit and Appurtenant Easements Interests are conveyed subject to and with the benefits of the following, all of which the Grantee by acceptance and recording of this Deed agrees to comply with, perform, assume and pay:

1.      The provisions and restrictions set forth in the Master Deed, the Declaration of Trust, the By-Laws, the Rules and Regulations, and any administrative rules and regulations promulgated pursuant thereto, as each may be amended from time to time; and

2.      All easements, restrictions, agreements and other matters of record affecting the Unit and the Common Elements insofar as now in force and applicable.

Without limiting the foregoing, the Unit is subject to the restrictions set forth in Sections 9.1, 9.2 and 9.3 of the Master Deed and in the Rules and Regulations as follows (capitalized terms used and not defined herein, shall have the meanings given to them in the Master Deed):

A.      General:  Except as provided in Article 9 of the Master Deed, the Primary Units may be used for any lawful purpose not otherwise prohibited by the terms and provisions of this Master Deed, the Declaration of Trust, or any document affecting title to the Land, subject to the receipt of all necessary governmental permits and approvals.

B.      Restriction on Use of Units:  The Primary Units shall be subject to the restriction on the use of Units set forth in the Rules and Regulations, which restrictions are incorporated herein by reference as if fully set forth herein.

C.      Leasing of Units:  Except as provided in Article 9 of the Master Deed, any lease of a Primary Unit or portion thereof shall be in writing and shall provide that the tenancy shall be in compliance with the Primary Condominium Documents, including the Rules and Regulations, a copy of which shall be attached to such lease.  No right to lease by any Primary Unit Owner shall be exercised so as to restrict use or occupancy of a Primary Unit or portion thereof because of race, creed, sex, color or national origin.  A Primary Unit Owner shall provide in writing to the Primary Trustees the name(s) of any tenants or occupants of the Primary Unit, other than visitors for less than thirty (30) days, and the name of the person or entity who shall oversee the maintenance and repair of the Primary Unit during the term of a lease.  A "lease" shall include all written occupancy agreements for use of space within the Retail Unit, the Residences Unit or the Apartments Unit, but shall not include any agreement for use of hotel rooms or other facilities within the Hotel Unit.

D.      Time Sharing Prohibited:  No Primary Unit or Secondary Unit within a Secondary Condominium shall be used for any so-called time-sharing programs or purposes, whereby a unit owner sells, leases, licenses or otherwise grants an interest or a right of occupancy in or to any such unit or portion thereof for one or more fixed

or floating intervals within any two (2) or more successive years, including, without limitation, so-called time span ownership, interval ownership, vacation or other time-sharing license or lease programs or purposes. The provisions of this paragraph shall not, however, be construed to derogate from the right of a Secondary Unit Owner within the Secondary Residences Condominium and the Apartments Unit Owner to enter into a lease pursuant to the provisions of Section 9.2 of the Master Deed.

Grantor hereby certifies that it has not elected to be treated as a corporation for federal tax purposes.

For Grantor's title, see Unit Deed dated August 4, 2008 and recorded with the Registry in Book 43887, Page 100.

[Signature on next page]

84245-0028/128864721.2

[Signature page to Primary Condominium Unit Deed - Hotel Unit]

WITNESS the execution hereof, under seal, this _____ day of _____, 201___.

**GRANTOR:**

**CWB HOTEL LIMITED PARTNERSHIP**
a Delaware limited partnership

By:     _____,
        its general partner

        By:_____
            Name:
            Title:

COMMONWEALTH OF MASSACHUSETTS    )
                                 )
SUFFOLK, ss                      )

On this _____ day of _____, 201___, before me, the undersigned notary public, personally appeared _____, the _____ of 10 State Street Holdings, LLC, proved to me through satisfactory evidence of identification, which was personal knowledge to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily as manager of 10 South State Street Holdings, LLC, in its capacity as general partner of CWB Hotel Limited Partnership, for its stated purpose.

_____
Notary Public
My commission expires:

[affix notarial seal]

**EXHIBIT D**

**Form of Bill of Sale**


**BILL OF SALE**

THIS BILL OF SALE is made as of this [___] day of [_____], 2015 by CWB Hotel Limited Partnership, a Delaware limited partnership (the "<u>Assignor</u>"), for the benefit of [_____] ("<u>Assignee</u>"), having an address at [_____].

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor hereby irrevocably assigns, transfers and sets over unto Assignee, from and after the date hereof, as is, without representation or warranty of any kind by or recourse to Assignor, express or implied, by operation of law or otherwise, all of Assignor's right, title and interest in and to the equipment, machinery, consumables, inventory and other tangible personal property of every kind and nature installed in, located at, situated on, or used exclusively in connection with all or any portion of the property described on <u>Exhibit A</u> attached hereto a made a part hereof (the "<u>Property</u>"), excluding, however, any such personal property belonging to any tenants at the Property, any public utility, subject to leases, or any other person or entity except Assignor.

This Bill of Sale shall be binding upon and shall inure to the benefit of Assignee, its successors and assigns.


*[SIGNATURES ON FOLLOWING PAGE]*

**IN WITNESS WHEREOF**, Assignor has executed and delivered this Bill of Sale as of the day and year first above written.

Signed and acknowledged in the presence of:  **ASSIGNOR**:

CWB HOTEL LIMITED
PARTNERSHIP, a Delaware limited
partnership

_____
Witness
Print Name: _____

_____

_____
By:_____
Witness
Its:
Print Name: _____

# EXHIBIT A
## TO
## BILL OF SALE

Legal Description of the Hotel Unit of The 776-778 Boylston Primary Condominium

Real property at 776-778 Boylston Street in the City of Boston, County of Suffolk, Commonwealth of Massachusetts, described as follows:

The Hotel Unit

Condominium Name:  The 776-778 Boylston Primary Condominium (the "Condominium")

A.    That unit of the Condominium referred to above, submitted to the provisions of Massachusetts General Laws, Chapter 183A, by virtue of Master Deed of The 776-778 Boylston Primary Condominium, dated July 14, 2008, and recorded with the Suffolk County Registry of Deeds on August 5, 2008, in Book 43887, Page 1, as affected by Special Amendment to Master Deed dated as of September 15, 2008, recorded in Book 44032, Page 184; and by Special Amendment to Master Deed dated as of October 2, 2008, recorded in Book 44104, Page 281, as further amended of record (the "Master Deed"), and the Declaration of Trust of The 776-778 Boylston Primary Condominium Trust dated July 14, 2008, and recorded with the Suffolk County Registry of Deeds on August 5, 2008, in Book 43887, Page 57, as amended of record (the "Condominium Trust").

B.    Together with the undivided percentage interest appurtenant to said unit in the common areas or facilities of said Condominium as set forth in said Master Deed.

C.    Easements appurtenant to said unit:

  (1)  for the existence and maintenance of encroachments within the common areas or facilities;

  (2) for the use of utility and other common facilities; and

  (3) for other purposes as set forth in said Master Deed.

D.    Rights appurtenant to said unit, subject to the provisions of the Master Deed:

  (1) Together with the benefit of the Declaration of Cross-Easements and Operating, Parking and Common Area Agreement between BP Prucenter Acquisition LLC and CWB Boylston LLC, dated as of February 22, 2005, filed as Document No. 696671, and recorded in Book 36524, Page 1; as affected by First Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement dated as of July 20, 2007, filed as Document No. 740294, and recorded in Book 42181, Page 97; as further affected by Second Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement dated as of June 30, 2008, filed as Document No. 754133, and

recorded in Book 43779, Page 59; as further affected by Waiver of Right of First Offer by BP Prucenter Acquisition LLC, dated as of August 15, 2008, and recorded in Book 43927, Page 343, and filed as Document No. 755646, and by Estoppel Certificate and Agreement (BP), dated as of August 15, 2008, and recorded in Book 43928, Page 1, and filed as Document No. 755652 (the "CWB Declaration").

(2) Together with the benefit of a Declaration of Cross-Easements and Operating, Parking and Common Area Agreement by The Prudential Insurance Company of America, dated as of June 30, 1998, recorded July 2, 1998, in Book 22643, Page 1, and filed as Document No. 568836; as affected by First Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement by and between BP Prucenter Acquisition LLC and Avalon Bay BFG Limited Partnership, dated as of November 6, 2001, filed as Document No. 623541, and recorded in Book 27354, Page 114; as further affected by Second Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement by and between BP Prucenter Acquisition LLC and Avalon Bay BFG Limited Partnership, dated as of February 22, 2005, filed as Document No. 696665, and recorded in Book 36523, Page 167, and unrecorded Side Letter Agreement from BP Prucenter Acquisition LLC and CWB Boylston LLC to Avalon Bay BFG Limited Partnership, dated January 5, 2005; as further affected by Third Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement dated as of July 20, 2007, filed as Document No. 740296, and recorded in Book 42181, Page 113; as further affected by Fourth Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement dated as of July 19, 2011, recorded in Book 48162, Page 7, and filed as Document No. 798038; as further affected by Fifth Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement dated as of December 16, 2011, recorded in Book 48826, Page 189 (the "Avalon Cross-Easement").

(3) Together with the benefit of certain access rights set forth in Declaration of Cross-Easements and Operating, Parking and Common Area Agreement by and between BP Prucenter Acquisition LLC and BP Belvidere LLC dated as of November 6, 2000, filed as Document No. 606580, and recorded in Book 25546, Page 185; as affected by First Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement by and between BP Prucenter Acquisition LLC and InterCapital Belvedere Limited Partnership dated as of April 29, 2002, filed as Document No. 634160, and recorded in Book 28566, Page 225; as further affected by Acknowledgement and Release Agreement by and between BP Prucenter Acquisition LLC and The Trustees of the Belvedere Condominium Trust, dated as of June 5, 2006 and recorded in Book 39773, Page 92, and filed as Document No. 721368.

(4) Together with the benefit of certain access rights set forth in Declaration of Cross-Easements and Operating, Parking and Common Area Agreement between BP Prucenter Acquisition LLC and BP Supermarket LLC, dated as of November 6, 2001, filed as Document No. 623544, and recorded in Book 27354, Page 179; as affected by First

Amendment to Declaration of Cross-Easements and Operating, Parking and Common Area Agreement dated as of July 19, 2011, recorded in Book 48162, Page 64, and filed as Document No. 792987.

(5) Air rights at 772-778 Boylston Street, Boston, Suffolk County, Massachusetts, as recited in Release Deed from the City of Boston dated February 27, 2007, recorded in Book 41484, Page 325. Said air rights are shown on the plan entitled "City of Boston Public Works Department, Engineering Division, Vertical Discontinuance Plan, Boylston Street, Boston Proper" dated December 2, 2005, and prepared by Vanasse Hangen Brustlin Inc., recorded in Plan Book 2007, Page 36.

**EXHIBIT E**

**TITLE AFFIDAVIT**

AFFIDAVIT

TO: FIRST AMERICAN TITLE INSURANCE COMPANY (the "Company")

DATED: _____ __, _____

STATE / DISTRICT OF                )
MASSACHUSETTS
CITY / COUNTY OF SUFFOLK      )

**Re:   First American Title Insurance Company Commitment No. NCS-756293-BOS1 ("Commitment")**

The undersigned, CWB Hotel Limited Partnership (the "Undersigned"), being first duly sworn, deposes and says as follows:

1.      This Affidavit is given in connection with those certain premises in the City of Boston, Commonwealth of Massachusetts, commonly known as Mandarin Oriental Hotel (the "premises").

2.      To the best of the Undersigned's knowledge, there is no person, firm or corporation to whom a debt is past due or will become past due who has furnished labor, services or materials on behalf of the Undersigned in connection with the construction or repair of any buildings or other improvements on the herein-described premises, during the preceding ninety three (93) days, which could give rise to a mechanic's lien.

3.      To the best of the Undersigned's knowledge, there are no present tenants, lessees or other parties in possession of said premises except:

4.      To the best of the Undersigned's knowledge, there have been no new improvements to the premises which are not disclosed on that certain ALTA/ACSM Land Title Survey prepared by Feldman Professional Land Surveyors, dated July 21, 2008.

5.      As an inducement to the Company to insure over any matters attaching or created during the "gap" in time between the date hereof and the recording of the documents creating the interest being insured, the Undersigned agrees to promptly remove of record any matters filed of record during said gap period, and shall hold harmless and indemnify the Company against all expenses, costs and reasonable attorneys' fees which may arise out of its failure to so remove said matters of record. Notwithstanding anything to contrary contained herein, this indemnity shall terminate, without recourse to the Undersigned, upon the earlier to occur of: (a) two business days after the date hereof, and (b) the recording of such documents; provided, however, the Undersigned's obligations hereunder shall survive with respect to any adverse matter which

shall have been filed of record affecting the premises during the gap period and prior to such termination.

*[Signature on following page]*

The undersigned make this affidavit for the purposes of inducing third parties to purchase or lease the premises, and/or for the purpose of inducing third party lenders to grant a mortgage on said premises, and for the purpose of inducing the Company to issue a policy (policies) of title insurance.

_____, a _____ _____

By:_____

Name:

Title:

Commonwealth of Massachusetts                )
                                             ) ss
County of _____                      )                    _____ __, 2015

        On this __ day of _____, 2015, before me, the undersigned notary public, personally appeared _____, the _____ of _____, and proved to me through satisfactory evidence of identification, which was a driver's license, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose.

_____

Notary Public

My Commission Expires:_____

## EXHIBIT F

### Form of Assignment Agreement

ASSIGNMENT OF LEASES AND CONTRACTS

THIS ASSIGNMENT AND ASSUMPTION OF LEASES AND CONTRACTS (this "Assignment") is made as of this __ day of _____, _____, by and between CWB HOTEL LIMITED PARTNERSHIP, a Delaware limited partnership ("Assignor"), and [_____, a _____] ("Assignee").

WITNESSETH:

WHEREAS, Assignor and Assignee have entered into that certain Agreement of Purchase and Sale, dated as of [_____] (the "Purchase Agreement") (any term with its initial letter capitalized and not otherwise defined herein having the meaning set forth in the Purchase Agreement), with respect to the sale of a hotel located at 776 Boylston Street, Boston, Massachusetts (the "Property");

WHEREAS, Assignor has entered into certain Bookings, Leases, Permits and Hotel Contracts in connection with the Property; and

WHEREAS, the Purchase Agreement requires Assignor and Assignee to execute this Assignment.

NOW, THEREFORE, in consideration of the premises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto do hereby agree as follows:

AGREEMENT:

1.    Assignment and Assumption.  Subject to the terms and conditions of the Purchase Agreement (including the exclusion of items from the definition of "Property" at the end of Section 1 thereof), Assignor hereby irrevocably assigns, sets over, transfers and conveys to Assignee all of Assignor's right, title and interest in and to (i) the Bookings, (ii) the Leases, (iii) the Permits and (iv) the Hotel Contracts. Subject to the terms and conditions of the Purchase Agreement (including the exclusion of items from the definition of "Property" at the end of Section 1 thereof), Assignee (x) hereby accepts this Assignment and (y) hereby expressly assumes, for itself and its successors, assigns and legal representatives, the Bookings, Leases, Permits and Hotel Contracts and all of the obligations and liabilities, fixed and contingent, of Assignor thereunder accruing from and after the date hereof with respect to the Bookings, Leases, Permits and Hotel Contracts and agrees to (a) be fully bound by all of the terms, covenants, agreements, provisions, conditions, obligations and liability of Assignor thereunder, which accrue from and after the date hereof, and (b) keep, perform and observe all of the covenants and conditions contained therein on the part of Assignor to be kept, performed and observed, from and after the date hereof.

84245-0028/128864721.2

2.    General Provisions.

a.    Successors.  This Assignment shall inure to the benefit of, and be binding upon, the parties hereto and their respective successors and assigns.

b.    Counterparts.  This Assignment may be executed in as many counterparts as may be deemed necessary and convenient, and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same instrument.

c.    Governing Law.  This Assignment and the legal relations between the parties hereto shall be governed by and construed and enforced in accordance with the laws of the State of Massachusetts, without regard to its principles of conflicts of law.

*(Remainder of Page Left Blank Intentionally)*

IN WITNESS WHEREOF, this Assignment was made and executed as of the date first above written.

**ASSIGNOR:**

CWB HOTEL LIMITED PARTNERSHIP, a Delaware limited partnership

By: _____

Its: _____

**ASSIGNEE:**

[_____],
a [_____]

By: _____

Its: _____

**EXHIBIT G**

Form of Interim Beverage Agreement

**INTERIM BEVERAGE AGREEMENT**

      **THIS INTERIM BEVERAGE AGREEMENT** (this "Agreement") is made and entered into as of this ___ day of _____, 201_ (the "Effective Date"), by and among CWB HOTEL LIMITED PARTNERSHIP, a Delaware limited partnership ("Licensee"), _____, a _____ ("New Owner") and _____, a _____ _____ ("Manager"). Licensee, New Owner and Manager are sometimes referred to herein individually as a "Party", and collectively as the "Parties".

RECITALS.

      WHEREAS, Licensee has been the owner of the hotel facility located at 776 Boylston Street, Boston, Massachusetts, and commonly known as the Mandarin Oriental Hotel (the "Hotel").

      WHEREAS, Licensee holds that certain Innholder All Alcoholic Beverages License, License Number _____ (the "Liquor License") issued by the City of Boston Licensing Board (the "Board") and the Alcohol Beverages Control Commission (the "ABCC"), which said license is not transferrable or assignable.

      WHEREAS, Licensee is selling the Hotel to New Owner on the date hereof, and hereafter, New Owner will be the new owner of the Hotel.

      WHEREAS, in order to conduct alcohol sales at the location, New Owner (or its affiliate) or Manager must (i) apply for a new all alcoholic beverages innholder's ("on-premise") license or (ii) purchase a similar license and apply for the transfer and change in location of such license to the Hotel (such new or purchased license, the "New Liquor License" and any applications required in connection therewith, the "License Application").

      WHEREAS, Manager shall be engaged by New Owner (or its affiliate) to operate the purchase, storage, sale and supervision of alcoholic beverage sales at the Hotel (the "Alcohol Operations").

      WHEREAS, New Owner has requested that Licensee continue to operate the Alcohol Operations to ensure continued service of alcohol at the Hotel pending approval of the License Application.

      WHEREAS, Licensee desires to appoint Manager to conduct the Alcohol Operations at the Hotel during the interim period that the New Owner (or its affiliate) or Manager has not yet received the New Liquor License for the Hotel.

NOW, THEREFORE, in consideration of the mutual covenants set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      Recitals. The recitals set forth above are true and correct and are incorporated herein by reference.

2.      Appointment of Manager. Licensee hereby grants the Manager the concession, on an exclusive basis and for the Term (as hereinafter defined), to operate the Alcohol Operations at the Hotel under the Liquor License, to the extent required and/or permitted under Massachusetts law.  Manager shall perform its obligations as set forth in this Agreement at the sole and exclusive direction, instruction and control of the Licensee, except as otherwise expressly provided in this Agreement.

3.      Term. This Agreement shall commence on the Effective Date and expire on the earlier to occur of the following (the "Term"):

    a.  One Hundred Eighty (180) days from the date hereof;

    b.  Within seven (7) days after the effective date of the issuance of the New Liquor License to New Owner (or its affiliate) or Manager following the approval by the ABCC and the Board of the New Liquor License to New Owner (or its affiliate) or Manager;

    c.  the issuance of any final and non-appealable ruling, decision or order by any court of competent jurisdiction or other federal, state or local government or other political subdivision thereof, including, without limitation, any person exercising executive, legislative, judicial, regulatory or administrative governmental powers or functions, including, without limitation the Board or the ABCC, in each case to the extent the same has jurisdiction over the person or property in question (a "Governmental Authority") that (i) the New Liquor License shall not be transferred or issued to New Owner (or its affiliate) or Manager, (ii) the License Application is withdrawn, suspended or revoked, or the Liquor License is revoked, or (iii) this Agreement is adjudged to be prohibited under Applicable Law (as hereinafter defined);

    d.  the failure by any Party to cure any monetary default within five (5) days after receipt of written notice from another Party or its agents and/or representatives, or the failure of any Party to cure any non-monetary default within thirty (30) days after receipt of written notice from another Party or its agents and/or representatives, or if such non-monetary default cannot be cured within thirty (30) days, the failure by such defaulting Party to commence to cure such default within such thirty (30) day period and diligently pursue such cure to completion; or

    e.  any attempt by New Owner or  Manager to assign or pledge any of its rights, or delegate any of its obligations, under this Agreement, without the prior written consent of Licensee or its agents and/or representatives;

provided, however, in the event this Agreement is terminated prior to the issuance of the Liquor License to New Owner (or its affiliate) or Manager, the Alcohol Operations shall cease but the Licensee shall maintain the Liquor License until the revocation or cancellation of the Liquor License by the applicable Governmental Authority.

4.      Purchase of Alcoholic Beverages.  During the Term, all alcoholic beverages to be purchased for service or sale at the Hotel shall be purchased and paid for by Manager in cash (and not credit) upon or prior to delivery from Massachusetts distributors and other suppliers in the name of the Licensee.

5.      Fees.  All gross revenue and receipts derived from the Alcohol Operations are the exclusive property of Licensee; provided that during the Term, Manager shall collect said revenues and receipts on behalf of Licensee.  On behalf of Licensee, Manager shall pay all operating expenses and other costs incurred in connection with the Alcohol Operations out of the proceeds of the Alcohol Operations.  The net profits from the Alcohol Operations (i.e., the proceeds of the Alcohol Operations less all operating expenses and other costs incurred in connection with the Alcohol Operations), if any, shall be held in an account for the duration of the Term for payment of operating expenses and other costs to be incurred in the balance of the Term.  In consideration of the services rendered hereunder, Licensee shall pay to Manager an amount equal to $225,000 per month, as prorated for each partial month (the "Management Fee"), payable in arrears at the expiration of the Term; provided, however, in no event shall such Management Fee, in the aggregate over the Term, exceed the net profits held by Manager on behalf of Licensee from the Alcohol Operations during the Term.  In the event the said net profits exceed the Management Fee, such net profits shall be held in the account for the balance of the Term, and shall become the property of the Licensee only if the License Application is denied.

6.      Employees.  Licensee, through the New Owner (or its affiliate) or Manager, shall maintain exclusive control of every phase of the storage, distribution, transportation, sale and service of all alcoholic beverages purchased, stored or sold at the Hotel insofar as the same relates to the Alcohol Operations, through use of the services and employees or subcontractors of New Owner or Manager.  New Owner and Manager acknowledge that Licensee may require New Owner (or its affiliate ) or Manager to reassign any such employees or subcontractors for failure to comply with any and all relevant ordinances, laws, statutes and other requirements imposed by the ABCC with respect to the Liquor License.  All persons involved in the Alcohol Operations at the Hotel shall be employees of New Owner (or its affiliate) or Manager, and New Owner (or its affiliate) or Manager shall be responsible for the payment of all salaries, wages, employment taxes and all other employee benefits for such employees.

7.      Compliance with Law.  At all times during the Term of this Agreement, New Owner and Manager shall comply with any and all relevant ordinances, laws, statutes, rules, regulations and other requirements ("Applicable Law") applicable to the Liquor License.  Notwithstanding anything to the contrary in this Agreement, no Party shall be required to perform any of its obligations under this Agreement during any period to the extent the performance of such obligations is (i) adjudged to be prohibited under Applicable Law, or (ii) prohibited, suspended or enjoined by any court of competent jurisdiction or other Governmental

Authority, unless such prohibition, suspension or injunction shall have been stayed pending appeal.

8.      Transfer or Issuance of Liquor Licenses.  Subject to the other terms of this Agreement, (i) Manager and New Owner shall exercise all commercially reasonable efforts to keep the Liquor License in full force and effect and in good standing (and Licensee shall cooperate, at no cost or expense to Licensee, with respect thereto), (ii) none of New Owner, Manager nor Licensee shall relinquish the Liquor License (other than as required by any Governmental Authority) and New Owner or Manager shall exercise all commercially reasonable efforts to renew, extend, reapply for or otherwise continue the Liquor License, to be paid from the revenues and receipts received from the Alcohol Operations, as necessary to keep such Liquor License in full force and effect until the expiration of the Term (and Licensee shall cooperate with respect thereto, including executing and delivering to Manager any forms requested by Manager and necessary therefor), and (iii) no Party shall take or fail to take any action which would cause a suspension, revocation or termination of such Liquor License during the Term. New Owner (or its affiliate) or Manager, at its cost and expense, shall pursue the New License as promptly as reasonably practicable, in accordance with reasonable custom and practice in Massachusetts. Licensee shall cooperate in all reasonable respects with New Owner (or its affiliate) and Manager and any Governmental Authority (at no cost or expense to Licensee) in pursuit of the New License, including, without limitation, executing all documents as may be reasonably requested of Licensee by New Owner (or its affiliate) or Manager, at no cost or expense to Licensee, and providing any other documentation reasonably required of the Seller by the City of Boston Licensing Board ("BLB") and/or Massachusetts Alcoholic Beverages Control Commission ("ABCC"), including, without limitation, providing a Certificate of Good Standing from the Massachusetts Department of Revenue. Licensee shall not be deemed to be in default under this Agreement if the Liquor License is revoked, terminated, suspended or not renewed as a result of Manager's or its affiliates' operation and management of the Hotel or Manager's or its affiliates' use of the Liquor License hereunder, as the case may be.

9.      Insurance.  New Owner (or its affiliate) or Manager shall obtain and maintain in force and effect at all times during the Term: (a) commercial general liability insurance coverage in the amount of at least $10,000,000, (b) dram shop insurance coverage in the amount of at least $5,000,000, (c) completed products insurance, (d) worker's compensation insurance, and (e) such other insurance coverages as may be reasonably required by Licensee from time to time. All such insurance policies shall be on an "occurrence" basis and maintained with insurance companies reasonably acceptable to Licensee and shall name (except for the worker's compensation insurance) Licensee and any other person designated by Licensee as an additional insured. New Owner (or its affiliate) or Manager shall deliver to Licensee a certificate of insurance which shall provide that such insurance may not be canceled or modified without thirty (30) days prior notice to Licensee. Payment of all costs of insurance may be made from the revenues of the Alcohol Operations. This Section 9 shall survive the expiration or termination of this Agreement.

10.     Release and Indemnification.  Manager and New Owner, jointly and severally, to the fullest extent permitted by law, shall and hereby do indemnify and hold harmless Licensee and its officers, directors, partners, affiliates, members, shareholders, principals, employees, representatives and agents (collectively, the "Indemnified Parties") from and against any and all

liabilities, actions, suits judgments, obligations, liens, damages, penalties, claims, costs, charges and expenses, including without limitation, reasonable attorneys' fees and disbursements, which may be imposed upon or incurred by or asserted against any of the Indemnified Parties by reason of any and all claims, actions, lawsuits, demands, damages, fines, penalties, liens, judgments, costs or expenses of any kind or nature whatsoever arising from or related to this Agreement, the Alcohol Operations from and after the Effective Date, and/or all sums of money for which Licensee may be liable to pay to any person as the result of any violation of Applicable Law relating to the Alcohol Operations from and after the Effective Date. This Section 10 shall survive the expiration or termination of this Agreement.

11.    Waiver of Default. No waiver by any Party of any default or breach by another Party of any term or provision of this Agreement shall be deemed to be a waiver of any subsequent default or breach of the same or any other term or provision of this Agreement.

12.    Notices. All notices, demands and other communications from any Party to another Party shall be in writing (collectively, "Notices") and shall be deemed to have been duly given and to be effective on the date upon which such communications are received, or refused, by the Party to whom such notice has been sent. All Notices shall be delivered: (i) in-hand, or (ii) by DHL, Federal Express, or other similar overnight courier service that provides a written receipt upon delivery, or (iii) by the United States Postal Service or its successor, as registered or certified matter, postage prepaid, return receipt requested, addressed as follows:

a)    If to Licensee:
CWB Hotel Limited Partnership
c/o Cortona Capital Management LLC
800 Boylston Street, Suite 1600
Boston, Massachusetts 02199
Attention: George Guzzi
E-mail: gguzzi@cortonacapital.com

With a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, California 90071-3144
Attention: Van C. Durrer II and Meryl K. Chae
E-mail: van.durrer@skadden.com and meryl.chae@skadden.com

b)    If to New Owner (or its affiliate) or Manager:

_____
_____
_____

With a copy to:

_____
_____
_____

13.    Assignment.  No Party shall assign any of their rights, or delegate any of their obligations, under this Agreement, without the prior written consent of the other Parties.

14.    Successors and Assigns; Third Party Beneficiaries.  This Agreement shall be legally binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

15.    Governing Law; Severability.  This Agreement shall be construed under and governed by the laws of the Commonwealth of Massachusetts. If any term or provision of this Agreement is held to be or rendered invalid or unenforceable at any time in any jurisdiction, such term or provision shall not affect the validity or enforceability of any other terms or provisions of this Agreement, or the validity or enforceability of such affected terms or provisions at any other time or in any other jurisdiction.

16.    Submission to Jurisdiction.  The Parties hereto each hereby irrevocably (i) agrees that any suit, action or other legal proceeding arising out of or relating to this Agreement may be brought in a court of record in the Commonwealth of Massachusetts or in the courts of the United States of America located in such state, (ii) consents to the jurisdiction of each such court in any such suit, action or proceeding and (iii) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any of such courts and any claim that any such suit, action or proceeding has been brought in an inconvenient forum.

17.    Prevailing Party.  If any litigation or other court action, arbitration or similar adjudicatory proceeding is undertaken by any Party to enforce its rights under this Agreement, all fees, costs and expenses, including, without limitation, reasonable attorneys' fees and court costs, of the prevailing Party in such action, suit or proceeding shall be reimbursed or paid by the Party against whose interest the judgment or decision is rendered.  This Section 17 shall survive the termination of this Agreement.

18.    Power.  Each of New Owner, Manager and Licensee represents that it has the legal power, right and authority to enter into this Agreement and the instruments referenced herein, and to consummate the transactions contemplated hereby.

19.    Authority.  Each of the individuals executing this Agreement and the instruments referenced herein on behalf of New Owner, Manager and/or Licensee represents that he or she has the legal right, power and authority to bind the Party on whose behalf such individual is executing this Agreement and such other instruments to the terms and conditions hereof and thereof.

20.    <u>Entire Agreement; Amendments to Agreement</u>.  This Agreement sets forth the entire understanding and agreement of the Parties hereto, and shall supersede any other agreements and understandings (written or oral) between the Parties on or prior to the date of this Agreement with respect to the transaction contemplated in this Agreement. No amendment or modification to any terms of this Agreement, waiver of any covenant, obligation, breach or default under this Agreement or termination of this Agreement (other than as expressly provided in this Agreement), shall be valid unless in writing and executed and delivered by the Parties.

21.    <u>Facsimile; Counterparts</u>.  Each Party may deliver executed signature pages to this Agreement by facsimile or other electronic transmission to any other Party, which facsimile or other electronic copy shall be deemed to be an original executed signature page. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the Parties had signed the same signature page.

[Signature page follows]

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed and delivered in their names by their respective duly authorized officers or representatives as of the Effective Date.

**LICENSEE:**

CWB HOTEL LIMITED PARTNERSHIP,
a Delaware limited partnership

By:      _____

           Name:
           Title

**MANAGER:**

a _____  _____

By:      _____

           Name:
           Title

**NEW OWNER:**

a _____  _____

By:      _____

           Name:
           Title

**SCHEDULE 1.1.8**

**LEASES**

1.      License Agreement dated October 1, 2015 by and between Mandarin Oriental Boston, as Agent for CWB Hotel LLP d/b/a Mandarin Oriental Boston and Lux Bond & Green

2.      License Agreement dated as of October 1, 2015 by and between Mandarin Oriental Boston, as Agent for CWB Hotel LLP d/b/a Mandarin Oriental Boston and Pageo Jewelers

3.      License Agreement dated as of October 1, 2015 by and between Mandarin Oriental Boston, as Agent for CWB Hotel LLP d/b/a Mandarin Oriental Boston and PENG Bags by Meichi Peng

4.      License Agreement dated as of May 18, 2015 by and between CWB Hotel LLP dba Mandarin Oriental, Boston,  acting by and through its agent, Mandarin Oriental (Boston) and The Swatch Group (U.S.) Inc. - OMEGA Retail Division.

## SCHEDULE 1.1.9

## HOTEL CONTRACTS

| Counterparty | Hotel Contract |
| --- | --- |
| ACLS (Royal Laundry) | Laundry Service |
| Air Duct Services | Kitchen Grease Exhaust Cleaning |
| ALLIED WASTE (Republic) | Waste Removal |
| Avendra | Suppliers/Products |
| Barclay | Water Treatment |
| Bay State Linen | Uniform Laundry |
| Excel Night Cleaners | Janitorial services |
| Cintas Uniform Service (2 contracts) | Stewarding/Culinary Uniforms/Cleaning |
| Datavision Technologies | Support/Maintenance softward |
| Guest TEK | In Room Movies |
| Harvard Pilgrim | Health insurance |
| IDeaS | Revenue management software |
| Infor Global Solutions | Accounting software |
| JRS International | Chandeliers/inside windows |
| LTI transportation | Limo Service Commission Income |
| Lutron | Lighting support |
| NEC | Nec Secure Maint |
| NewMarket International | Software |
| Omnipoint Communications | Telecommunications |
| Otis Elevators | Elevator Service |

| Post Integrations | Merchant Services Agreement |
|---|---|
| RCN | Cable TV/Video |
| Ricoh | Copy Machines |
| SpaSoft (PSMS) | SpaSoft software |
| Tangerine | Television |
| Verizon | Local Phone and internet |
| Waltham Services | Insect/Termite Control |

**Exhibit B**

**Proposed Sale Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                               :
In re:                                         :    Chapter 15
                                               :
IRISH BANK RESOLUTION CORPORATION              :    Case No. 13-12159 (CSS)
LIMITED (IN SPECIAL LIQUIDATION),              :
                                               :
Debtor in a foreign proceeding.                :
                                               :
                                               :    **Related Docket No.: ___**
                                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ORDER (I) APPROVING THE SALE OF CERTAIN HOTEL ASSETS RELATING TO THE MANDARIN ORIENTAL BOSTON, AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Sale Motion")[1] [Docket No. 482] of Kieran Wallace and

Eamonn Richardson, the duly appointed and authorized foreign representatives (the "Foreign

Representatives" or "Special Liquidators") of Irish Bank Resolution Corporation Limited

("IBRC" or the "Debtor"),  pursuant to sections 105, 363, 365, 1520, and 1521 of title 11 of the

United States Code (the "Bankruptcy Code"), rules 2002, 6004, and 6006 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local Rules for the

United States Bankruptcy Court, District of Delaware (the "Local Rules") for entry of an order

(the "Order"): (i) approving the sale of the Hotel Assets, and (ii) granting related relief; and the

Bankruptcy Court having conducted a hearing on the Sale Motion on _____, 2015 (the

"Sale Hearing"); and all parties in interest having been heard, or having had the opportunity to be

heard, regarding the Sale Motion; and the Bankruptcy Court having reviewed and considered the

Sale Motion, any objections and replies filed in connection therewith, all arguments made and all

---

[1]    Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Sale Motion.

evidence presented at the Sale Hearing; and upon the record of the Sale Hearing, the Wallace Declaration, any and all declarations and other materials submitted by the Debtor in connection with the Motion, any objections and replies filed in connection with the Motion, and these chapter 15 cases and proceedings, and after due deliberation thereon, and good cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    **Findings and Conclusions**.  The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    **Jurisdiction and Venue**.  The Bankruptcy Court has jurisdiction over the Sale Motion and the Sale Transaction pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue in this district is proper pursuant to 28 U.S.C. §§ 1408, 1409, and 1410.

C.    **Statutory Predicates**.  The statutory predicates for the relief requested in the Sale Motion are Bankruptcy Code sections 105(a), 363, 365, 1520 and 1521, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rule 6004-1.

D.    The relief granted herein is necessary and appropriate and in the interests of the public and international comity, consistent with the public policy of the United States, warranted pursuant to section 1507 of the Bankruptcy Code, and will not cause hardship of any party in interest that is not outweighed by the benefits of the relief granted herein.

E.      The Sale Transaction is not contrary to the public policy of the United States.

F.      **Notice**.  Proper, timely, adequate, and sufficient notice of the Sale Motion, including, without limitation, the Sale Transaction, the Sale Hearing, and the entry of this Order, has been provided in accordance with Bankruptcy Code sections 102(1), 105(a), 363, 365, 1520 and 1521, Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, and 9014, and Local Rule 6004-1. Such notice was good and sufficient and appropriate under the particular circumstances.  No other or further notice of the Sale Motion, including, without limitation, the Sale Transaction, the Sale Hearing, or entry of this Order, is necessary or shall be required.

G.      **Business Justification**.  The Debtor and the Borrowers have demonstrated good, sufficient and sound business purpose and justification for the Sale Transaction. The Debtor and the Borrowers have also demonstrated compelling circumstances for the Sale Transaction, without the filing and confirmation of a plan of reorganization or liquidation in this case, including, without limitation: (a) the Sale Agreement constitutes the highest or otherwise best offer for the Hotel Assets; (b) the Sale Agreement and the closing of the Sale Transaction will present the best opportunity to maximize the value of the Hotel Assets; and (c) the closing of the Sale Transaction is necessary to comply with the Sale Agreement.  Entry of this Order approving the Sale Agreement and all provisions thereof is a necessary condition precedent to the Purchaser consummating the Sale Transaction.

H.      The decision to enter into the Sale Agreement reflects the exercise of the sound business judgment of the Debtor and the Borrowers.

I.      **Opportunity to Bid**.  The Debtor, the Borrowers, and their respective professionals marketed the Hotel Assets and conducted the sale process consistent with the Bidding Procedures and the Bidding Procedures Order.  The bidding and other procedures

3

underlying the sale process for the Hotel Assets were non-collusive, created and followed in

good faith, were substantively and procedurally fair to all parties, and afforded a full and fair

opportunity for any qualified entity to make a higher or otherwise better offer to purchase the

Hotel Assets. Based upon the record of these proceedings, all creditors and other parties in

interest and all prospective purchasers have been afforded a reasonable and fair opportunity to

bid for the Hotel Assets.

   J.  **<u>Highest or Otherwise Best Offer</u>**. The total consideration provided by the

Purchaser for the Hotel Assets is the highest or otherwise best offer received by the Debtor and

the Borrowers.

   K.  **Section 363(m)**. The Purchaser is not an "insider" or "affiliate" of the Debtor

as those terms are defined in the Bankruptcy Code. The Purchaser is a buyer in good faith,

as that term is used in the Bankruptcy Code and the decisions thereunder, and is entitled to

the protections of section 363(m) of the Bankruptcy Code with respect to the purchase of

the Hotel Assets. The Sale Agreement was negotiated and entered into in good faith, based upon

arm's length bargaining, and without collusion or fraud of any kind. Neither the Debtor, the

Borrowers, nor the Purchaser have engaged in any conduct that would prevent the

application of section 363(m) of the Bankruptcy Code to the Sale Agreement or to the

consummation of the Sale Transaction and transfer of the Hotel Assets, including the Assumed

and Assigned Contracts to the Purchaser. The Purchaser is entitled to all the protections and

immunities of section 363(m) of the Bankruptcy Code.

   L.  **<u>Section 363(n).</u>** The Sale Agreement was not controlled by an agreement

between potential or actual bidders within the meaning of Bankruptcy Code section 363(n). The

Debtor, the Borrowers, and the Purchaser have not engaged in any conduct that would cause or

permit the Sale Agreement or the consummation of the Sale Transaction to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code. Further, the Purchaser had no undue advantage over other potential buyers or bidders at the Auction that would authorize avoidance or recovery under Section 363(n) of the Bankruptcy Code.

M.      Except as otherwise provided in the Sale Agreement, the Hotel Assets shall be sold free and clear of all mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens (including, without limitation, mechanics', materialmens' and other consensual and non-consensual liens and statutory liens), judgments, demands, encumbrances, rights of first refusal, offsets, setoffs, holdbacks, chargebacks, reconciliations, contracts, recoupment, rights of recovery, claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-ego, environmental, pension, or tax, decrees of any court or foreign or domestic governmental entity, or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, debts arising in any way in connection with any agreements, acts, or failures to act, of the Debtor, claims (as that term is used in the Bankruptcy Code), reclamation claims, obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the

commencement of the bankruptcy case, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines or statutes of successor liability (collectively, "Liens, Claims, Encumbrances and Interests") with such Liens, Claims, Encumbrances and Interests to attach to the consideration to be received by the Debtor or anyone claiming by or through the Debtor in exchange for the Hotel Assets in the same priority and subject to the same defenses and avoidability, if any, as before the Closing, and the Purchaser would not enter into the Sale Agreement to purchase the Hotel Assets otherwise.

N.      Not selling the Hotel Assets free and clear of all Liens, Claims, Encumbrances and Interests would adversely impact the Debtor's estate, and the sale of the Hotel Assets other than one free and clear of all Liens, Claims, Encumbrances and Interests would be of substantially less value to the Debtor's estate.

O.      **Corporate Power and Authority**.  No consents or approvals, other than as expressly provided for in the Sale Agreement and the entry of this Order, are required by the Debtor to consummate the Sale Transaction.  Subject to entry of this Order, the Debtor has full corporate power and authority to direct the applicable Borrower to execute and deliver the Sale Agreement and the Sale Transaction and direct the applicable Borrower to perform all of their respective obligations thereunder, and the Sale Transaction of the Hotel Assets has been duly and validly authorized by all corporate authority necessary to consummate the Sale Transaction.

P.      **No Fraudulent Transfer**.  The Sale Transaction does not have the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.  None of the Debtor, the Borrowers, or the Purchaser is or will be entering into the Sale Transaction fraudulently.

6

Q.      **Fair Consideration**.  The consideration constitutes reasonably equivalent value
and fair consideration (as those terms are defined in each of the Uniform Fraudulent Transfer Act,
Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code), and under the
laws of the United States, any state, territory, possession or the District of Columbia.  The Sale
Agreement represents a fair and reasonable offer to purchase the Hotel Assets and assume or
acquire liabilities.  Approval of the Sale Agreement and the consummation of the Sale
Transaction is in the best interests of the Debtor, its creditors, and all other parties in interest in
the above-captioned case.

R.      **Compliance with the Bankruptcy Code**.  The consummation of the Sale
Transaction is legal, valid, and properly authorized under all applicable provisions of the
Bankruptcy Code with respect to the Debtor, including without limitation Bankruptcy Code
sections 105(a), 363(b), 363(f), 363(m), 365(b), 365(f), 1520(a)(2), and 1520(a)(3), and
1521(a)(7), and all of the applicable requirements of such sections have been or will be complied
with in respect of the Sale Transaction as of the date of closing or the effective date of
assignment.

S.      No bulk sales law or any similar law of any state or other jurisdiction shall apply
in any way to the Sale Transaction.

T.      The hearing held on the Sale Motion was fair and open to all parties potentially
affected by the relief requested in the Sale Motion.

U.      Time is of the essence in closing the Sale Transaction referenced herein, and the
Debtor, the Borrowers, and the Purchaser intend to close the Sale Transaction as soon as
practicable in accordance with the terms set forth in the Sale Agreement.

V.       For the avoidance of doubt, this Court makes no findings of fact with respect to any aspect of applicable Irish law in connection with the Hotel Assets.

W.       Cause has been shown as to why this Order should not be subject to the stay provided by Bankruptcy Rules 6004 and 6006; and therefore

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.       **Relief Granted**. The relief requested in the Sale Motion is granted in its entirety.

2.       **Objections Overruled**. All objections and responses to the Sale Motion, this Order or the relief granted herein that have not been overruled, withdrawn, waived, settled or otherwise resolved, are hereby overruled and denied on the merits with prejudice.

3.       **Notice**. Notice of the Sale Motion, including without limitation, the transactions set forth in the Sale Agreement, the sale process, the Sale Approval Hearing, and the Sale Transaction was fair and equitable under the circumstances and complied in all respects with Bankruptcy Code sections 102(1), 105(a), 363, 365, 1520 and 1521, Bankruptcy Rules 2002, 6004, 6006, 9006, 9007 and 9014, and Local Rule 6004-1.

4.       **Approval**. The Sale Transaction is hereby approved and authorized in all respects, and the Debtor is hereby authorized and empowered and directed to cause the Borrowers to enter into, and to perform its obligations under, the Sale Agreement and to execute and perform such agreements or documents, and take such other actions as are necessary or desirable to effectuate the terms of the Sale Agreement.

5.       **Section 363(n) of the Bankruptcy Code**.  The Sale Transaction approved by this Order is not subject to avoidance or any recovery or damages pursuant to section 363(n) of the Bankruptcy Code.

6. **Authorization of Performance by the Debtor**. The Debtor is authorized to and shall direct the Borrowers to fully perform under, consummate, and implement the terms of the Sale Agreement together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Sale Agreement, this Order, and the Sale Transaction, including, without limitation, deeds, assignments, stock powers, transfers of membership interests and other instruments of transfer, without any further corporate action or orders of the Bankruptcy Court.

7. The Debtor is authorized to and shall direct the Borrowers to cause to be filed with the secretary of state of any state or any other applicable governmental units, any and all certificates, agreements, amendments, or other documents necessary or appropriate to effectuate the transactions contemplated by the Sale Agreement, any related agreements, and this Order. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.

8. **Direction to Government Agencies**. Each and every filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, federal, state and local official, and any other persons and entity who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Hotel Assets, is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Sale Agreement and this Order.

9. **Fair Consideration**. The consideration provided by the Purchaser to the Debtor or the Borrowers pursuant to the Sale Agreement for the purchase of the Hotel Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform

Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the laws of the United States, any state, territory, possession or the District of Columbia.

10.        **No Bulk Sales; No Brokers**. No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction.  Other than the brokers who have been identified by IBRC on the record (the "Brokers"), no other brokers were involved in consummating the Sale Transaction, and other than the fee due to the Brokers in connection with the Sale Transaction, no brokers' commissions are due to any person or entity in connection with the Sale Transaction.

11.        **Amendments**. Subject to the terms of the Sale Agreement, the Sale Agreement and any related agreements may be waived, modified, amended, or supplemented by agreement of the Debtor, the Borrowers, and the Purchaser, without further action or order of the Bankruptcy Court.

12.        **Failure to Specify Provisions**. The failure specifically to include any particular provisions of the Sale Agreement or any related agreements in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court, the Debtor, the Borrowers, and the Purchaser that the Sale Agreement and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order.  Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

13.        **Binding Order**.  This Order and the Sale Agreement shall be binding upon and govern the acts of all persons and entities, including without limitation, the Debtor, the Borrowers, and the Purchaser, their respective successors and permitted assigns, including, without limitation, all creditors of the Debtor (whether known or unknown), filing agents, filing

10

officers, title agents, recording agencies, governmental departments, secretaries of state, federal,

state and local officials, and all other persons and entities who may be required by operation of

law, the duties of their office or contract, to accept, file, register, or otherwise record or release

any documents or instruments or who may be required to report or insure any title in or to the

Hotel Assets. The Sale Agreement and Sale Transaction shall not be subject to rejection or

avoidance under any circumstances. This Order and the Sale Agreement shall inure to the benefit

of the Debtor, its creditors, the Purchaser and its respective successors and assigns.

14.     **No Stay of Order**. Notwithstanding Bankruptcy Rules 6004 and 6006, this Order

shall be effective and enforceable immediately upon entry and its provisions shall be self-

executing.

15.     **Final Order**.  This Order constitutes a final and appealable order within the

meaning of 28 U.S.C. §158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to

any extent necessary under Bankruptcy Rule 9014 and rule 54(b) of the Federal Rules of Civil

Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is

no just reason for delay in the implementation of this Order and that waiver of any applicable

waiting period is appropriate, and expressly directs entry of judgment as set forth in this Order.

16.     **Lift of Automatic Stay**. The automatic stay pursuant to section 362 of the

Bankruptcy Code is hereby lifted with respect to the Debtor to the extent necessary, without

further order of the Bankruptcy Court, to allow the Purchaser to deliver any notice or direction

necessary to consummate the Sale Agreement and allow the Purchaser to take any and all actions

permitted under the Sale Agreement in accordance with the terms and conditions thereof.

17.     **Retention of Jurisdiction**. The Bankruptcy Court shall retain jurisdiction to (a)

interpret, implement and enforce the terms and provisions of this Order and the Sale Agreement,

11

including all amendments thereto and any waivers and consents thereunder and each of the

agreements executed in connection therewith, in all respects, and (b) to decide any disputes

concerning this Order and the Sale Agreement, or the rights and duties of the parties hereunder

or thereunder or any issues relating to the Sale Agreement and this Order including, but not

limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status,

nature and extent of the Hotel Assets and all issues and disputes arising in connection with the

relief authorized herein.

18.      **Further Assurances**. From time to time, as and when requested by any party,

each party shall execute and deliver, or cause to be executed and delivered, all such documents

and instruments and shall take, or cause to be taken, all such further or other actions as such

other party may reasonably deem necessary or desirable to consummate the Sale Transaction,

including, such actions as may be necessary to vest, perfect or confirm, or record or otherwise, in

the Purchaser its right, title and interest in and to the Hotel Assets.


Dated: January ___. 2015
      Wilmington, Delaware


                                    _____
                                      Honorable Christopher S. Sontchi
                                      UNITED STATES BANKRUPTCY JUDGE

**CERTIFICATE OF SERVICE**

I, Van C. Durrer, II, hereby certify that on December 7, 2015, I caused the foregoing *Notice Of Successful Bidder* to be served on the parties on the service list attached hereto as Exhibit A by first-class U.S. mail, unless otherwise indicated.


*/s/ Van C. Durrer, II*
Van C. Durrer, II

**In re Irish Bank Resolution Corporation Limited (In Special Liquidation)**
**Case No. 13-12159 (CSS)**
**Master Service List**

Van C. Durrer, II, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Suite 3400
Los Angeles, California  90071

Martin N. Flics, Esq.
Paul S. Hessler, Esq.
Robert H. Trust, Esq.
Nancy Chu, Esq.
Linklaters LLP
1345 Avenue of the Americas
New York, NY  10105

David L. Buchbinder, Esq.
Office of the United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE  19899-0035

Mark D. Collins, Esq.
Jason M. Madron, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801

Robert S. Brady, Esq.
Robert F. Poppiti, Jr., Esq.
Young Conaway Stargatt & Taylor LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801

Allan S. Brilliant, Esq.
Dennis H. Hranitzky, Esq.
Craig P. Druehl, Esq.
Stephen M. Wolpert, Esq.
David A. Kotler, Esq.
Dechert LLP
1095 Avenue of the Americas
New York, NY  10036

Frederick B. Rosner, Esq.
Scott J. Leonhardt, Esq.
The Rosner Law Group LLC
824 Market Street, Suite 810
Wilmington, DE 19801

David M. Fournier, Esq.
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE  19801-1709

Jacqueline Marcus, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153

Charles J. Brown, III, Esq.
Gellert Scali Busenkell & Brown, LLC
913 N. Market Street, 10th Floor
Wilmington, DE  19801

Doron A. Henkin, Esq.
The Law Office of Doron A. Henkin
Radnor Financial enter
150 N. Radnor-Chester Road, Suite F200
Radnor, PA  19087

Stephen M. Miller, Esq.
Morris James LLP
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE  19899-2306

Steven M. Abramowitz, Esq.
Vinson & Elkins LLP
666 Fifth Ave., 26th Floor
New York, NY  10103

Josiah M. Daniel, III, Esq.
Vinson & Elkins LLP
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, TX  75201-2975

Gregory A. Taylor, Esq.
Amanda Winfree Herrmann, Esq.
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899-1150

Jeff Smith, Esq.
Steven Bryant, Esq.
Locke Lord LLP
2800 JPMorgan Chase Tower
600 Travis
Houston, TX   77002

Christopher R. Belmonte, Esq.
Pamela A. Bosswick, Esq.
Satterlee Stephens Burke & Burke LLP
230 Park Avenue
New York, NY   10169

Kathleen M. Miller, Esq.
Smith, Katzenstein & Jenkins LLP
800 Delaware Avenue
Suite 1000
P.O. Box 410
Wilmington, DE   19899

Jason B. Burnett, Esq.
David S. Hendrix, Esq.
Alissa M. Ellison, Esq.
Gray Robinson, P.A.
50 North Laura St., Suite 1100
Jacksonville, FL 32202

Marc Kieselstein, Esq.
Justin R. Bernbrock, Esq.
Kirkland & Ellis LLP
300 N. LaSalle Street
Chicago, IL   60654

Jeffrey M. Reisner, Esq.
Irell & Manella LLP
jreisner@irell.com
**(by electronic mail)**

2