**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re: : Chapter 15
:
IRISH BANK RESOLUTION CORPORATION : Case No. 13-12159 (CSS)
LIMITED (IN SPECIAL LIQUIDATION), :
: **Related Docket No. _____**
:
Debtor in a foreign :
proceeding. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF KIERAN WALLACE IN SUPPORT OF**
**FOREIGN REPRESENTATIVES' MOTION FOR ORDER AUTHORIZING THE**
**DEBTOR TO CAUSE ITS AFFILIATE TO ENTER INTO ASSET MANAGEMENT**
**AGREEMENT RELATING TO CERTAIN RETAIL ASSETS**

I, Kieran Wallace, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

1. I lead and am a partner in KPMG's restructuring practice in Dublin, Ireland. I have over 20 years of experience in the restructuring field. I have degrees in both commerce and accounting from the University College of Dublin, and I was qualified as a chartered accountant in 1993.

2. On 7 February 2013, the Irish Minister for Finance (the "Finance Minister") issued the Irish Bank Resolution Corporation Act 2013 (Special Liquidation) Order 2013 (the "Special Liquidation Order") appointing my colleague Eamonn Richardson and me as joint special liquidators (the "Special Liquidators") for Irish Bank Resolution Corporation Limited (in special liquidation) ("IBRC" or the "Debtor") pursuant to Section 4 of the Irish Bank Resolution Corporation Act 2013 (the "IBRC Act") for the purposes of winding up and liquidating IBRC in

1

an orderly manner (the "Irish Proceeding"). Under the terms of the Special Liquidation Order, either Mr. Richardson or I have full authority to act for IBRC in connection with its liquidation.

3. I submit this declaration (the "Wallace Declaration") in support of the *Foreign Representatives' Motion for Order Authorizing the Debtor to Cause Its Affiliate to Enter Into Asset Management Agreement Relating to Certain Retail Assets* (the "Asset Management Motion"). The Special Liquidators rely on this Wallace Declaration in support of the Asset Management Motion.[1]

4. All of the exhibits and documents referenced in the Wallace Declaration are true and correct copies of the original documents, except as otherwise provided. Except as otherwise noted, the facts and matters stated herein are gained from information within my own knowledge and belief or acquired by me or supplied to me in the performance of my duties in relation to IBRC. To the extent that the contents are not derived from my own knowledge and belief, I have indicated the source of such statement as may be appropriate.

**I.      The Retail Assets**

5. IBRC's predecessors in interest, Anglo Irish Bank Corporation Limited ("Anglo Irish") and Irish Nationwide Building Society, routinely made both commercial and residential loans, and as a result IBRC holds a commercial loan book, a mortgage loan book, and a portfolio of certain commercial and residential properties. Certain of IBRC's assets are located within the territorial jurisdiction of the United States, but a majority of IBRC's assets are located in Ireland and other parts of the European Union.

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed thereto in the Asset Management Motion.

6. As set forth in further detail in the *Declaration of Kieran Wallace In Support of Verified Petition Under Chapter 15 for Recognition of a Foreign Proceeding* [Docket No. 4], IBRC sold certain loan assets prior to commencing the Irish Proceeding and this chapter 15 case (the "Chapter 15 Case"), including certain loan assets held in the United States. Following the commencement of the Irish Proceeding, the Special Liquidators have directed their efforts towards maximizing the value of IBRC's assets, including its loan assets within the territorial jurisdiction of the United States. The Special Liquidators have complied with the provisions of the IBRC Act and with the Ministerial Instructions issued by the Finance Minister.

7. IBRC has engaged in the process of selling its assets by dividing such assets into portfolios and marketing each portfolio individually. IBRC undertook this segmentation approach following advice from its advisors that such an approach would maximize the value received for the loan assets. To the extent any such sale involves loan assets with borrowers or collateral located outside the territorial United States, the Irish Proceeding does not require that the Foreign Representatives obtain approval prior to selling such assets.

8. Until 2016, IBRC held certain indirect interests in a luxury hotel and retail complex located in the Back Bay area of Boston, Massachusetts. The complex is currently operated as the Mandarin Oriental Boston and is comprised of three different groups of assets: a luxury hotel (the "Hotel Assets" and collectively with the Retail Assets, the "Operational Assets"), retail spaces (the "Retail Assets"), and sixteen remaining condominium units. Each group of Operational Assets is owned by a separate limited partnership entity. As detailed further below, IBRC serves a lender to these limited partnership entities under a 2008 loan agreement, and also indirectly owns these two limited partnership entities due to a 2010

3

assignment in lieu of foreclosure transaction involving another borrower under a separate mezzanine loan.

9.     The Operational Assets.  Anglo Irish entered into a loan on October 6, 2008 with certain affiliates (the "Affiliates") of the CWB Entities (as defined below), by which Anglo Irish loaned a principal amount of $8,000,000.00 to such affiliates (the "Mezzanine Loan").  The Mezzanine Loan was secured by the Affiliates' partnership interests in a limited partnership entity which is the indirect parent company of the CWB Entities.  The Mezzanine Loan fell into default, and on April 30, 2010, the Affiliates and Anglo Irish completed a transaction which effectively allowed the Affiliates to withdraw from the limited partnership entity and transfer their partnership interests therein to affiliates of Anglo Irish, utilizing a deed in lieu of foreclosure.  The limited partnership entity in turn owned partnership interests in three operational limited partnerships, two of which are still operational: (i) CWB Hotel Limited Partnership ("CWB Hotel"), which held the Hotel Assets, and following the Hotel Sale Transaction (as defined below) is no longer operational; (ii) CWB Apartments Limited partnership ("CWB Apartments"); and (iii) CWB Retail Limited Partnership ("CWB Retail"), which holds the Retail Assets associated with the complex.  CWB Hotel, CWB Apartments and CWB Retail are referred to herein collectively as the "CWB Entities."  IBRC is the sole indirect owner of CWB Retail.  IBRC has full corporate power and authority to direct CWB Retail to execute and deliver the Asset Management Agreement and to direct CWB Retail to perform all of its respective obligations thereunder.

10.     The Sale of the Hotel Assets.  In April 2015, the Special Liquidators determined to auction certain assets, including the Operational Assets in a parallel asset sale process in an effort to maximize their value for the benefit of IBRC and its creditors (the "Sale Process").  The

Special Liquidators held the auction on December 11, 2015, in accordance with this Court's May 12, 2015 Order approving the bidding procedures [Docket No. 501]. Consistent with this Court's January 15, 2016 *Order (I) Approving the Sale of Certain Hotel Assets Relating to the Mandarin Oriental Boston, and (II) Granting Related Relief* [Docket No. 569] (the "Sale Order"), the Hotel Assets were sold to Boylston Street Hotel LLC (the "Hotel Sale Transaction"). The Hotel Sale Transaction closed on or about April 27, 2016. The Special Liquidators recovered $140 million, nearly $1 million per room, in the Hotel Sale Transaction.

11. The Retail Assets. IBRC retained ownership over CWB Retail, which was not included in the Hotel Sale Transaction. The primary assets of CWB Retail are the Retail Assets. The Retail Assets represent the last material assets of IBRC in the United States, and they are held through IBRC's indirect non-debtor subsidiary, CWB Retail. The Retail Assets link the larger Prudential Center and the Copley Place Mall from Back Bay Station to Boylston Street. The Retail Assets also provide a link to the Boston Mandarin Oriental Hotel. The larger Prudential Center and environs (including Copley Place Mall and Back Bay Station to the east and the Mandarin Oriental and Boylston Street to the north) (collectively, the "Prudential Market") constitutes one of the most valuable retail destinations on the East Coast.

12. During the Sale Process, despite receiving multiple bids, the Special Liquidators exercised their business judgment not to sell the Retail Assets, because they determined that the bids did not reflect the inherent value of the Retail Assets' strategic location within the Prudential Market. Consequently, the Special Liquidators began to explore alternative means to realize this value. Recently, the Special Liquidators observed an increased commercial interest in the area surrounding the Retail Assets. Some notable examples include a recently approved new construction project, which is anticipated to integrate the Back Bay area with its

surrounding neighborhoods, as well as the addition of high-end stores like Christian Louboutin, Saint Laurent, TOD's, and APM Monaco to the neighboring Copley Place shopping mall, in addition to the recent transformation of Copley Place completed the fall of 2017.  The Special Liquidators believe that the revival of interest in the area has paved the way for increased foot traffic in and around the Prudential Market generally, and the Retail Assets in particular.  Given this increased interest in the Back Bay area, the Special Liquidators have determined, in their business judgment, that they can maximize the value of the Retail Assets for the benefit of the Debtor's estate by actively operating the Retail Assets for an interim period prior to a sale, and participating in this revitalization of the Prudential Market.

**II.    The Proposed Asset Management Agreement**

13.    In order to execute this strategy, the Special Liquidators have determined to engage an expert.  The proposed asset manager, Frazer Dos Holdings LLC ("Frazer"), is a reputable, well-known, and established commercial real estate manager in the Boston real estate market.  Frazer's notable experience in the Boston retail market includes its recent transformation of 41 Winter Street, which resulted in one-hundred percent occupancy for the property.  The Frazer team also has extensive experience in repositioning and redeveloping many other core retail properties in Boston's Back Bay district including the conversion and construction of the 60,000 square foot 4/6 Newbury Street which now houses Chanel's flagship.  In addition, Frazer is deeply familiar with the property and the Retail Assets, as Frazer was previously a bidder for the Retail Assets in the Sale Process.  Frazer, as a proven commercial real estate manager, will be best positioned to protect and manage the Retail Assets in the current competitive environment for the benefit of CWB Retail, the asset owner, and ultimately for the benefit of IBRC and its stakeholders.

14. Given that IBRC has few remaining assets in the United States, the Special Liquidators are turning their attention to the best strategy to maximize the value of those remaining assets. Due to the growing number of new investments and new tenants in the same and surrounding properties, the Special Liquidators believe that it is in IBRC's best interest to retain an experienced professional to more efficiently manage the Retail Assets, enabling such assets to keep pace with their competitors and see a potential boost in performance. Frazer's services will allow the Special Liquidators to protect and maximize the value of the Retail Assets for the benefit of IBRC and all other parties in interest in a competitive environment that calls for experienced management. If appropriately managed, the environment would provide the Debtor's estate with an opportunity to realize additional value.

15. Pursuant to the Asset Management Agreement, a copy of which is attached hereto as <u>Exhibit B</u>, Frazer will manage the Retail Assets to achieve efficient and economic operations as well as to realize increased value. Frazer's services will include monitoring and supervising the performance of everything reasonably necessary for the proper operation of the Retail Assets; for example, taking action on tenant service requests and recording the same in a systematic fashion, supervising the moving in and out of tenants and subtenants with minimum disturbance to the operation of the Retail Assets, reviewing and paying bills, not knowingly permitting use of the Retail Assets for a purpose that might result in an uncollectable loss under the insurance held by CWB Retail, protecting and preserving the title and interest of the Retail Assets, filing all necessary disclosure documents, and determining and recommending to CWB Retail the most effective manner for the property operations, including internal management, third party property management and third party facilities management. Additionally, Frazer will utilize its experience as a commercial property manager to assist in the management and direction of the

business of the Retail Assets, including preparing an annual budget and advising on need for capital improvements, repairs and other maintenance, proposing an overall investment strategy, including capitalization and property operations, implementing programs to ensure probability of productive long-term client satisfaction characterized by lease renewals with desirable tenants, and developing a leasing and pricing strategy.

16. In addition, the fee structure of the Asset Management Agreement incentivizes Frazer to best prepare the property for an eventual high-grossing sale. Under the Asset Management Agreement, Frazer will earn a monthly fee in consideration for the asset management services to be provided (the "<u>Asset Management Fee</u>") and an additional incentive fee upon transfer of the Retail Assets (the "<u>Sale Incentive Fee</u>"). The Sale Incentive Fee is earned only upon the closing of a sale (1) with a gross purchase price above a threshold value and (2) to a purchaser that is not an affiliate of either CWB Retail or Frazer.

17. A higher Sale Incentive Fee is earned at increasing tiers of the gross purchase price received for the Retail Assets. The percentages used in the calculation of the Sale Incentive Fee are applied only to the amount realized above the entry value of the applicable gross purchase price tier, up to the exit value of such tier, and the Sale Incentive Fee is calculated cumulatively so that at higher tiers, the Sale Incentive Fee earned also includes the fee earned at the lower tiers.[2]

18. The cost of capital expenditures made to the Retail Assets that CWB Retail has paid or that are assumed, or taken subject to, by the eventual purchaser of the Retail Assets is

---

[2] The dollar values for the entry and exit values of each gross purchase price tier and the corresponding percentage value for the Sale Incentive Fee are set forth in <u>Exhibit B</u> attached to the Asset Management Motion. A motion authorizing the filing of <u>Exhibit B</u> under seal is being filed concurrently herewith.

subtracted from the Sale Incentive Fee. Additionally, if the Sale Incentive Fee exceeds a certain dollar value, 50% of the Asset Management Fee is credited towards the Sale Incentive Fee.

19. In the event that the three-year term of the Asset Management Agreement expires with a binding purchase and sale agreement ("PSA") for the sale of the retail assets where the Sale Incentive Fee is due, Frazer will continue to prepare the Retail Assets for sale without receiving the Asset Management Fee. If at the end of the three-year term of the Asset Management Agreement there is no PSA in place, then Frazer will earn a fee determined as if the gross purchase price in the calculation of the Sale Incentive Fee were replaced with the value a willing buyer would pay a willing seller in an arm's length transaction as determined by one of three third-party brokers selected by CWB Retail.

20. Prior to taking action in connection with the use of its last remaining material assets, IBRC and the Special Liquidators seek entry of the Approval Order to allow IBRC to cause its indirect, non-debtor subsidiary, CWB Retail, to take the necessary steps to enter into the Asset Management Agreement.

21. In conclusion, I believe that approval of the proposed Asset Management Agreement contemplated by the Asset Management Motion will allow the Debtor to best fulfill its fiduciary duties to maximize the value of its assets for the benefit of all stakeholders.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: May 15, 2018
       Dublin, Ireland

                                                         */s/ Kieran Wallace*
                                                         Kieran Wallace

                                                         *Foreign Representative of Irish Bank Resolution Corporation Limited*