## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 15 |
| IRISH BANK RESOLUTION CORPORATION LIMITED (IN SPECIAL LIQUIDATION), | Case No. 13-12159 (CSS) |
| Debtor in a Foreign Proceeding. | |

### MOTION BY MICHAEL BRESLIN FOR AN ORDER PURSUANT TO SECTIONS 105(a) AND 1525(b) OF THE BANKRUPTCY CODE AND RULE 2004 OF THE  FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) DIRECTING THE FOREIGN REPRESENTATIVES TO PRODUCE DOCUMENTS AND (II) DELAYING THE CLOSING OF THE CHAPTER 15 CASE UNTIL ALL CONTROVERSIES WITH MICHAEL BRESLIN HAVE BEEN RESOLVED

Michael Breslin ("Mr. Breslin"), by and through his undersigned counsel, moves for an order  pursuant to 11 U.S.C. §§ 105(a) and 1525(b) and Rule 2004 of the Federal Rules of Bankruptcy Procedure, directing Kieran Wallace and Eamonn Richardson (the "Foreign Representatives") in their capacities as foreign representatives of Irish Bank Resolution Corporation Limited (in Special Liquidation) ("IBRC"), the debtor in the above-captioned chapter 15 case, to produce certain documents and delay the closing of the chapter 15 case until all controversies with Mr. Breslin have been resolved (the "Motion").  In support of the Motion, Mr. Breslin asserts the following:

### Introduction, Parties, Jurisdiction, and Venue

1.      Mr. Breslin is a United States citizen of Irish birth and a creditor of IBRC.  As set forth in detail below, Mr. Breslin has claims against IBRC for fraudulent inducement by IBRC's predecessor-in-interest, Anglo Irish Bank Corporation ("Anglo"), of his guarantee of a U.K. loan made by Anglo, for breach of performance by IBRC itself of a promise to deliver a release of that guarantee, and for damages and indemnification resulting from such fraudulent inducement

and breach of performance.  The U.K. loan at issue was assigned by IBRC to National Asset

Loan Management Limited ("NAML"), for which IBRC then acted as an agent.  Despite IBRC's

promise to release the fraudulently-induced guarantee, NAML has recovered a judgment against

Mr. Breslin in the Irish High Court on this guarantee for £9,397,725.60 plus costs (the "NAML

Judgment").  The NAML judgment was by the Irish Court of Appeal on October 27, 2017, and

an application for leave to appeal to the Irish Supreme Court was denied on April 20, 2018.

2.       As will be discussed herein, the Irish Court of Appeal affirmed the Irish High

Court's grant of  summary judgment without any discovery rejecting  Mr. Breslin's defenses

that, among other things, the guarantee had been fraudulently induced, and IBRC, as NAML's

agent, had promised to release it.  In the Court of Appeal judgment, Ms. Justice Máire Whelan

stated with respect to the latter ground that Mr. Breslin's "rights and remedies in relation to same

must inevitably operate against IBRC in special liquidation alone" and that such finding is

"entirely without prejudice" to Mr. Breslin "as against IBRC (in special liquidation)."  *Nat'l

Asset Loan Mgmt. Designated Activity Co. Ltd. v. Breslin*, [2017] IECA 283, ¶ 78 (Ct. App.)

(Ir.).

3.       By this Motion, Mr. Breslin seeks documentary discovery from IBRC to pursue

his claims against IBRC either in the Irish courts or in this Court.  In addition, because the Irish

courts may prevent Mr. Breslin's claims from being heard on the merits based on an estoppel

under Irish law stemming from the NAML Judgment that would not be available under U.S. law,

Mr. Breslin seeks an order delaying the closing of this chapter 15 case until his claims against

IBRC have been resolved on the merits either by the Irish courts or by this Court.

4.       The Foreign Representatives are the foreign representatives of IBRC, the debtor

in the present case pending under chapter 15 of title 11 of the United States Code (the

"Bankruptcy Code") in this Court.  IBRC was created as the successor in interest to Anglo and

Irish Nationwide Building Society pursuant to the Credit Institutions (Stabilisation) Act 2010.

IBRC was placed into special liquidation in Ireland pursuant to the Irish Bank Resolution

Corporation Act 2013, and is being liquidated in an Irish proceeding (the "Irish Proceeding") by

two joint special liquidators, namely the Foreign Representatives.

5.      On August 26, 2013, the Foreign Representatives filed a petition for recognition

of the Irish Proceeding as a foreign main proceeding pursuant to section 1517(b)(1) of the

Bankruptcy Code.   On December 18, 2013, this Court entered an order granting such

recognition and related relief, docket no. 187 (the "Recognition Order").  The chapter 15 case

remains pending in this Court.

6.      By virtue of the Recognition Order, the Foreign Representatives have the capacity

to sue and be sued, pursuant to section 1509(b) of the Bankruptcy Code.

7.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157(a) and

1334(b).  This  Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).   Mr. Breslin

consents to entry of a final judgment by this Court.  Venue is proper in this district pursuant to 28

U.S.C. § 1409(a).

### Mr. Breslin's Claims Against IBRC

8.      The recitations of Mr. Breslin's claims set forth herein are summarized from and

supported by:

(a) an affidavit of Mr. Breslin, submitted to the Irish High Court in an action

commenced against him by National Asset Loan Management Limited ("NAML")

entitled *National Asset Loan Management Limited v. Michael Breslin, High Court*

*Record No. 2015 No.404S* (the "NAML Action"), a copy of which is annexed as Exhibit A;

(b) an affidavit of Mr. Breslin's Irish solicitor, Mr. Denis McDwyer, submitted in the NAML Action, a copy of which is annexed as Exhibit B; and

(c) an affidavit Mr. Fergal Feeney, the director of U.K. lending of Anglo, which has not heretofore been submitted to any court,[1] a copy of which is annexed as Exhibit C.

9.      Beginning in 2007, Anglo began providing financing to Car Park Solutions Limited ("CPS"), a company owned and controlled by Mr. Breslin's brother and his business colleague, for the acquisition of property on Waterloo Road in London, and its development as a hotel.  At no time did Mr. Breslin have any ownership interest in CPS.

10.     As a condition of renewing the existing financing, totaling approximately £21.4 million, for which Mr. Breslin had no personal liability, and providing additional financing to CPS for the completion of the construction of the hotel, in 2008 Anglo sought from Mr. Breslin, with whom Anglo had had prior successful lending relationships, a personal guarantee of CPS's debt to Anglo.  In determining whether to issue a guarantee on behalf of an entity in which he had no ownership interest, Mr. Breslin did due diligence, including participating in meetings with the designated operator of the hotel and executives of Anglo.

11.     In particular, on or about October 23, 2008, Mr. Breslin met in London with Mr. Rishi Sachdev of Shiva Hotels Limited, the designated operator of the hotel, and during that meeting had a telephone conversation with Mr. Feeney, who, as stated above, was the director of UK Lending of Anglo, regarding Anglo's financing for the completion of the construction of the

---

[1] Mr. Feeney's affidavit was intended to be submitted to the Irish High Court in the NAML Action, but it was received too late for a timely submission.

hotel.  During that telephone conversation Mr. Feeney assured Mr. Breslin that Anglo was "fully behind" the hotel project.

12.    On October 24, 2008, Mr. Breslin met with Mr. Feeney and another executive of Anglo, Mr. David McGuinness, and the CPS shareholders at Anglo's offices in London to discuss the financing of the completion of the hotel.   At that meeting Mr. Feeney represented and confirmed to Mr. Breslin that if he signed a personal guarantee of the CPS debt to Anglo, CPS obtained planning permission for the construction of the hotel, and CPS found a suitable hotel operator, Anglo would provide the financing necessary to complete the construction of the hotel, estimated to amount to £63 million.  The suitable hotel operator, Shiva Hotels Limited, had already been found.  Mr. Breslin reasonably believed that, despite the then-current worldwide financial crisis, Anglo had the financial ability to provide such financing, because Anglo had received at the end of September 2008 a guarantee from the government of the Republic of Ireland.  Moreover, Mr. Breslin reasonably relied on the reputation of Anglo of delivering on its assurances and representations of its funding commitments.

13.    Having received multiple representations, confirmations, and assurances from Mr. Feeney that the funding for the completion of the hotel project would be provided by Anglo to CPS if Mr. Breslin signed a personal guarantee and the other two conditions (planning approval for the hotel and hiring a suitable hotel operator) were met, both at the meeting on October 24, 2008 and during prior telephone conversations, on October 23, 2008, Mr. Breslin signed a personal guarantee of the CPS debt to Anglo (the "CPS Debt").   Just prior to Mr. Breslin's signing  of the personal guarantee, according to Mr. Breslin, Mr. Feeney said something to the effect of "this secures the construction financing now that you are standing behind it."  Affidavit of Michael Breslin, Exhibit A, ¶ 26.

14.    Mr. Feeney himself stated in his affidavit:

> I confirmed to Mr. Breslin that the Bank would be willing to provide the construction funding subject to (a) Mr. Breslin providing his personal guarantee, (b) the Borrower obtaining planning permission for a 330- bedroom hotel and (c) the Borrower finding a suitable hotel operator (the 'Conditions').  As part of the discussion at this meeting I confirmed I would seek credit committee approval to extend the loan to allow time for planning permission to be granted, request an additional 6 months interest to be prefunded into a deposit account held with the Bank and require that Michael Breslin would provide a personal guarantee.

*    *    *    *    *    *    *    *    *

> It is my view that Mr. Breslin only gave his personal guarantee on the understanding that the Bank understood and agreed with the business plan and would provide the funding for the construction of the hotel, based on his meeting with me in London prior to the execution of the Supplemental Facility Letter and his personal guarantee.

*    *    *    *    *    *    *    *    *

> I confirm that in good faith I did indicate to Mr. Breslin that the Bank would provide finance for the construction of the hotel if and when the Conditions were met.  Whilst all loan proposals ultimately had to obtain formal credit committee approval, it would have been commonplace for senior lenders in the Bank such as myself to give customers such as Michael Breslin verbal assurance of their support of a loan proposal.  Over the years, Anglo Irish Bank customers had very much come to rely on the Bank's track record of delivering on these assurances as the senior lenders were members of its credit committee and were very conversant with the credit underwriting requirements of the Bank.

*    *    *    *    *    *    *    *    *

> It is my belief that Mr. Breslin in giving his personal guarantee was convinced that the Bank would support the construction of the hotel and he felt it was going to provide the future funding of the project in which he planned to be involved.

Affidavit of Fergal Feeney, Exhibit C, ¶¶ 4, 6, 7, 8.

15.    At the request of Anglo in light of a defect in the guarantee signed on October 24,

2008, on November 5, 2008, in New York, Mr. Breslin re-executed his personal guarantee of the CPS Debt.

16.     On February 16, 2009, final planning approval was granted for the construction of the hotel by local officials in London.  This satisfied the remaining condition in Mr. Feeney's representations to Mr. Breslin in connection with his signing of the personal guarantee for Anglo to provide the financing necessary to complete the hotel.  The other condition, a suitable hotel operator had already been identified.

17.     In March 2009, an updated appraisal form was submitted to Anglo showing that the total cost to complete the hotel project would be £58,461,639, well within the estimated funding commitment.

18.     On March 26, 2009, having already obtained Mr. Breslin's personal guarantee, and despite the approval of the project by local officials and the receipt by Anglo of a budget showing the costs of the hotel project to be within pre-approved estimates, in stark contradiction to the assurances he had previously given, Mr. Feeney sent an email to Mr. Breslin stating "given the current position of the loan regarding its site value and the probable value at completion, it was decided that the bank would not fund the development in the current market."

19.     Following unsuccessful attempts by Mr. Breslin and others on behalf of CPS to persuade Anglo to honor its funding commitment to permit the hotel project to go forward, in August 2009, Anglo issued demands to CPS for the payment of the previously outstanding CPS Debt of approximately £22 million.  In September 2009, Anglo appointed receivers for the London property acquired by CPS.

20.     On or about March 16, 2011, after having declined to pursue a *higher* offer from a business colleague of Mr. Breslin's, the receivers sold the London property to a company

controlled by Shiva Hotels Limited, which had been the designated operator of the hotel, for less than £16 million.  By this time, IBRC had been created as the successor in interest to Anglo.

21.    In a letter, dated October 19, 2011, from IBRC to CPS, IBRC informed CPS of the following:

> This loan facility has been transferred to National Asset Loan Management Limited a subsidiary of the National Asset Management Agency, pursuant to National Asset Management Agency Act of 2009 ("the NAMA Act").  *Irish Bank Resolution Corporation Limited is managing this facility on behalf of or for the benefit of NAMA/NALM* (emphasis added).

The letter also referred to "associated debtors," meaning guarantors, including Mr. Breslin.  Mr. Breslin had been included despite Anglo's representations to Mr. Breslin and its failure to satisfy the condition for Mr. Breslin's personal guarantee of the CPS Debt, namely, providing the prospective funding for the completion of the hotel project.

22.    Shortly thereafter, in connection with a separate mortgage loan that had been extended by Anglo to Mr. Breslin and his wife, Dolores Breslin, to acquire real property at Dunsany in County Meath, Ireland, IBRC communicated with Mrs. Breslin about the status of such loan, which was not then in default and had not yet matured.  Because the Dunsany property  was  worth about €1,000,000 less than the amount of the loan (€1,614,993.65) based on appraisals done at the time, Mr. Breslin arranged to meet with IBRC to resolve the outstanding debt, seeking a reduction in principal in exchange for an early payment.

23.    Following such meeting, Mr. Breslin asked his attorneys to arrange for the discharge all of the debts that Mr. Breslin and his wife had contracted with Anglo, including the debt on the Dunsany property and Mr. Breslin's personal guarantee of the CPS Debt.  In pursuing such arrangement, Mr. Breslin's Irish solicitor, Mr. McDwyer, communicated with Ms. Helen Rooney, the Assistant Manager, Group Recovery Management Unit of IBRC.  These

communications began in January 2012.  Mr. McDwyer discussed with Ms. Rooney a resolution

of the entirety of Mr. Breslin's Anglo-related debts, the Dunsany mortgage debt and the personal

guarantee of the CPS Debt.  At no time during such discussions did Ms. Rooney state that she or

IBRC lacked authority to compromise or settle Mr. Breslin's personal guarantee of the CPS

Debt.

24.     At the same time that he was discussing a resolution of Mr. Breslin's Anglo-

related debts with Ms. Rooney, Mr. McDwyer communicated with another IBRC representative,

Ms. Karen Burke, a senior manager in the IBRC NAMA Unit, to obtain copies of documents

relating to the CPS Debt.  In particular, by letter, dated February 22, 2012, addressed to Ms.

Burke, Mr. McDwyer requested that she furnish him with "copy PG's [personal guarantees] that

are held by NAMA."  By letter, dated February 28, 2012, the IBRC NAMA Unit sent Mr.

McDwyer documents relating to the CPS Debt.

25.     As a result of (i) IBRC's statutory authority as successor in interest to Anglo, (ii)

the statement by IBRC in the October 19, 2011 letter that it was managing the CPS loan facility

that had been transferred to NAMA, (iii) the discussions between Mr. McDwyer and

representatives of IBRC regarding the resolution of Mr. Breslin's personal guarantee of the CPS

Debt, (iv) Ms. Rooney's failure to state during such discussions that she or IBRC lacked

authority to compromise or settle Mr. Breslin's personal guarantee of the CPS Debt, and (v) the

IBRC NAMA Unit's furnishing requested documentation to Mr. McDwyer regarding the CPS

Debt held by NAMA, it is clear that IBRC had the necessary authority to resolve Mr. Breslin's

personal guarantee of the CPS Debt.

26.     The discussions between Mr. McDwyer and Ms. Rooney culminated in an

agreement on March 7, 2012 to settle all of Mr. Breslin's outstanding debts contracted with

Anglo.  In this regard, Mr. McDwyer sent Ms. Rooney a proposed general release that had been

prepared by Mr. Breslin's New York attorney using a standard New York form of release.  The

form of release to be issued by IBRC, as "RELEASOR," to Mr. and Mrs. Breslin as

"RELEASEES," states that the RELEASOR "releases and discharges" the RELEASEES and

their "heirs, executors, administrators, successors and assigns" from the following:

> all actions, causes of action, suits, debts, sums of money, accounts,
> reckonings, bonds, bills, specialities, covenants, contracts,
> controversies, agreements, promises, variances, trespasses,
> damages, judgments, extents, executions, claims, and demands
> whatsoever, in law, admiralty or equity, which against the
> RELEASEE, the RELEASOR, RELEASOR'S successors and
> assigns ever had, now have or hereafter can, shall or may have, for,
> upon, or by reason of any matter, cause or thing whatsoever from
> the beginning of the world to the day of the date of this RELEASE.

27.    The settlement reached between Mr. McDwyer and Ms. Rooney was that in

exchange for Mr. Breslin's payment of the full amount due on the Dunsany mortgage debt, even

though not yet due, IBRC would release its mortgage and execute and deliver the form of release

set forth above, which the parties referred to as "USA documentation."   The settlement

appropriately released claims against Mr. Breslin based on his personal guarantee of the CPS

Debt in light of the breach of the representations made to Mr. Breslin by Anglo and the failure of

the condition to Mr. Breslin's guarantee that Anglo would fully fund the CPS hotel project.

28.    On March 7, 2012, Mr. McDwyer delivered to Ms. Rooney the full amount due

under the mortgage  of €1,614,993.65 in the form of a bank draft, and Ms. Rooney delivered to

Mr. McDwyer an undertaking by IBRC in the form of a letter acknowledging receipt of the

payment, and further stating:

> the above loan will be redeemed in full and the bank will vacate its
> mortgage against the property, Woodridge Stud, Dunsany, County
> Meath.  Furthermore, the bank will undertake to complete USA
> documentation as furnished Denis McDwyer subject to the

amendment of the amount of €1,614,993.65 and furnish same to
you in due course.

29.     Although the completed USA documentation had been promised "in due course,"

it has to the date of this Motion never been delivered.  After an initial follow-up inquiry by Mr.

McDwyer on March 27, 2012, Ms. Rooney replied on March 29, 2012 that IBRC's Security

Release Team had "all the paperwork and there should be no further delays now."  Shortly

thereafter, Ms. Rooney left her position at IBRC.

30.     Contrary to Ms. Rooney's statement to Mr. McDwyer, on April 18, 2012, Mr.

John Reid of IBRC informed Mr. McDwyer that although the vacated mortgage on the Dunsany

property had been processed, IBRC would not provide the USA documentation.  In a letter, dated

May 4, 2012, Mr. Reid purported to "revoke the undertaking given by the Bank to complete the

USA documentation."  This purported revocation confirmed that there had in fact been such an

express undertaking.

31.     On May 25, 2012, Mr. McDwyer wrote to Mr. Reid that "it is not open to you to

revoke the contract concluded," and that in exchange for the early payment of the Dunsany

mortgage in the agreed-upon sum, IBRC had agreed "to execute the American Document which

document had been posted and emailed to IBRC on separate occasions prior to the meeting of

which the deal was done."  Having received no response, Mr. McDwyer wrote again on July 27,

2012.  He received a response on August 3, 2012, in which IBRC provided proof of the

discharge of the Dunsany mortgage, but reiterated that IBRC had revoked its undertaking to

complete the USA documentation.

32.     Thereafter, in September 2012 Mr. and Mrs. Breslin instituted proceedings in the

High Court in Ireland against IBRC to compel the performance of the agreement that had been

reached, and in particular, to compel IBRC to execute and deliver the USA documentation.

These High Court proceedings were entitled *Michael Breslin and Dolores Breslin v. Irish Bank Resolution Corporation, High Court Record No. 2012 No. 8301P* (the "2012 Proceedings"). IBRC appeared in the 2012 Proceedings through the firm of Eugene F. Collins.

33.    In 2013, IBRC was placed into special liquidation in Ireland pursuant to the Irish Bank Resolution Corporation Act 2013, and in accordance with Section 6(2) of such Act, a stay was imposed on the 2012 Proceedings.  In July 2014, Mr. McDwyer filed a motion seeking an order to amend the title of the 2012 Proceedings so that words "(in special liquidation)" appear after the name of the Defendant.  The motion was returnable on October 13, 2014.

34.    On October 7, 2014, Mr. McDwyer spoke with Ms. Rachel Solanki of Eugene F. Collins who informed him that her instructions from the special liquidators of IBRC were neither to oppose nor to consent to the motion, and invited him to negotiate a resolution of the 2012 Proceedings.  Mr. McDwyer insisted on the execution and delivery by IBRC, through the special liquidators, of the USA documentation and a contribution toward Mr. Breslin's costs of the 2012 Proceedings.

35.    On October 9, 2014, Mr. McDwyer reached a tentative settlement with Ms. Solanki, who requested a Word version of the USA documentation so that it could be amended to state the correct amount paid, to recite that IBRC was in special liquidation, and to have an appropriate signature block.  In reliance on the tentative settlement, Mr. McDwyer agreed to a brief adjournment of the motion.  On October 15, 2014, Eugene F. Collins requested a Word version of the USA documentation, and on October 29, 2014, Mr. McDwyer sent it.

36.    On October 30, 2014, Mr. McDwyer spoke with Ms. Solanki, who informed him that the USA documentation could not be signed by the special liquidators before November 3, 2014, and requested an adjournment of the motion until November 17, 2014 to enable her to

obtain the signatures.  On November 11, 2014, Mr. McDwyer met with Ms. Solanki, and they

agreed, subject to the approval of their respective clients, that the USA documentation would be

executed, and Mr. Breslin would accept a contribution toward costs of whatever sum would not

require the approval of the IBRC credit committee, believed to be in the range of €2,000 to

€3,000.

37.     On November 13, 2014, Ms. Solanki sent Mr. McDwyer a draft nondisclosure

agreement and terms of settlement for his review.  Since the matters had not been resolved by the

adjourned motion date of November 17, 2014, the motion proceeded, and the court granted an

order discharging the stay of the 2012 Proceedings and permitting the amendment of the title to

add "*In Special Liquidation*" to the name of the defendant.

38.     On February 6, 2015, Mr. McDwyer received an email from Ms. Solanki stating

that her client had executed the terms of settlement, and requested a draft notice of

discontinuance of the 2012 Proceedings, with which, if it met with her client's approval, she

could proceed to complete the settlement.  Mr. McDwyer supplied the draft notice of

discontinuance later that day.

39.     Upon learning from Ms. Solanki that the draft notice of discontinuance had been

approved, Mr. McDwyer arranged to meet Ms. Solanki at her office to complete the settlement

on February 10, 2015.  After Mr. McDwyer arrived at the office of Eugene F. Collins on

February 10, 2015, and waited for an hour without explanation, Ms. Solanki finally emerged to

meet with him.   She then told him that she was compromised, a conflict had arisen, she had

instructions to hold off completion of the settlement, and she may have to "come off record" in

the 2012 Proceedings.

40.     On February 18, 2015, NAML wrote to Mr. Breslin notifying him that the CPS facilities and guarantees had been transferred to NAML.

41.     On February 25, 2015, Eugene F. Collins issued a motion in the 2012 Proceedings to withdraw from the representation of IBRC, based on an affidavit by Ms. Solanki that the firm had a conflict of interest.  The motion was heard on March 16, 2015, at which time the firm of Maples & Calder appeared as successor counsel to IBRC.

42.     Notwithstanding all of the foregoing agreements and representations by and on behalf of IBRC to the contrary for nearly three years before its notice of transfer of the CPS Debt, in March 2015, NAML instituted the NAML Action in the High Court against Mr. Breslin to recover on his guarantee of the CPS Debt.  With not-inconsiderable irony, NAML was initially represented by Eugene F. Collins in the NAML Action.

43.     On March 12, 2015, Mr. McDwyer wrote to Eugene F. Collins expressing his amazement that NAML had chosen to ignore the factual position of the settlement that Eugene F. Collins itself had reached in the 2012 Proceedings, and inquired if Eugene F. Collins would "come off record" in the NAML Action.  By letter, dated March 12, 2015, Eugene F. Collins informed Mr. McDwyer that it now was no longer acting for NAML in the NAML Action and that a notice of change of solicitor would shortly be filed and served on him.  Mr. McDwyer subsequently received a notice that Dillon Eustace would act for NAML in the NAML Action.

44.     In the NAML Action, NAML moved for summary judgment.  Mr. Breslin asserted several defenses, including that the guarantee was induced by misrepresentations and that there was a binding promise to release it.  *As a consequence of the motion for summary judgment, Mr. Breslin was not able to obtain discovery from NAML in the NAML Action.*

45.     On May 26, 2017, in the 2015 Proceedings NAML recovered a judgment against

Mr. Breslin in the amount of £9,397,725.60 plus costs (the "NAML Judgment").  In delivering

the High Court's judgment, Mr. Justice Brian J. McGovern relied heavily on several provisions

of the NAMA Act, especially Section 101, to reject Mr. Breslin's defense based on the

misrepresentation that induced the guarantee.  Section 101 of the NAMA Act provides in

relevant part as follows:

> (1) In in relation to a bank asset that NAMA or a NAMA group entity has acquired –
>
>> (a) it is alleged that a representation was made to, a consent was given to, an undertaking was given to, or any other obligation was undertaken (by agreement or otherwise) in favour of, the debtor or another person by the participating institution from which the bank asset was acquired or by some person acting or claiming to act on its behalf,
>>
>> (b) no such representation, consent, undertaking or obligation was disclosed to NAMA in writing, before the service on the participating institution of the relevant acquisition schedule,
>>
>> (c) the records of the participating institution do not contain a note or memorandum in writing of the terms of any such representation, consent, undertaking or obligation or do not contain a record of any consideration paid in relation to any such representation, undertaking or obligation, and
>>
>> (d) the representation, consent undertaking or obligation, if made, given or undertaken, would affect the creditor's rights in relation to the bank asset,
>
> then that representation, consent, undertaking or obligation –
>
>> (i) is not enforceable, and cannot be relied on, by the debtor or any other person against NAMA or the NAMA group entity,
>>
>> (ii) is enforceable, and can be relied on, by the debtor or any other person, if at all, only

> against a person other than NAMA or a
> NAMA group entity, and
>
> (iii)    is not enforceable, and cannot be relied on,
> by NAMA or the NAMA group entity
> against the debtor.

*See Nat'l Asset Loan Mgmt. DAC v. Breslin*, [2017] IEHC 350, ¶¶ 13, 33 (High Ct.) (Ir.), *aff'd*

[2017] IECA 283 (Ct. App.) ( Ir.).

46.    In rejecting Mr. Breslin's defense based on the representations of Mr. Feeney, Mr.

Justice McGovern stated, "There is no record of such a representation . . . ." *Id.* ¶ 32.  Mr.

Justice McGovern did not supply a reference to any affidavit submitted by NAMA in making

such statement.  In rejecting the defense of the binding promise to release the guarantee, Mr.

Justice McGovern relied on an affidavit, submitted by Mr. Kevin Bradley, a representative of

NAMA, that NALM "'did not direct, supervise, authorise, or even know about the purported

agreement said to have been entered into as between the special liquidators of IBRC and Mr.

Breslin and his wife.'"  *Id.* ¶ 35 (quoting Mr. Bradley's affidavit).

47.    As stated above, on October 26, 2017, the Irish Court of Appeal affirmed the

NAML Judgment.  *Nat'l Asset Loan Mgmt. Designated Activity Co. Ltd. v. Breslin*, [2017]

IECA 283 (Ct. App.) ( Ir.).  Also as stated above, in the Court of Appeal judgment, Ms. Justice

Máire Whelan stated with respect to the latter ground that Mr. Breslin's "rights and remedies in

relation to same must inevitably operate against IBRC in special liquidation alone" and that such

finding is "entirely without prejudice" to Mr. Breslin "as against IBRC (in special liquidation)."

*Id.* ¶ 78.

48.    In November 2017 Mr. Breslin filed an application for leave to appeal the NAML

Judgment to the Irish Supreme Court.  On April 20, 2018, the Irish Supreme Court denied the

application for leave to appeal.  A consensual stay of the NAML Judgment has now  expired.

49.     On October 18, 2017, after having received the consent of the Irish High Court to do so, Mr. Breslin filed a plenary summons with a general indorsement of claim against IBRC for damages "for misrepresentation, negligent misstatement, breach of duty (including duty of care, fiduciary duty and/or statutory duty) and/or for breach of contract."  These High Court proceedings were entitled *Michael Breslin v. Irish Bank Resolution Corporation Limited (In Special Liquidation), High Court Record No. 2017 No. 9327P* (the "2017 Proceedings").

50.     On November 10, 2017, Mr. Breslin's solicitors received a letter from solicitors A&L Goodbody on behalf of IBRC requesting that the 2017 Proceedings be discontinued in part because of the estoppel effects of the NAML Judgment against Mr. Breslin and its affirmance by the Irish High Court.

## Relief Sought

51.     Mr. Breslin seeks an order, pursuant to sections 105(a) and 1525(b) of the Bankruptcy Code and Rule 2004 of the Federal Rules of Bankruptcy Procedure directing the Foreign Representative to produce documents.  Specifically, the documentary discovery sought by Mr. Breslin consists of those including documents and communications (electronic and written) that concern the following:

(i) Mr. Breslin's guarantee of the CPS Debt,

(ii) representations made by Anglo to Mr. Breslin before and after he signed the guarantee,

(iii) the decision of Anglo not to provide the construction financing for the CPS hotel project,

(iv) communications between Anglo and the receivers for the  CPS hotel property,

(v) the decision of Anglo to reject an offer for the CPS hotel property from a business colleague of Mr. Breslin's,

(vi) the sale of the CPS hotel property,

(vii) communications between IBRC and CPS or any other person regarding the CPS Debt,

(viii) the USA documentation,(ix) communications between or among IBRC and NAMA or NAML regarding Mr. Breslin, the USA documentation, or the CPS Debt,

(x) the structure of IBRC's NAMA Unit and its relationship to NAMA or NAML,

(xi)  IBRC's role as the managing agent of NAMA/NALM generally and as specifically referred to in the letter of October 19, 2011,

(xii) communications between or among IBRC or NAMA or NALM and their respective  representatives (including Ms. Rooney, Ms. Burke, Mr. Reid, Ms. Solanki, Eugene F. Collins, and Dillon Eustace) and Mr. Breslin's representatives (including Mr. McDwyer), and

(xiii) any consideration by Anglo to cease extending credit to borrowers or potential borrowers or financing transactions during the twelve months prior to the date of the transaction at issue, including, but not limited to, and documents and communications generated by Anglo executives or other employees to cease extending such credit or financings.

.

**Basis for the Relief Sought**

52.    Rule 2004(a) of the Federal Rules of Bankruptcy Procedure provides:  "On motion of any party in interest, the court may order the examination of any entity."  Rule 2004

applies in chapter 15 cases. *In re Platinum Partners Value Arbitrage Fund L.P.*, No. 16-12925,

2018 WL 1864931, at *5-6 (Bankr. S.D.N.Y. Apr. 17, 2018); *In re AJW Offshore, Ltd.*, 488 B.R.

551, 561 (Bankr. E.D.N.Y. 2013); *In re Millennium Global Emerging Credit Master Fund Ltd.*,

471 B.R. 342, 347 (Bankr. S.D.N.Y.  2012); *see In re Irish Bank Resolution Corp. Ltd.*, 559 B.R.

627, 635 (Bankr. D. Del. 2016) (discussing the granting of a Rule 2004 order in this chapter 15

case).  Since Rule 2004(a) authorizes the court to order the examination of "any entity," the

Court may authorize the examination of the Foreign Representatives.  Moreover, 11 U.S.C. §

1525(b) expressly authorizes the court "to request information or assistance directly from . . . a

foreign representative."  Such request for information or assistance may take the form of order

for an examination of the foreign representatives under Rule 2004.  *See id.* § 105(a)

(empowering the court to issue any order "necessary or appropriate to carry out the provisions"

of the Bankruptcy Code).

53.    Rule 2004(c) authorizes the production of documents in connection with an

authorized examination.  The documents requested by Mr. Breslin fall within the scope of the

examination authorized by Rule 2004(b).  In particular these documents relate to the "acts,

conduct, or property, or to the liabilities and financial condition of the debtor."  Fed. R. Bankr. P.

2004(b).

54.    The party seeking to conduct a Rule 2004 examination has the burden to show

good cause for the examination sought.  *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614,

627 (Bankr. D. Del. 2017).  "Generally, good cause is shown if the [Rule 2004] examination is

necessary to establish the claim of the party seeking the examination, or if the denial of such

request would cause the examiner undue hardship or injustice."  *Id.* (quoting *ePlus, Inc. v. Katz

(In re Metiom, Inc.)*, 318 B.R. 263, 270 (S.D.N.Y. 2004)) (alteration in original); *accord In re*

*Dinubilo*, 177 B.R. 932, 943 (E.D. Cal. 1993); *see In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991).

55.    In the present case, Mr. Breslin respectfully submits that in light of the foregoing, he has demonstrated good cause.  The documents requested are relevant to the claims that Mr. Breslin intends to pursue against IBRC either in the Irish courts or in this Court.  Moreover, the denial of the requested documents would cause Mr. Breslin undue hardship or injustice, because he has not heretofore been able to obtain relevant discovery from NAML in the NAML Action, or from IBRC in the 2012 Proceedings or the 2017 Proceedings.   The NAML Action was decided on summary judgment, prior to document discovery, and the 2012 Proceedings and the 2017 Proceedings are in the pre-discovery phase, and may never reach the discovery phase.  The thirteen categories of documents set forth in paragraph 51 are particularly relevant to the issues of the authority of IBRC, including its NAMA Unit, to grant the release of the CPS Debt, and whether Mr. Breslin was indeed induced by misrepresentations to sign the guarantee of the CPS Debt in the first instance.

56.    Moreover, since discovery is currently unavailable in the 2012 Proceedings and the 2017 Proceedings, the "pending proceeding" rule is inapplicable.  That rule limits access to Rule 2004, when there is pending a proceeding between the Rule 2004 applicant and party from whom discovery is sought, and discovery can be sought in such other proceeding.  *See In re Wash. Mut., Inc.*, 408 B.R. 45, 51 (Bankr. D. Del. 2009).  Even when the "pending proceeding" rule may be properly invoked, is not absolute.  Rule 2004 examinations may be authorized when the discovery sought is unrelated to the pending proceeding or where the safeguards and protections of the Federal Rules of Civil Procedure are not circumvented.  *Id.*  Since the only

discovery sought is document discovery, there are no safeguards or protections of the Federal

Rules of Civil Procedure being circumvented by this Motion.

57.     In the cross-border context, a request for discovery under Rule 2004 has been

likened to one under 28 U.S.C. § 1782.  *In re Hughes*, 281 B.R. 224, 230 (Bankr. S.D.N.Y.

2002) (§ 304 case).  28 U.S.C. § 1782 is entitled "Assistance to foreign tribunals and

international tribunals and to litigants before such tribunals."  Subsection (a) provides in relevant

part:

> The district court of the district in which a person resides or
> is found may order him to give his testimony or statement or to
> produce a document or other thing for use in a proceeding in a
> foreign or international tribunal, including criminal investigations
> conducted before formal accusation.  The order may be made
> pursuant to a letter rogatory issued, or request made, by a foreign
> tribunal or upon the application of any interested person and may
> direct that the testimony or statement be given, or the document or
> other thing be produced, before a person appointed by the court.
> . . .  The order may prescribe the practice or procedure of the
> foreign country or the international tribunal, for taking the
> testimony or statement or producing the document or other thing.
> To the extent that the order does not prescribe otherwise, the
> testimony or statement shall be taken, and the document or other
> thing produced, in accordance with the Federal Rules of Civil
> Procedure.

58.     As set forth above, Mr. Breslin is a litigant before Irish courts in two pending

proceedings against IBRC, the 2012 Proceedings and the 2017 Proceedings.  He is therefore an

"interested person" within the meaning of section 1782 of the Judicial Code.  *Intel Corp. v.*

*Advanced Micro Devices, Inc.*, 542 U.S. 241, 256-57 (2004).  The discovery sought herein would

be of use in such proceedings.

59.     To obtain discovery under section 1782 of the Judicial Code a litigant before a

foreign tribunal is not required to show the U.S. law would permit discovery in a domestic

litigation analogous to the foreign litigation, or that the evidence sought is discoverable in the

foreign litigation. *Intel*, 542 U.S. at 247, 263; *In re Chevron Corp.*, 633 F.3d 153, 161 (3d Cir.

2011). Instead, a court presented with a section 1782 application is required to consider two

factors in determining whether and to what extent to authorize such discovery. First, when the

person from whom discovery is sought is a participant in the foreign litigation, the court should

consider whether the foreign tribunal itself can direct the production of the evidence. Second,

the nature of the foreign tribunal and the character of the foreign litigation should be taken into

account, and the court should consider whether the section 1782 request conceals an attempt to

circumvent foreign proof-gathering restrictions, and the court should reject intrusive or

burdensome requests. *Intel*, 542 U.S. at 264-65; *Chevron*, 633 F.3d at 161-62.

60.    As set forth above, discovery in the 2012 Proceeding and the 2017 Proceedings

is currently unavailable. Moreover, the discovery sought is neither intrusive nor burdensome.

Consequently, the consideration of the *Intel* factors results in permitting Mr. Breslin to obtain the

discovery requested.

61.    Finally, considerations unique to chapter 15 support the proposed discovery. This

Court has granted relief to the Foreign Representatives, including authorizing the sales of assets

within the territorial jurisdiction of the United States, and, pursuant to section 1521 of the

Bankruptcy Code, entrusting the proceeds of such sales to the Foreign Representatives. *See*

*Order Entrusting Distribution of Assets to Foreign Representatives*, docket no. 602, May 8,

2017.

62.    Section 1522(a) of the Bankruptcy Code provides that this Court may grant or

may modify or terminate relief previously granted under section 1521 of the Bankruptcy Code

only if the interests of creditors are sufficiently protected. This provision promotes the concept

that "there should be a balance between relief that may be granted to the foreign representative

and the interests of the persons that may be affected by such relief." *Platinum Partners*, 2018 WL 1864931, at \*5 (quoting *In re Int'l Banking Corp. B.S.C.*), 439 B.R. 614, 626 (Bankr. S.D.N.Y. 2010)); *see* United Nations Commission on International Trade Law, Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency ¶ 196 (Rev. 2013). Chapter 15 should not be construed as a one-way street in which foreign representatives get what they ask for but are otherwise unaccountable to U.S. creditors. Section 1522(c) of the Bankruptcy Code provides that this Court may, at the request of an entity affected by the relief granted under section 1521 of the Bankruptcy Code, modify or terminate such relief. Mr. Breslin is a United States creditor whose interests will not be sufficiently protected if his claims against IBRC will not be heard on their merits because of a procedural estoppel that would not bar such claims in the United States.

63. As a result, Mr. Breslin has established good cause to obtain the documentary discovery sought under Bankruptcy Rule 2004.

### Certification Pursuant to Local Bankruptcy Rule 2004-1(b)

64. The undersigned Delaware counsel certifies that, prior to filing this Motion, counsel for Mr. Breslin sought to obtain the requested discovery without the intervention of this Court. On April 24, 2018, the undersigned sent an email to several of the attorneys who have appeared for the Foreign Representatives in this case, attaching a draft of this Motion so that the discovery requested could be viewed in proper context and requesting the production of the documents sought without the necessity of filing the Motion.

65. In addition to an initial telephone call between counsel for Mr. Breslin and counsel for the Foreign Representatives attempting to frame the issues and requests, two conference calls took place between counsel for Mr. Breslin and the Foreign Representatives on

May 8 and May 14, 2018 to discuss the requested discovery. During the conference call on May

14, 2018, counsel for the Foreign Representatives informed counsel for Mr. Breslin that the

Foreign Representatives would not agree to produce any documents. As a result, Mr. Breslin has

filed this Motion.

### **Delay of the Closing of the Case**

66.     In addition to the Rule 2004 discovery, Mr. Breslin requests that this Court delay

the closing of this chapter 15 case until all controversies with Mr. Breslin have been resolved.

This chapter 15 case provides a U.S. forum for Mr. Breslin in the event the Irish courts will not

hear his claims against IBRC on their merits. If the Irish courts refuse to hear his claims on their

merits, and this chapter 15 case is closed, Mr. Breslin will be left without a day in any court on

the merits, and will be unable to re-establish personal jurisdiction over the Foreign

Representatives in the United States.

67.     This Court has the power to delay the closing of the case, just as this Court has the

power to stay proceedings before it as incident to its power to control its own docket. *Clinton v.*

*Jones*, 520 U.S. 681, 706 (1997); *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *Bechtel Corp.*

*v. Local 215, Laborers' Int'l Union of N. Am.*, 544 F.2d 1207, 1215 (3d Cir. 1976); *Second Ave.*

*Holdings, LLC v. Latimer (In re Latimer)*, 489 B.R. 844, 856 (Bankr. N.D. Ala. 2013).

68.     For all the reasons set forth herein, including the balancing of rights between the Foreign Representatives and persons affected by the relief granted to them, *see Platinum Partners*, 2018 WL 1864931, at *5, it is respectfully submitted that the delay of the closing of this chapter 15 case as requested by Mr. Breslin should be granted.

### Notice

69.     Mr. Breslin proposes to give notice through the Court's CM/ECF system and by mail to (i) the Foreign Representatives in care of their counsel, (ii) all parties who have requested notice in this case, and (iii) the United States Trustee's office.  In light of the nature of the relief requested, Mr. Breslin submits that no other or further notice of this Motion is necessary or required.

### No Prior Request for Relief

70.     No prior request for the relief sought herein has been made to this or any other court.

### Conclusion

**WHEREFORE**, for the reasons set forth herein, Mr. Breslin respectfully requests that the Court, after notice and a hearing, grant him an order under pursuant to 11 U.S.C. §§ 105(a) and 1525(b) and Rule 2004 of the Federal Rules of Bankruptcy Procedure, directing Foreign Representatives to produce the documents requested herein, delaying the closing of the chapter

15 case until all controversies with him have been resolved, and grant him such other and further

relief as this Court deems just and proper.

Dated:   May 18, 2018

Respectfully submitted,

*Joseph H. Huston, Jr.*_____
Joseph H. Huston, Jr. (No. 4035)
STEVENS & LEE, P.C.
919 North Market Street, Suite 1300
Wilmington, Delaware 19801
Telephone:  (302) 425-3310
Email:  jhh@stevenslee.com

-and-

BECKER, GLYNN, MUFFLY, CHASSIN &
HOSINSKI LLP
Alec P. Ostrow
299 Park Avenue
New York, New York 10171
Telephone: (212) 888-3033
Email: aostrow@beckerglynn.com

*Attorneys for Michael Breslin*